# EXHIBIT A

E-FILED

## COMMONWEALTH OF MASSACHUSETTS

**WORCESTER, ss.**

**SUPERIOR COURT**
C.A. NO. 2185CV0310

CHRISTOPHER DUSTIN )
)
Plaintiff )
v. )
)
TRUSTEES OF THE COLLEGE OF )
THE HOLY CROSS, the )
COLLEGE OF THE HOLY CROSS and )
REV. PHILIP L. BOROUGHS, S.J. )
President of the College of the Holy Cross )
)
Defendants )

**FILED**

**JUN 0 3 2021**

ATTEST: _Del Molh_ CLERK

## COMPLAINT with JURY DEMAND

Christopher Dustin brings this action asserting claims under Title IX of the Education Amendments of 1972 and related state-law claims arising out of his employment as a tenured Philosophy Professor and the Dean of the Faculty at The College of the Holy Cross.[1]

## INTRODUCTION

1. This case arises out of the prolonged mishandling of sexual misconduct issues at Holy Cross College by its President, Rev. Philip Boroughs, the College's Title IX Office, and various other officials identified herein. The Title IX office, first established in December of 2015 - fourteen months after the College resolved a Title IX enforcement action instituted against Holy Cross by the Department of Education's Office of Civil Rights -

---

[1] While the plain language of Title IX ("no person shall, on the basis of sex, ... be subjected to discrimination ...") suggests that Title IX was intended to provide for the relief sought herein, Plaintiff is contemporaneously filing charges of employment discrimination with both the Equal Employment Opportunity Commission and the Massachusetts Commission Against Discrimination, and intends to amend this complaint to include related federal and state claims arising out of those filings once he receives permission to bring a private cause of action.

was so ineffective that it has since been disbanded and completely reformed.  It is now known as the Office of the Director of Title IX and Equal Opportunity ("the Office").

2.  At all times material to this action, the issues in the Office adversely impacted the handling of sexual misconduct complaints at the College, fostered unrest on campus in regard to sexual misconduct, and greatly undermined confidence within the Holy Cross community as to the College's level of commitment to fairness and transparency in sexual misconduct and Title IX matters.

3.  As a Sexual Misconduct Policy Review Committee formed by the College to review these issues at the time reported in its July 12, 2019 Memorandum to Father Boroughs:

> *Some members of the College community are skeptical about the College's motivations with respect to cases of sexual misconduct.  Some believe that the College would prefer that complaints not be made.  Some believe that the College's principal concerns in addressing cases of sexual misconduct are to avoid litigation and publicity.*
> COMPLAINT EXHIBIT A at Page Three, Section A (1), at ¶ 2.

4.  The unrest referenced in Paragraph Two and the skepticism referenced in Paragraph Three, above, became public in December of 2018, when student leaders delivered a demand letter signed by more than 500 students and staff to Father Boroughs listing demands in regard to the Title IX office and its handling of sexual misconduct matters (COMPLAINT EXHIBIT N).

5.  Two months later, in February of 2019, students staged a three-day sit-in outside the President's Office, leaving only after the President agreed to their demands.  This event was followed a little over a month later by a Faculty Assembly vote (on April 3, 2019) demanding changes in how the College handles Title IX matters.  The day after that vote, a Faculty Ad Hoc Committee demanded an independent investigation into sexual

misconduct at Holy Cross and how such matters are handled.  Local media covered these events extensively.

6.  Prompted to act and having made public commitments to do so in response to the campus-wide clamor, Father Boroughs and Holy Cross officials instituted a series of public actions against male faculty and staff, including the prosecution of Professor Dustin over a charge that was brought forth not by the alleged female victims but by two former male students – one of whom was pursuing his own claim against the College with the support of the other (as explained below) raising questions about alleged actions three decades earlier that the College had previously considered and dismissed.

7.  At the time Professor Dustin was notified of these charges, none of the alleged female victims ever complained to the College or agreed to participate in the subsequent investigation.  The College nonetheless proceeded in an orchestrated march to a predetermined outcome – Professor Dustin's termination - doing so in order to quell the clamor referenced in Paragraph Two, above.

8.  During this same time frame, the College (i) terminated the male coach of the women's basketball team; (ii) placed a male professor in the Philosophy Department on leave, after escorting him out of his office and off the campus in humiliating fashion; and, (iii) terminated a male professor in the Philosophy Department, effective two days before his long-announced retirement date, who had made the mistake of coming to Professor Dustin's defense and publicly complaining about the disparate and unfair treatment Professor Dustin received at the time it was occurring.

9.  In contrast, during this same time frame, the College took no action against the female complainants who publicly discussed and disparaged Professor Dustin in violation of the

3

College' sexual misconduct policy, nor against a female faculty member in the Philosophy Department who interfered in the investigation of Professor Dustin in violation of the College's sexual misconduct policy and then lied to the Dustin investigator when asked about her actions. This, despite Professor Dustin's request that this faculty member be investigated and disciplined for her interference and failure to tell the truth.

10. Finally, during this same time frame, the College investigated and exonerated the school's female Provost, Margaret Freije, for her handling of the very same set of allegations lodged against Dustin.  The claim against Provost Freije was that she was told about Professor Dustin's alleged actions by the student, but did not credit the complaints at the time, and therefore took no action.  While Provost Freije and Professor Dustin denied the merits of the exact same allegations, Freije, a female, was exonerated, while Dustin, a male, was terminated.

11. Professor Dustin was terminated even though he was found not responsible for the actions alleged in the complaint against him or for any actions constituting sexual harassment under the College's sexual misconduct policies; he was terminated for "not being truthful in an investigation" (COMPLAINT EXHIBIT F) because he denied the allegations in the Notice of Investigation.

12. Against this backdrop, and as a direct result of the foregoing actions,  the College President Father Boroughs, the Holy Cross Executive Team, its Title IX officials, and other Holy Cross officials breached the express provisions of Professor Dustin's contract with the College, deprived Professor Dustin of his contractual rights and his right of basic

fairness[2], and violated various provisions of Title IX of the Education Amendments of 1972, causing him to sustain extraordinary damage, as set forth below.

13.

## PARTIES

14. Christopher Dustin is an individual with a usual residence located in Thompson, Connecticut ("Professor Dustin"). At all times material hereto, Professor Dustin was employed in the Commonwealth of Massachusetts.

15. The Trustees of the College of the Holy Cross is a duly constituted Massachusetts body corporate pursuant to the provisions of Chapter 99 of the Acts of 1865. The corporation established and has since maintained a private, four-year, liberal arts college located in Worcester, Massachusetts known as the College of the Holy Cross (both the Trustees and the College are hereinafter referred to as "Holy Cross" or "the College").

16. At all times material to this action, "the College of the Holy Cross" was the nominal party to the employment contract with Professor Dustin. COMPLAINT EXHIBIT B. It is therefore averred that "the College of the Holy Cross" is a necessary party to this action as the employer of Professor Dustin, and the employer of persons named herein[3] who acted on behalf of the College as its agents and employees in regard to the actions set forth in this complaint.

---

[2] The recently-decided First Circuit opinion in *John Doe v. Trustees of Boston College*, 942 F.3d 527 (1st Cir. 2019) referenced two rulings from the Supreme Judicial Court of Massachusetts— *Schaer v. Brandeis University* and *Coveney v. President and Trustees of the College of the Holy Cross*—which confirmed that private colleges in Massachusetts are bound by the concepts of fundamental fairness and basic fairness when conducting disciplinary proceedings.

[3] Due to the nature of some of the allegations contained herein, pseudonyms and/or initials may sometimes be used to identify certain individuals.

17. Rev. Philip L. Boroughs, S.J. ("Father Boroughs") is, and at all times material to this action has been, President of Holy Cross. In that position he has served as chief executive of the College, charged with responsibility for overseeing all affairs of the institution. Father Boroughs maintains a residence and a place of business in Worcester, Massachusetts.

## FACTUAL ALLEGATIONS

### A. *Background Facts Regarding the Parties and their Contractual Relationship*

18. Professor Dustin served as Professor in the Department of Philosophy at Holy Cross for over three decades, from his original appointment in 1991 until terminated in September of 2020. He achieved tenure status on March 10, 1997. COMPLAINT EXHIBIT B.

19. While at the College, Professor Dustin served on and chaired numerous committees assembled to advance a variety of initiatives at Holy Cross; directed the First-Year Program; and served as chair of the Philosophy Department (twice). In short, Professor Dustin fully immersed himself in the activities of the College, both in and out of the classroom.

20. Professor Dustin received the Holy Cross Distinguished Teaching Award in 2004, an O'Leary Faculty Recognition Award in 2005, and achieved the capstone honor of appointment as the Dean of the Faculty of the College in February of 2017.

21. Upon achieving tenure status, the terms of Professor Dustin's tenure contract with Holy Cross specified that his teaching contract – previously a "year-to-year" agreement, "shall be renewed on the same or better terms and conditions unless either party shall give notification of the intention to terminate it according to the requirements for such

notification set down in the official Statutes of the Faculty ("the Statutes") …".
COMPLAINT EXHIBIT B.

22. At all times material to this action, Exhibit B was the sole and exclusive mechanism by which Holy Cross granted tenure to a member of its teaching faculty.

23. By virtue of the incorporation of the Statutes of the Faculty into the terms of Professor Dustin's tenure contract, the Statutes were part of the terms and conditions of his contract with the College.  In like manner, by virtue of the incorporation of the Sexual Misconduct Policy, the Policy was part of the terms and conditions of Professor Dustin's contract with the College.

24. The Statutes contain no provisions in regard to a <u>notification process</u> in the event the College sought to terminate a tenured faculty member.

25. The Statutes do however provide a basis, and a process, for the dismissal of a tenured faculty member at Chapter VII.  The Statutes limit dismissal of a tenured faculty member to three specific reasons: (i) serious neglect of academic duties, (ii) serious violation of the College's policies on scholarly misconduct or harassment, or (iii) for such public misconduct as disqualifies him or her from continued association with the College.
COMPLAINT EXHIBIT C at Par. A.

26. The second of the three bases is the only one applicable to Professor Dustin's termination, as the first and third do not apply (and were never alleged to apply) to any of the facts material to this action.

27. And as to that second basis, only harassment applies as there has never been an allegation of scholarly misconduct lodged against Professor Dustin at any time material to this action.

28. Professor Dustin's tenure contract with the College does not include a specific statement of policies on harassment.

29. In like manner, the Statutes of the Faculty do not include a specific statement of policies on harassment.

30. Finally, the Policy Index of the College's Policies and Procedures contains no statement or definition of "harassment;" the Index does not even so much as include the word.

   **B. Summary of Professor Dustin's termination under the College's Sexual Misconduct Policy**

31. At all times material to this action, Holy Cross acted by and through the following administrative agents: Provost Margaret Freije; Title IX Director/Coordinator Tracy Kennedy; Title IX Assistant Director/Coordinator Cheryl Rogers; Denielle Burl (who acted in various capacities including Risk and Compliance Officer, and Interim Title IX Coordinator); General Counsel Elizabeth Small; Professor Stephanie E. Yuhl and Professor Michael Cahill.

32. Each of the individuals named in the preceding paragraph acted in their official capacity with the College and under the direction of its President, Father Boroughs, at all times material to this action. The College is therefore legally responsible for the actions set forth herein.

33. Professor Dustin received two notices regarding the matter leading to his termination.

34. The first notice of investigation, dated March 1, 2019 ("First Notice"), referred to "concerns" raised by two former male students about Professor Dustin's conduct relating to various named and unnamed female students during the years 1994-1998. None of the females, the notice explained, either complained to the College or would agree to

participate in the investigation.  The College nonetheless instituted an investigation.

COMPLAINT EXHIBIT D

35. The second notice of investigation, dated June 19, 2019, related to conduct alleged to have

occurred during the 1995-96 academic year ("Second Notice").  The notice alleged that

the conduct constituted harassment, using the word harassment twice: the first time in

reference to "the College's Policy on Harassment"; the second, indicating that the actions

being investigated "could constitute prohibited sexual harassment as a sexual relationship

in which an inherent balance of power existed."  COMPLAINT EXHIBIT E.

36. The notice also explained that "a factfinder had been engaged to conduct a thorough and

impartial investigation."   The notice indicated the factfinder had been engaged prior to

February 1, 2019 - more than four months before the June 19, 2019 notification sent to

Professor Dustin. COMPLAINT EXHIBIT E.

37. The second notice, to the extent it provided any detail, explained that the investigation was

instigated by "multiple persons" (not the alleged student) and that the student who

graduated in the mid-90's and had previously declined to participate, now "agreed to

participate in the investigation."  COMPLAINT EXHIBIT E.

38. It is clear from the second notice that the alleged victim, identified as NB, was the same

party who had refused to file a complaint or participate three months earlier (see Par. 34,

above).  She only became involved in this investigation after being contacted by the

Investigator for the College and prompted to do so.

39. NB graduated more than two decades prior to being persuaded to participate in the

investigation.  She never complained while a student at the College, and for the two full

decades after her graduation that preceded the investigation.

40. Notwithstanding that (i) conduct not considered offensive at the time it occurred cannot be the basis to create, retroactively, a hostile environment claim, and (ii) the Sexual Misconduct Policy in effect at the time explicitly applied its protections only to "members of the College community," the College chose to initiate an investigation into this decades-old allegation.

41. Professor Dustin, relying on the reasonable expectation that he would be treated fairly, fully cooperated in the investigation process.

42. On Sunday, January 26, 2020, Professor Dustin received an email notifying him of the "outcome of the Determination Panel." COMPLAINT EXHBIT F.

43. The panel concluded that Professor Dustin, who steadfastly denied that the allegations of a sexual relationship were true, was "responsible for two violations of College policies: (1) Failure to report a romantic and/or sexual relationship ... and (2) Violation of the ... Duty of Honesty." COMPLAINT EXHIBIT F.

44. The panel also found that Professor Dustin was "not responsible for sexual harassment..." COMPLAINT EXHIBIT F.

45. Thus, Professor Dustin was found <u>not</u> responsible for the charge brought against him by the College, but was found responsible for "failure to report" - a charge that was not initiated by the College. As Professor Dustin had no prior notice of the failure to report charge, he was never given the opportunity to address it during the course of the investigation.   This is why the charge was vacated on appeal.  The other finding was in regard to a vaguely worded provision – the so-called "Duty of Honesty"— which by the express language contained in the Sexual Misconduct Policy should have resulted in

"separate disciplinary action" but here, formed the alleged basis to terminate a tenured professor.  COMPLAINT EXHIBIT F.

46. The Sunday evening email included a notice of four sanctions assigned as a result of the findings.  The first was that Professor Dustin "be dismissed for cause from your tenured faculty position at the College effective immediately."  COMPLAINT EXHIBIT F.

47. As the notice itself clearly stated, it is indisputable that Professor Dustin was tenured and could only be dismissed for the enumerated reasons set forth in Paragraph 25, above.  It is also indisputable that of those reasons, the only one applicable to his dismissal would be harassment.  Finally, it is indisputable that Professor Dustin was found "not responsible for sexual harassment."

48. Thus, when the College terminated Professor Dustin, it did not have cause or a lawful basis for doing so.

49. In terminating him as it did, Holy Cross violated its Contract with Professor Dustin, a tenured professor, who was entitled to a renewal of his contract upon being found "not responsible for sexual harassment."

50. Not only did Holy Cross officials violate the Contract - they completely ignored it.  The termination notice makes no reference to Professor Dustin's contractual rights as a tenured Professor.  It instead purports to follow the Holy Cross Sexual Misconduct Policy ("the Policy"), which likewise makes no reference to, or accounting for, the contractual rights of tenured professors facing discipline under the Policy.

51. The reason that Father Boroughs and Holy Cross officials acted as they did in violating Professor Dustin's contract rights, violating the College's Sexual Misconduct Policy and

11

applicable principles of Title IX and its associated regulations, all in the course of their

"investigation" of Professor Dustin, is, on information and belief, the following.

### C. *Relevant History of Title IX and Holy Cross*

52. Title IX of the Education Amendments of 1972 ("Title IX") is a federal civil rights law

    that prohibits discrimination on the basis of sex in federally-funded education programs

    and activities.

53. The Act provides, <u>inter alia,</u> that "[n]o person in the United States shall, on the basis of

    sex, be excluded from participation in, be denied benefits of, or be subjected to

    discrimination under any education program receiving Federal financial assistance . . . ."

    20 U.S.C. § 1681(a).

54. The provisions of the Act are, and at all times material to this action have been, enforced

    by the United States Department of Education's Office for Civil Rights ("OCR").

55. Title IX is also enforceable through an implied right of action affording an individual

    discriminated against due to his or her gender pecuniary damages and equitable relief.

56. On April 11, 2011, OCR issued its now infamous "Dear Colleague Letter," which

    instructed universities on how to investigate and resolve complaints of sexual misconduct

    under the Act ("Dear Colleague Letter" available at https://www2.ed.gov/about/offices/

    list/ocr/letters/colleague-201104.html). COMPLAINT EXHIBIT G.

57. Holy Cross and Father Boroughs were aware of the implications of Title IX compliance,

    having received the Dear Colleague Letter, and having been investigated for Title IX

    violations that resulted in the execution of an October 28, 2014 Resolution Agreement

    with OCR addressing discriminatory practices in the College's athletic department.

58. The agreement required the college to conduct an equity assessment of its male and female athletic programs, implement remedial measures where necessary, and called for ongoing monitoring by OCR to ensure compliance.

59. In resolving the 2014 OCR enforcement action against it, Holy Cross acknowledged that it is an institution to which the provisions of Title IX apply.

60. Those provisions continued to apply to Holy Cross at all times material to this action.

61. The year following the conclusion of the OCR investigation, Holy Cross established a Title IX Initiatives Office, including the position of Title IX coordinator.

62. This was consistent with the mandate of a 2011 OCR advisory which emphasized the importance of an impartial process in adjudicating sexual misconduct complaints, administered by an official (the Title IX coordinator) whose role was free of conflicts of interest. COMPLAINT EXHIBIT G at pp. 7, 9-12.

63. From its creation in December of 2015 until the time the office began its 2019 investigation of Professor Dustin, the Title IX Office had two directors. One stayed for eighteen months, the other, for less than a year. An assistant director stayed for nine months, leaving the office without a Title IX coordinator upon her departure, in violation of the provisions of the 2011 OCR advisory.

64. The assistant director's departure came nine days after her notification to Professor Dustin the College was initiating an investigation against him. COMPLAINT EXHIBIT E.

   D. *Tumult At Holy Cross Over Sexual Misconduct Issues*

65. As set forth more fully in the following paragraphs, over the course of the entire Dustin investigation, the College of the Holy Cross, its Title IX office, and its President, Father

Boroughs, experienced an unprecedented period of pressure, turmoil and tumult regarding campus sexual misconduct – all of which was the subject of extensive media coverage.

### 1. *James David Christie matter*

66. In early August of 2018, The Boston Globe reported on findings released by a Pennsylvania Grand Jury which had nothing to do with Holy Cross directly.  The focus was on the Catholic Church as an institution, and its mishandling of its sexual abuse crisis.

67. On August 17, 2018 Father Boroughs published a written message to the college community regarding the report, and the Grand Jury's findings of clerical sexual abuse that Father Boroughs characterized as "staggering."

68. One week later, The Boston Globe reported on the alleged mishandling of a sexual abuse claim regarding a Holy Cross faculty member, identified as James David Christie, and "allegations of sexual misconduct dating back decades."

69. On August 24, 2018, Father Boroughs published a written message to the college community following this coverage, which directly implicated the College, in which he described himself as "deeply saddened and disturbed" by the published allegations of misconduct.  COMPLAINT EXHIBIT H.

70. In his message, Father Boroughs pledged that the College would "immediately undertake a thorough review of culture, structure and/or procedures at the College to prevent misconduct. If issues are found, we will address them. Quickly." COMP. EXHIBIT H.

71. Christie resigned his position at Holy Cross in August, 2018.

72. Notwithstanding Christie's almost immediate resignation, a group of students and alumni, collectively referred to as "Holy Cross Organ Scholars" continued to press Father Boroughs to take further action, focusing on the payment of damages.

14

73. On November 30, 2018, the Organ Scholars publicly complained that the college had delayed and/or been non-responsive to their requests in a published story that publicly raised questions about Holy Cross and its Title IX measures. COMPLAINT EXHIBIT I.

74. On January 24, 2019 the Organ Scholars were again the subject of a published story that publicly raised questions about Holy Cross and its Title IX measures. This article included a public rebuke, claiming a proposal by Holy Cross "demonstrates a shocking lack of concern and care for the other Organ Scholars suffering as a result of Holy Cross's negligence." COMPLAINT EXHIBIT J. This article also included a public disclosure of matters involving Professor Dustin, referencing "multiple sources from within Holy Cross" (Id.) and conflating Dustin with the college organist, discussed more fully below.

   2. *Coach Gibbons matter*

75. Holy Cross is now embroiled in a lawsuit with its former, long-time Women's Basketball Coach, William Gibbons ("Coach Gibbons"). Coach Gibbons filed his complaint on September 12, 2019.

76. Coach Gibbons led the Holy Cross Women's Team for thirty-four years, during which time he served with distinction – team success on the court and 100% student graduation off the court were hallmarks of the program under his tutelage.

77. Coach Gibbons was suspended after a game on November 15, 2018 in which he and a female assistant coach had a disagreement over a substituted player. His contract was not renewed in the Spring of 2019, after the 2018-2019 season.

78. Coach Gibbons has alleged in his complaint that Holy Cross and Father Boroughs "were under intense media scrutiny for its failure to investigate, in a timely and adequate manner, claims of student sexual assaults by some faculty members" at the time of his suspension, and were "seeking to offset a deluge of negative publicity" in rushing to

"announce and implement its suspension of Coach Gibbons to create the public

impression that it diligently investigated internal complaints" COMPLAINT EXHIBIT K

at ¶¶ 99, 100.

79. Coach Gibbons has further alleged that "Holy Cross intentionally omitted in its press

release and public statements any description of the alleged "unprofessional" conduct on

which his suspension was based" thereby creating "a false impression to the public that

Coach Gibbons had been found guilty of inappropriate sexual behavior or improper

behavior toward a student."   COMPLAINT EXHIBIT K at ¶¶ 101, 105.

80. Coach Gibbons has further alleged that Holy Cross sought to address the public fallout

over the Christie complaints by inaccurately portraying his suspension, which had nothing

to do with sexual misconduct, in a manner that would create the appearance that Holy

Cross acted quickly to address such issues, as Father Boroughs had pledged to do in his

August 24, 2018 message to the community a mere three months prior to the game

incident referenced in Paragraph 77, above.

81. In like manner, Holy Cross sought to address the public fallout over the Christie

complaints and the subsequent campus unrest by inaccurately portraying the reason that it

placed Professor Dustin on leave and ultimately dismissed him, thereby creating the

appearance that Holy Cross was acting to address sexual misconduct issues quickly as

Father Boroughs had pledged to do in his August 24, 2018 message.

82. Both Coach Gibbons and Professor Dustin were treated in precisely the same manner, for

precisely the same reason, by Father Boroughs and Holy Cross when they were

effectively/actually terminated from their respective positions at the College.  Two males,

dispatched "Quickly" – as Father Boroughs had promised.  COMPLAINT EXHIBIT H.

### 3. *Additional issues*

#### (a) *Title IX Office issues*

83. In August of 2018, as Father Boroughs sought to respond to the growing campus-wide concerns about sexual misconduct and the Title IX office, he engaged the law firm Holland & Knight, to "conduct a review of the College's culture, structure and procedures to prevent future campus sexual misconduct." COMPLAINT EXHIBIT H.

84. When Holland & Knight completed its review, central among the issues addressed was the Holy Cross Title IX office itself. One recommendation contained in its final report was as basic as the College "identify[ing] ways to increase staffing appropriately." COMPLAINT EXHIBIT L at "Recommendations", Par. 1.

85. When Holland & Knight began its review, Holy Cross was already on to its second Title IX Director, Tracy Kennedy, who stayed less than a year.

86. As a direct result of the Office's staffing issues, the investigation of Professor Dustin was handled by Denielle Burl, the College's Chief Risk and Compliance Officer, who personally oversaw the termination process until its conclusion.

87. Ms. Burl confirmed her exclusive control over the matter in an August 1, 2020 email in which she advised Professor Dustin that she had been "shepherding this case for a year."

88. The assignment of the Dustin matter to the College's Chief Risk and Compliance Officer was in direct contravention of OCR guidelines, discussed in Paragraphs 55 and 61, above.

89. OCR's advisory in this regard specified that the Title IX office should have its own, independent director, who could fulfill the institution's obligations under Title IX without the conflicting concern over related liability issues an institution might face as a result of these matters. COMPLAINT EXHIBIT G at Page 7, Section B.

90. Not only did Holy Cross ignore this conflict concern, it installed its Chief Risk and Compliance Officer to run the Title IX office over the course of the Dustin Investigation in a perspicuous demonstration of the College's one priority: to manage the burgeoning campus turmoil.

91. As a result, and by design, the College provided none of the impartial processes that Professor Dustin should have been afforded, and instead committed the multiple violations referenced in this complaint.

   **(b) *Student and Faculty unrest***

92.  As alleged in Paragraph 69 above, Father Boroughs pledged to "immediately undertake" a review of sexual misconduct issues at the College.  Engaging Holland & Knight was the first step in that process.

93. That review, however, was not enough in the minds of the Organ Scholars, who voiced dissatisfaction over Father Boroughs and his lack of accessibility in a November 30, 2018 article published in the Worcester Telegram.  COMPLAINT EXHIBIT M.

94. Four days later, on December 4, 2018 a group of students went to Father Borough's office and delivered a document, electronically signed by over five hundred students and faculty, that included a list of demands "in an effort to improve current survivor-support infrastructure" for those victimized by sexual misconduct.  COMPLAINT EXHIBIT N.

95. Two weeks later, on December 17, 2018, Father Boroughs wrote to the campus community, advising that he was "directing members of the executive team to take responsibility for coordinating Title IX policies and processes…".

96. On January 24, 2019 Worcester Magazine published an article captioned "Sexual misconduct allegations raise concern at Holy Cross" ("the Article"), in which the Organ

Scholars publicly rebuked the College for its actions/inactions to date in the Christie

matter. The Article addressed not only Christie, who had resigned from the College, but

also directly and repeatedly referenced Professor Dustin. COMPLAINT EXHIBIT J.

97. The Article set off a firestorm on the Holy Cross campus followed by months of

unprecedented unrest targeting the College's handling of sexual misconduct issues.

98. The reference to Professor Dustin in the Article related to a matter that the College first

notified him about on May 30, 2017 involving a student who had graduated four days

earlier. The matter was resolved by the Holy Cross Title IX office in September of 2018,

and the student's appeal of the matter was resolved in December of 2018, with her appeal

being denied.

99. The article included new, different and far more incendiary allegations by the student,

which she never raised in her May 2017 complaint to the College. The student

complained about the results of the College's investigation and the fact that it extended

over twenty (20) months – neither of which Professor Dustin had anything to do with.

The student claimed the long investigation and its delays were due to a bias favoring

Professor Dustin, which caused student and faculty ire to be directed at him during the

unrest that followed. COMPLAINT EXHIBIT J.

100. The Article quoted "multiple sources from inside Holy Cross" who had alleged

Professor Dustin had been demoted over "sexual misconduct allegations," and concluded

with a defense of the Holy Cross Title IX office and yet another Boroughs pledge "to

improve policies and processes related to Title IX." COMPLAINT EXHIBIT J.

101. The Article directly linked Christie – who had resigned in a de facto admission of the

sexual misconduct allegations against him – to Professor Dustin, who had steadfastly

denied any type of misconduct and in fact had nothing at all to do with the Christie allegations.  COMPLAINT EXHIBIT J.

102.    In addition, and in reliance on "multiple sources from inside Holy Cross", the Article insinuated in its second paragraph that Professor Dustin had been removed as Dean of the Faculty "amid sexual misconduct allegations."  COMPLAINT EXHIBIT J.

103.    At the time the Article was published, Holy Cross (i) had completed its investigation of Professor Dustin, (ii) had reviewed the student statements quoted in the article, (iii) knew the allegations were false and/or misleading, (iv) possessed and had reviewed the emails referenced in the article, (v) knew what was depicted in the article was false and/or misleading, and (vi) was fully aware that allegations raised against Professor Dustin were in no way comparable to those raised against Christie, as the Article strongly implied.

104.    Multiple Holy Cross officials therefore knew that what was portrayed in the Article was false and misleading yet took no action to correct it.  This was precisely what they did in the Coach Gibbons matter, and further fostered campus anger over sexual misconduct issues at the College – with Father Boroughs and the College looking to direct that anger away from the administration by defaming these, and other, individuals.

105.    The College implicitly endorsed the Article by failing to take any steps to respond to the inaccurate information in it, once published.  This failure was compounded by the Article citing its reliance on "multiple sources from inside Holy Cross."  COMPLAINT EXHIBIT J.

106.    Moreover, all of the foregoing occurred even though the College had completed its investigation of the allegations in the Article and returned Professor Dustin to his role as a tenured member of the teaching faculty, as discussed more fully below.

107.   The actions, and the failure to act, by the College described above caused students and faculty to treat this false article as if it were accurate, causing irreparable damage to Professor Dustin and his reputation on campus.

108.   The day after the Article was published, the College's Speaker of the Faculty and an agent of the College, Miles Cahill – who never so much as reached out to Professor Dustin to hear what he might have to say about the allegations -- sent an email to each faculty member at the College declaring the alleged conduct (that had not occurred) to be "reprehensible" "manipulative" and "abusive." COMPLAINT EXHIBIT V.

109.   Professor Cahill's email was a clear violation of the school's Sexual Misconduct Policy.  Yet Holy Cross officials took no action to prevent, correct or condemn the email, or to investigate Professor Cahill under the policy for his clear violation.

110.   Professor Cahill's email had a materially adverse impact on Professor Dustin's rights under the Sexual Misconduct Policy as Cahill effectively poisoned the pool of faculty members who could participate in the process of resolving the Dustin Investigation – one of the underlying reasons why conduct such as Cahill's was expressly prohibited by the policy.

111.   The next day, Prof. Stephanie Yuhl, the  Director of the Montserrat program and an agent of the College, sent an email to every faculty  member in the program expressing "anger" and "outrage" that Professor Dustin had been allowed to continue  teaching, despite acknowledging her ignorance of the allegations apart from what was  published in the Article and her complete ignorance of the as-yet-unspecified "new allegations." COMPLAINT EXHIBIT W.

112.   She wrote that students and faculty must feel "deeply upset" and even  made to feel "unsafe" by the alleged conduct, reinforcing the unjustified impression that Professor Dustin was guilty of sexual "assaults."  She further advised she had "been in touch" with "several faculty" and discussed the Article.  COMPLAINT EXHIBIT W.

113.   Professor Yuhl's conduct was a clear violation of the school's Sexual Misconduct Policy.  Yet Holy Cross officials took no action to prevent, correct or condemn the email, or to investigate Professor Yuhl under the policy for her clear violation.

114.   Professor Yuhl's actions had a materially adverse impact on Professor Dustin's rights under the Sexual Misconduct Policy as Yuhl effectively poisoned the pool of faculty members who could participate in the process of resolving the Dustin Investigation (again, one of the reasons why the Policy expressly prohibited this type of conduct).

**(c) *Father Boroughs and Holy Cross respond to Student and Faculty Unrest***

115.   The mounting unrest prompted Father Boroughs and Holy Cross officials to embark on a campaign against Professor Dustin, Coach Gibbons, and other male faculty members in an orchestrated attempt to offset negative publicity regarding sexual misconduct issues at Holy Cross by appearing to take strong and quick action against male malefactors.

116.   On January 30, 2019 Fr. Boroughs issued an "Update to the Holy Cross Campus Community" that revealed publicly to the entire Holy Cross community that Professor Dustin had been investigated and "found responsible and sanctioned for violating our policy."  He also publicly revealed that new allegations had prompted the College to place Professor Dustin on administrative leave, and that an external investigator would conduct an investigation.  COMPLAINT EXHIBIT O, Page One.

117.   Incredibly, the Title IX Office knew about this statement prior to its publication.  It

implicitly endorsed/sanctioned the statement in an extremely revealing email from the Assistant Director of the Title IX Office to Professor Dustin, sent as a "heads up" contemporaneously with the release of the Boroughs' statement. The email states that "concerns that have developed since the article in the Worcester Magazine" and "recent allegations regarding sexual misconduct" had prompted Father Boroughs campus-wide "update." COMPLAINT EXHIBIT O, Page Two.

118.   What Father Boroughs revealed publicly in this statement had never previously been disclosed, consistent with the provisions of the Sexual Misconduct Policy in effect at the time, at Section VII(B)(6), which provided that "information [regarding disciplinary outcomes] should remain confidential except in situations in which disclosure is necessary to protect the safety of the community." COMP. EXHIBIT Q at Page 28.

119.   Father Boroughs statement (i) violated the confidentiality provision of the Sexual Misconduct Policy, (ii) was a knowing violation made in furtherance of his campaign, to quell the clamor on campus, and (iii) was made with the intention of discrediting Professor Dustin as part of Father Boroughs and Holy Cross officials' plan to address the mounting public pressure "Quickly." COMPLAINT EXHIBIT H.

120.   The statement violated Professor Dustin's rights to basic fairness.[4]

121.   The statement's highly inflammatory  language, condemning Professor Dustin for

---

[4] As explained in Par. 246, below, Massachusetts requires school disciplinary hearings to be conducted with basic fairness. *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 725 (1st Cir. 1983) (citing *Coveney v. President & Trs. of Holy Cross Coll.*, 388 Mass. 16, 19 (1983)); *Schaer v. Brandeis Univ.*, 432 Mass. 474, 481(Mass). While the hearing process had not yet begun, this announcement was clearly directed to the audience of adjudicators (fellow tenured factulty members) which Father Boroughs knew would make it impossible for Professor Dustin to be treated fairly when the investigation results were presented.

having "betrayed [the College's] core mission" and for having  committed a "violation of

the sacred trust between a student and faculty member"  ( COMPLAINT EXHIBIT O,

Page One) was completely contrary to the facts adduced over the course of the College's

own investigation into the matter that had concluded months earlier with Professor

Dustin being returned to his teaching duties.   Father Boroughs was fully aware of these

facts at the time he issued his statement.

122.   The next day the College summarily suspended Coach Gibbons – denying him a right

to appeal, turning off his Holy Cross email account and ordering him off campus

immediately.  Again, quick action, as promised by Father Boroughs the previous August.

123.   As of February 1, 2019, Father Boroughs and Holy Cross were delivering the very sort

of quick action promised the previous August.

124.   The statements by Boroughs, Cahill and Yuhl, and the actions by the College

suspending Professor Dustin and Coach Gibbons were reported extensively and

repeatedly in the media .

125.   Further student action followed soon after.

126.   Hundreds of Holy Cross students marched into Fenwick Hall on February 4, 2019 and

launched a sit-in outside of Father Boroughs' office, demanding that Professor Dustin be

permanently removed from the faculty and that his Distinguished Teaching Award be

revoked (among other demands)[5] and that the College launch an independent, third-party

audit of the College's Title IX office and policies.

---

[5] It is important here to note that when Professor Dustin was ultimately found responsible only for violating the College's Duty of Honesty because he denied a decades-old allegation brought against him, his punishment was precisely what the students demanded in their list of demands presented at the sit-in.

127.   Days after this protest ended, on February 8, 2019, yet another male faculty member,

tenured philosophy professor John Manoussakis, was escorted from his office without

notice, brought to the College's Human Resources Office and summarily placed on the

same leave Professor Dustin had faced just ten days earlier.  Father Boroughs and the

College again delivering on the promise of quick action.

128.   College officials continued into the next week with their public vilification of Professor

Dustin.  The College Provost, Margaret Freije, a member of Father Boroughs' Executive

Team who was intimately familiar with all of the facts regarding Professor Dustin,

emailed all College faculty on February 11, 2019 directly referring to Professor Dustin and

stating, inter alia, "We all are and should be angry that any student would be harassed by a

faculty member."  She wrote this, notwithstanding the fact that the student, NB, had told

her directly that she did not feel harassed by Professor Dustin at any time while she was at

the College (or for decades after).  COMPLAINT EXHIBIT P.

129.   Provost Freije further stated that she would take steps to create a policy for the

rescinding of  faculty teaching awards (as demanded at the student sit-in), initiate a review

of interim measures and sanctions, and offer counselling to Professor Dustin's former

students (implying that they had suffered harm).

130.  Provost Freije's decision to send this email was particularly galling, damaging and

demonstrative of the College's complete disregard for Professor Dustin's right to basic

fairness in regard to the Notice of Investigation (of which he had been informed, but had

still not seen) for the following reasons:

(a) Provost Freije was fully aware of the facts concerning the prior investigation.  She

played a role in determining the sanction in that matter and it was she who had

explicitly told Professor Dustin that he was  permitted to continue teaching because it

had been determined that he was not a threat to students.

(b) When that investigation concluded, Professor Dustin – then the Dean of the Faculty

and working on a daily basis with Provost Freije – advised her that he wanted to

appeal the outcome.  He was troubled that he was found responsible, given that he

had harassed no one, and that in at least one of the cases, the student complaining was

upset over a grade – not any harassing conduct.

(c) When he discussed this with Provost Freije, she advised him not to appeal, as the

students had graduated and moved on, and if he were to appeal, "it would keep the

story alive."  Provost Freije, who was familiar with the complaints and acknowledged

Professor Dustin's concerns over how the outcome might be perceived, expressed

none of the concerns displayed in her nstruction to all faculty that they "should be

angry" with him, which became her new position after the Article.

(d) Finally, Provost Freije had been aware since May of 2017 of the "new" allegations

Father Boroughs referenced in his update.  She dismissed them at that time after

consulting with the Title IX Director and the college's General Counsel.   Provost

Freije knew this, and therefore knew that her public statements about Professor

Dustin, issued at the start of the investigation, were highly prejudicial.  Yet she made

them – all in furtherance of the College's attempt to focus the furor of students and

faculty on Dustin (and Gibbons, and Manoussakis), and away from Father Boroughs

and the College's administrative officials who had failed in dealing with sexual

misconduct issues at Holy Cross.

131.    If Provost Freije had taken steps in February of 2019 to share the truth with the College community at the time, rather than inflame false perceptions, the College would have honestly confronted the issues it faced, and curtailed prejudicial assumptions against Professor Dustin that effectively denied him of any hope of fair treatment from any member of the Holy Cross community who had been exposed to these official statements either directly or through repeated references in the media

132.    In addition to the foregoing, Father Boroughs' statement compounded this damage as it disclosed a new investigation without providing any specifics, doing so in relation to a matter about which the Title IX Office had yet to provide Professor Dustin with any specific information. Moreover, the statement reinforced the highly prejudicial and inaccurate presumption that Professor Dustin had committed abusive acts like those that caused Christie to promptly resign over without protest.

133.    The unfair prejudice to Professor Dustin is further demonstrated by the provision in the Sexual Misconduct Policy which called for his case to be adjudicated by a Determination Panel to ultimately "determine responsibility once an investigation is concluded." (COMPLAINT EXHIBIT Q at p. 25, Pars (c) and (d)).  The Panel, under the provisions of the Policy, is to consist of "College community members." (Id.)

134.    Thus, the panel was to be selected from the very community to whom Boroughs, Freije, Cahill and Yuhl had spoken loudly and clearly.   This violated his right to basic fairness in relation to the investigation of these charges.

135.    Concurrent with the February 4 sit-in referenced in Paragraph 122, above, a group of students posted flyers in Stein Hall (COMPLAINT EXHIBIT R), including a photograph of Dustin that labelled him a "monster," demanded that he be removed from the faculty

and that his teaching award be revoked – the precise penalty levied at the conclusion of the investigation.

136.   These flyers were posted at the same time the sit-in students listed these same two demands: removal and rescission.  This was the penalty levied, even as the College investigation found Professor Dustin not responsible for what the students mistakenly believed to be true.

137.   Notwithstanding the fact that the actions of these students were in clear violation of the school's Sexual Misconduct Policy and other clearly established policies regarding such postings, Holy Cross officials took no action to prevent or condemn what had occurred or to investigate these policy violations– choosing instead to keep their focus on Professor Dustin, appeasing outraged and misinformed students and faculty, in furtherance of their efforts at quelling the campus-wide tumult.

   **c.  *Provost Freije Investigation***

138.   In a twist that has significant relevance to this case, the College convened an investigation in 2019 of Provost Freije in regard to her handling of the 2017 Dustin matter referenced in Paragraph 128(d), above.

139.   The entire process in that investigation concluded in less than three months.

140.   In contrast, the 2019 investigation of Professor Dustin lasted over eighteen months – beginning in February of 2019 and not concluding until September 4, 2020.

141.   Provost Freije was cleared of any wrongdoing.  The College credited her explanation for dismissing in 2017 the very allegations that Professor Dustin denied three years later.  Yet the College terminated Dustin while disregarding his rights and destroying his reputation in the same manner as occurred with Coach Gibbons and Professor

Manoussakis. These three men were all investigated at the same time over similar issues (relating to harassment). Father Boroughs and Holy Cross pursued these men in furtherance of a strategy to punish male faculty members in order to quell the campus tumult that began with the Christie publicity in 2018 - now exacerbated by the publication of the Article and the extensive media coverage spawned by it.

### 4.   *The investigation and termination under the Sexual Misconduct Policy*

142.   On January 30, 2019, Holy Cross Title IX Coordinator, Cheryl Rogers, telephoned Professor Dustin to inform him that new allegations had been received by the College. Rogers offered few specifics, other than to inform Professor Dustin that he was being placed on administrative leave, pending an investigation.

143.   Professor Dustin later learned that the new allegations consisted mainly of the hearsay reports of two male students about events from decades past, which the involved female students neither complained about nor chose to pursue at that time. One of the two reporting parties, Sean Redrow, was pursuing his own claims against the College over Christie – and was vocal about the College's shortcomings in regard to the Christie matter (as explained in the Article).

144.   Upon receipt of this verbal notice, and prior to receipt of any formal notification, the College ordered Professor Dustin to abide by certain interim measures. They included (i) a prohibition against any contact, direct or indirect, with any individuals (faculty, students, or staff members) currently or formerly associated with the College, (ii) the immediate disabling of Professor Dustin's Holy Cross email account without any prior notice, (iii) denial of access to campus, and (iv) denial of access to his office and the personal belongings contained therein.

145.   Interim measures, under the Policy, are intended only as an "initial step" to "address the safety and health needs of the Complaining Party and the College community"

146.   Here, it is clear the interim measures were implemented solely to respond to the mounting clamor on campus over the Article and the perception that Holy Cross had mishandled the prior Dustin investigation.  The former students involved in these allegations had all graduated from the College, with all but one declining to file any complaint or participate in any investigation.  None of the parties, therefore, presented any safety concerns for the College to address at the time the interim measures were ordered.

147.   Moreover, the College had determined two months earlier (on December 5, 2018) that Professor Dustin was not a danger to students and returned him to the classroom, under restrictions that Dustin objected to, yet accepted.

148.   Finally, the interim measures were implemented a mere two weeks after Professor Dustin had been granted a sabbatical leave -  which had been reviewed and granted by the Provost, the Dean of the Faculty and the Acting Dean of the Faculty .  COMPLAINT EXHIBIT S.

149.   The only occurrence between the events described in the preceding two paragraphs and the January 30, 2019 notification from Title IX Coordinator Cheryl Rogers that Professor Dustin was to be investigated and subjected to completely unwarranted and unnecessary interim measures was the January 24, 2019 Article and the burgeoning firestorm that followed – as conceded by Rogers in her notification.  COMPLAINT EXHIBIT O at Page Two.

150.    The interim measures rendered Professor Dustin's sabbatical nugatory, as he was

denied access to campus resources such as his office and the library, and denied the

ability to consult with his colleagues while conducting his work.

151.    The complete disruption of Professor Dustin's sabbatical caused an irreparable

interruption in his work – in particular the completion of a book which was to be the

focus of his sabbatical and the capstone of his academic career.

152.    In addition, the interim measures were intended to, and did in fact, impede Professor

Dustin's ability to locate and present evidence and did in fact interfere with his ability

both to defend himself and to maintain his professional activities pending the investigative

outcome, violating his right to basic fairness.

153.    This action by the Title IX office was then followed by Father Boroughs' statement

about the Article to the Holy Cross community.  The statement, referenced above, was

intended to, and did in fact, influence the entire community of potential Determination Panel

and Appeal Panel members who—under the terms of the Sexual Misconduct Policy – would

consist in whole or in part of fellow faculty members, the very group responsible for the

ultimate determination of Professor Dustin's culpability once the investigation concluded.

154.    This public disclosure of a new investigation, in violation of both the Title IX

provisions and the Sexual Misconduct Policy then in effect, together with the imposition

and disclosure of interim measures that were completely unnecessary and inconsistent

with the Policy, did precisely what was intended — completely eliminate the possibility

that Professor Dustin would receive a fair process in relation to this new investigation.

155.    When Professor Dustin finally did receive a First Notice (discussed in Paragraph 34,

above) the document revealed the completely pretextual nature of the College's

investigation of "new allegations." It explained that the allegations related to activities

alleged to have occurred in the 1990s, that all but one of the students alleged to be

involved neither complained nor would participate, and also referenced "Reports to

Margaret Freije" (COMPLAINT EXHIBIT D at Page Two) that she and other senior

College officials had addressed and dismissed three years before.

156.   None of the students identified in the First Notice were "members of the College

community" as that term was used in the Sexual Misconduct Policy, and the Title IX

Office therefore had no basis to open an investigation. All were graduates of the

college; none were on staff or otherwise affiliated with the operations at the College.

157.   The investigation nonetheless proceeded and Professor Dustin fully cooperated.

158.   Professor Dustin received a Second Notice regarding the investigation that purported

to notify of "additional allegations." COMPLAINT EXHIBIT E. The Second Notice

did little more than explain that NB, who had refused to participate and/or complain as

of the March 1 notice, had now "agreed to participate."

159.   Professor Dustin later learned that NB agreed to cooperate only after the Investigator

sent her a June 6 email urging her to do so. The fact that the Investigator pointedly

*asked* Ms. Burns to participate after she declined to do so was tantamount to pressuring

her, since the Investigator was at the time an authority figure representing the College.

160.   That the Investigator did more than just advise NB of the option to participate was,

moreover, a violation of the College's procedures. When the Investigator contacted NB,

she was neither a complaining party nor a reporting party. She had made known to the

Title IX office that she did not wish to participate. Yet the Investigator ignored these

facts and disclosed information derived during the investigation to NB, including the

Investigator's misrepresentation of statements Professor Dustin made to the Investigator during what should have been a confidential interview.

161. The actions by the Investigator were in direct violation of the Policy proscription against sharing confidential investigatory information with a non-party.

162. The June 6 email also included a proviso that the Investigator would maintain NB's privacy. The irony of this statement – a promise made in the same instrument in which the Investigator failed to afford that same confidentiality to Professor Dustin – further demonstrates the bias of the Investigator. It is further notable in light of the College's complete disregard for Professor Dustin's privacy at the inception of the investigation.

163. The actions set forth in the preceding paragraphs reveal that the Investigator was biased, was not fair to Professor Dustin, and did not conduct a reliable and impartial investigation.

164. One further example of the Investigator's bias is found in his pursuit of NB. The Investigator wrote in his June 6 email to NB that Professor Dustin denied having a "personal" relationship with her, which was completely inaccurate. Professor Dustin denied having a sexual relationship – which was the charge in the First Notice, in the Second Notice, and what Professor Dustin was asked about and denied in his interview.

165. The Investigator knew that mischaracterizing what Dustin said would be perturbing to NB, with whom Professor Dustin always acknowledged having a well-known and public (at the time) personal (mentoring) relationship. The mischaracterization achieved the desired result as NB thereafter agreed to participate, due to her mistaken belief that Professor Dustin was not being truthful.

166.    Moreover, this sort of mischaracterization was found throughout the investigatory

report, resulting in the "Duty of Honesty" issue which – ultimately – was all that was

left despite the efforts by Father Boroughs and his Executive Team to villainize Dustin.

167.    Finally, the Second Notice contained another foreboding, retaliatory and intimidating

message to Professor Dustin, that further reveals that Holy Cross had no intention of

conducting a reliable and impartial investigation.

168.    The Second Notice – dated less than two weeks after the June 6 email from the

Investigator to NB encouraging her to participate – included specific allegations made by

NB which were seen by Dustin for the first time when he received the Notice.  Holy Cross

never gave him the opportunity to review and respond before admonishing him, in the

Notice's fifth paragraph: "the College will [now] also review the allegation of whether

you have knowingly made a false statement."  COMPLAINT EXHIBIT E at Par. Five.

169.    Although this was the first time Professor Dustin was made aware of what NB was

alleging, Holy Cross used the same notice to charge him with making false statements

about an allegation the College had never previously shared with him.

170.    The inclusion of this new charge in the Notice reveals two major issues with the

investigation.

171.    First, it was only the investigator who could have made the allegation that Professor

Dustin was "knowingly making a false statement" as Professor Dustin was not speaking to

any other College official after March 1.  And Dustin only answered questions asked by

the Investigator, who had yet to speak to NB on the one occasion he interviewed Professor

Dustin prior to the June 19 Second Notice.  Lacking any other justification for this

additional allegation, its inclusion could only be explained by the investigator's bias in

crediting the female complainant's word above the male respondent's after the investigator spoke with NB between June 6 and June 19 -during which time he never spoke further with Professor Dustin.

172.   Second, the foregoing clearly demonstrates that the investigator and the Title IX office were in communication and coordinating efforts at this early point in an investigation which had barely begun and was to continue for three more months.  This was an egregious violation of the provisions of the Policy and Title IX which mandate a fair and impartial investigation.

173.   Moreover, the inclusion of this language in the Second Notice was clearly designed to intimidate, threaten and coerce Professor Dustin relative to his participation in the Investigation (simply because he was defending himself) in direct violation of the Prohibition Against Retaliation – an excerpt of which was included by Ms. Rogers on the second page of the same notice.  COMPLAINT EXHIBIT E at Page Two.

174.   The investigation proceeded to a conclusion, but not without further irregularities.

175.   The Investigator submitted his report in September.  Under the Policy, the parties had the opportunity to review and respond to the report, which Professor Dustin did.  The Policy provides that "[a]fter reviewing the submissions …the Investigator may determine that either additional investigation is required or no further investigation is needed.  If further investigation is conducted, the Investigator will include any additional relevant information in the Investigative Report."  COMPLAINT EXHIBIT  Q  at Page 25 (Policy Section VII(B)(4(b).

176.   Here, however, the policy was not followed.  Instead, the Investigator was allowed to prepare and submit a fully revised report, responding to Professor Dustin's comments to

his initial report in a fully revised advocacy piece - yet another stunning example of how

Holy Cross failed to promptly and equitably conduct a reliable and impartial investigation.

177.   The revised report was substantially different from the one initially prepared. It did not

merely provide additional information and testimony; it omitted information and

testimony that was included in the initial report. It also excluded statements by the

Investigator that Professor Dustin identified and complained about, which were strongly

indicative of bias and procedural impropriety which the revised report now effectively

concealed form the Determination Panel. This was a further violation of Professor

Dustin's rights under the Policy, among others that persisted throughout the investigation.

It resulted in a Determination Panel review of a completely sanitized report that

effectively stripped the Panel of its role.

178.   The revised report was finally made available to Professor Dustin, after the Investigator

spent three months re-writing it, mid-day on December 23, 2019.  Two days before the

Holy Cross community would be celebrating Christmas, one of the most recognized days

of the Christian liturgical year and a National Holiday, the College, through Denielle Burl,

its  Chief Risk and Compliance Officer that a new-found sense of urgency required

Professor Dustin to review the report (presumably with his attorney) and submit his

comments prior to January 3, 2020.  This absolutely outrageous deadline was required to

"meet our obligation to provide a *timely* investigation," – a concern Ms. Burl never shared

with the Investigator.  COMPLAINT EXHIBIT T at Page One.

179.   Acknowledging "that the timing of this report is challenging" she nonetheless advised

that "I am moving forward on the investigation during the holiday break." Id.

180.   Ms. Burl was giving Professor Dustin ten days during a known holiday period (Christmas, New Year's Day and New Year's Eve, along with the intervening weekend) for Professor Dustin to schedule his lawyers and appear at the Bowditch and Dewey law offices, where the report was to be made available, as the report – per the Policy - would not be provided to Dustin directly.  This was little more than a continuation of the College's pattern of limiting and coercing Professor Dustin as he sought to participate in good faith.

181.   Further evidence of this fact is that Ms. Burl arbitrarily extended the deadline twice, finally settling on January 12, 2020.  The deadline, and the College's purported focus on providing a timely investigation were purely pretextual, and further acts which make clear that Holy Cross had no intention of conducting a reliable and impartial investigation.  The Investigator took seven months to submit his report, and three more to conduct a complete rewrite.  Professor Dustin had less than three weeks, much of which included National/religious holidays.

182.   Notwithstanding what had occurred, Professor Dustin submitted a 27-page response to the report.  Two weeks later, without any explanation, Ms. Burl notified Professor Dustin that the panel found him responsible of a charge that had never been previously disclosed to him, and a violation of an "Additional Matter" procedural in nature.

183.   The notice further stated Professor Dustin was to be sanctioned precisely as the sit-in students had demanded – he was terminated and his honors that he earned and treasured professionally were revoked.  COMPLAINT EXHIBIT F.

184.   The march to a predetermined outcome had reached its first finish line.  Following the procedure under the Policy and acting in good faith with the hope and expectation that the Policy would be followed at its next phase, Professor Dustin filed his appeal.

185.   The process in effect at the time under the Holy Cross Sexual Misconduct Policy required that Professor Dustin's appeal be referred to an Appeal Panel, consisting of tenured members of the Committee on Faculty Affairs, selected by the Chair of the Committee on Faculty Affairs and the Title IX Coordinator.

186.   Instead, Holy Cross yet again disregarded its own clear process and Professor Dustin's appeal followed a different course.  In a February 17, 2020 email, the College's Chief Risk and Compliance Officer Denielle Burl, while purporting to "provide information on the appeal process" did little more than advise that she was implementing an alternative process for Professor Dustin's case by not convening an Appeal Panel from among members of the college community (who would know Dustin), and instead appointing a Title IX attorney Ms. Burl had selected from California, Natasha Baker.

187.   Ms. Burl's involvement in the process was in violation of Title IX guidelines that mandated the appointment of a full-time Title IX coordinator whose role would be free of conflicts with the liability concerns of the College – concerns which were at the very core of Ms. Burl's role with the College.

188.   Ms. Burl asserted in her email that Attorney Baker had no prior ties to Holy Cross, "this matter, or (to my knowledge) any College employee."  However, Ms. Burl provided no further details about Attorney Baker, nor disclosed the fact that Attorney Baker's practice focused on advising/representing higher education employers.  Attorney Baker's own

conflict disclosure was never referenced or shared with Professor Dustin at the time Holy

Cross made this choice to deviate from its own procedures.

189.   Ms. Burl explained that the reason she substituted this Higher Ed/Employment lawyer

for the Appeal Panel (of Holy Cross Faculty members) was that she had anticipated an

objection to process from Professor Dustin.  While Professor Dustin did raise the issue

discussed in Paragraphs 107, 111, and 126-130, above, the selection of a single attorney

who was a practitioner in the Title IX field (on the employer side) was certainly not what

Professor Dustin intended to invite as part of a fair process, nor an acceptable deviation

from the process.  Irrespectively, Ms. Burl did not solicit Professor Dustin's input, and

made clear this was her decision that could not be challenged.

190.   Professor Dustin nonetheless participated in good faith in this alternative process,

submitting a written appeal to Attorney Baker and notifying Ms. Burl he would cooperate

notwithstanding his concerns about her actions.

191.   Four months later, Ms. Burl delivered an email on Friday, July 24, 2020 to Professor

Dustin notifying him of Attorney Baker's conclusions.  COMPLAINT EXHIBIT U.

192.   Attorney Baker concluded that Holy Cross committed a procedural error during its

seven-month investigation in that its notice of charges was deficient, concluding that the

College therefore had to vacate the finding of failure to report a romantic or sexual

relationship.  Attorney Baker otherwise denied Professor Dustin's appeal.

193.   In her July 24 email, Ms. Burl further advised that "Ms. Baker determined that the

sanction of dismissal to be appropriate" (sic)  with no explanation of the basis for her

determination.  COMPLAINT EXHIBIT U

194.   The email further provided that, notwithstanding the Baker reversal of the failure to report charge, Acting Dean Loren Cass, following an alleged "de novo review of the matter ...,"  nonetheless imposed the exact same sanctions.   COMPLAINT EXHIBIT U.

195.   Where, as here, the Dean of the College (or, in this case, the acting Dean of the College) recommended a sanction of dismissal of a tenured faculty member, the Policy clearly provided that the recommendation be communicated to the President of the College (Father Boroughs) and referred to the Executive Committee of the Board of Trustees, of which the President is a part, to impose a sanction in light of the evidence.

196.   This did not occur.  Instead, Ms. Burl again decided not to follow the established process, but instead to appoint a "special committee" of her own choosing to determine the final sanction. Ms. Burl claimed that she was deviating from the Policy in anticipation of Professor Dustin's concerns when in fact, Professor Dustin objected strongly to this procedure when she informed him of the change.  Professor Dustin demanded that, in a case of this gravity, the President and Executive Committee must execute their statutory responsibilities in fairness to him, believing that those ultimately entrusted with ensuring that the College act with integrity and in good faith should be the ones who ultimately judged his case and determine the sanction. This objection was ignored.

197. Ms. Burl was clearly not acting with any regard to the College's Title IX obligations or in the interests of fairness to Professor Dustin, but instead was merely protecting the College and Father Boroughs from the faculty and student unrest.  While perhaps signing off as a Title IX agent in all of the foregoing acts, she at all times continued to act as the College's Risk Manager, putting the College's interests ahead of the fair and impartial investigation that the Title IX office was required to conduct.

198. Following the referral referenced in Paragraph 193, above, Professor Dustin received a notification on September 4, 2020 that he was dismissed for cause from his tenured faculty position – with no further specifics beyond enumerated sanctions.

### 5. *Professor Dustin's Damages*

199. The actions by Father Boroughs, Holy Cross officials and the College were taken against Professor Dustin on the basis of his sex through a discriminatory, gender-biased investigation initiated and carried out in a climate of media pressure and student/ faculty unrest arising out of the College's failure to properly meet its obligations under Title IX in regard to sexual misconduct on the campus. This discrimination has caused Professor Dustin to lose his teaching career and his professional reputation thereby depriving him of the benefits of that career and profession, in violation of the provisions of Title IX, all as set forth more fully below.

200. As a direct and proximate result of the foregoing, Professor Dustin has suffered and will continue to suffer significant damages, including, but not limited to emotional distress, loss of career opportunities related to and arising from his professional education, training and experience achieved over his lifetime devotion to philosophy and career at Holy Cross, loss of a sabbatical and the related professional research and writing opportunity which he had earned and been granted and was about to begin – along with all damages related thereto, economic and non-economic injuries including faculty benefits and privileges, expectation damages arising out of the loss of his research and writing opportunity, and other direct and consequential damages.

201. As a direct and proximate result of the actions of Father Boroughs, individually and as President of the College of the Holy Cross, Professor Dustin has suffered direct and

41

consequential damages arising out of the breach by Holy Cross of the tenure contract between the parties, including but not limited to loss of present income and related contract benefits including faculty benefits and privileges, loss of future income and related contract benefits and other related contract damages, including expectation damages arising out his research.

202.   As a direct and proximate result of the actions of Father Boroughs, individually and as President of the College of the Holy Cross, Professor Dustin suffered an interference with his tenure contract with the College, resulting in a loss of present income and related contract benefits including faculty benefits and privileges, loss of future income and related contract benefits and other related contract damages.

203.   As a direct and proximate result of the actions of individuals identified above who acted on behalf of the College as its agents and employees, Professor Dustin suffered an interference with his tenure contract with the College, resulting in a loss of present income and related contract benefits including faculty benefits and privileges, loss of future income and related contract benefits and other related contract damages.

204.   As a direct and proximate result of the actions described in Paragraph 139, Professor Dustin has suffered the loss of personal property, intellectual property and related items, and related economic damages as Holy Cross has wrongfully failed and/or refused to return property to him notwithstanding an agreement regarding the return of these items and the demand for their return.  While some of the personal property can be readily valued, the intellectual property – including research materials, lecture materials, et alia are of significant, less readily calculable value.

205.   As a direct and proximate result of the actions described in this complaint Professor Dustin has suffered and will continue to suffer damage to his personal and professional reputation and the resulting loss of professional stature, his post-secondary teaching career, and other related damages.

## COUNT ONE
## VIOLATION OF TITLE IX

206.   Professor Dustin repeats and realleges each and every allegation set forth in Paragraphs 1-195 as if fully set forth herein.

207.   Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et. seq.*, provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

208.   Title IX applies to all public and private educational institutions that receive federal funding, which includes the College of the Holy Cross.

209.   Title IX requires schools to adopt grievance procedures providing for prompt and equitable resolution of sexual misconduct complaints. 34 C.F.R. § 106.8(b).

210.   Title IX requires that the grievance procedures adopted by a school such as Holy Cross must accord a fair process to all parties. 34 C.F.R. § 106.8(b); 34 C.F.R. § 668.46(k)(2)(i).

211.   Title IX also prohibits retaliation: "An institution, or an officer, employee or agent of an institution may not retaliate, intimidate, threaten, coerce or otherwise discriminate against any individual for exercising their rights or responsibilities under any provision in this section. 34 C.F.R. § 668.46(m).

212.   Title IX guidance from OCR that was in effect at the time of the investigation of

Professor Dustin specified factors to review when evaluating whether a school's grievance procedures are "prompt and equitable." Those included whether the school "ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence"; and "designates and follows a reasonably prompt time frame for major stages of the complaint process." *Id.*

213.  OCR guidance further provided that in imposing "interim measures during the investigation of a complaint . . . a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator." *Id.*

214.  In but one example of the College's violation of these guidelines, Professor Dustin learned during the course of the investigation that individuals identified in each of the notices of investigation he received had not been barred from contacting each other, and in fact had contacted each other in direct contrast to the interim measure imposed upon Dustin prohibiting such conduct.  This greatly prejudiced/impeded Professor Dustin's ability to present witnesses while those very witnesses were speaking among themselves.

215.  Moreover, the Investigator contacted NB after March 1 (when she would not cooperate) and prior to the June 19th when it was disclosed that she had changed her mind and would now cooperate.

216.  The Investigator did so in a June 6th email in which he urged her to participate, claiming that Professor Dustin had denied  having a "personal" relationship with NB, which was not true, as he had always acknowledged a personal, mentoring relationship existed between the two.

217.   The Investigator's careful choice of words was misleading  and designed to goad NB
into participating and to influence her testimony by creating the false impression –
which Professor Dustin could not rebut given the interim measures in place – that
Dustin was misleading the College about the relationship.  It was only after this contact
by the Investigator that NB agreed to participate.  This is critical, as Professor Dustin's
termination was based solely on the alleged relationship with NB which was determined
not to constitute sexual harassment under the existing Policy.

218.   Holy Cross's adoption of interim measures that favored one party over the other,
completely restricting Professor Dustin's contact with witnesses; and, allowing the
Investigator to aggressively pursue and procure the testimony of a former student who had
already declined to participate in an investigation (promising to respect her right to privacy
while violating his) are but two examples of the College's gross failure to abide by the
regulations, and OCR guidance in relation thereto.

219.   Institutions that do not comply with the Title IX regulatory scheme have been found
liable for damages arising out of such failure under four theories: (1) "erroneous
outcome," (2) "selective enforcement," (3) "deliberate indifference," and (4) "archaic
assumptions."  Professor Dustin seeks recovery under the first two of these theories.

220.   To plead an erroneous outcome claim under Title IX, a Plaintiff found responsible in a
college disciplinary proceeding must allege: (1) facts sufficient to "cast some articulable
doubt on the accuracy of the outcome of the disciplinary proceeding," and (2) "gender bias
was a motivating factor." *Doe v. Trs. of Bos. Coll.,* 892 F.3d 67, 91 (1st Cir. 2018).

221.   Facts casting much more than "articulable doubt" on the accuracy of the outcome are,
in addition to those allegations described in detail above, the following:

a. The Determination Panel, the specially-retained attorney who handled the appeal in lieu of the Appeal Panel, and the three selected Board Members who acted in lieu of the Executive Committee to review the sanction of dismissal each meted out the same punishment notwithstanding that (i) the Determination Panel did not find Professor Dustin responsible for any form of sexual harassment, and (ii) the Appellate Officer vacated one of the violations (failure to report a sexual relationship) on which the Determination Panel's recommended sanction was based. In terminating Professor Dustin as it did, the College completely departed from its own Policy requiring referral to the President and Executive Committee, instead referring the final determination to a panel of hand-picked trustees who terminated Professor Dustin not for the charges originally raised against him, but for an <u>ad hoc</u> violation of the so-called Duty of Honesty, because he chose to defend himself.

b. Clearly, the punishment Professor Dustin received did not fit the sole violation he was (wrongly) found to have committed.  The disproportionality of the sanction -dismissal, the ultimate sanction, warranted only for "serious" violations of the harassment policy—is further highlighted by the fact the Duty of Honesty does not reference such a sanction.  Instead, the policy indicates that when an alleged violation occurs during an Investigation there will be a "separate College disciplinary action." EXHIBIT Q at p. 34 Par 9(a).

c. The Investigator determined before even speaking with NB that he did not believe Professor Dustin, as evidenced by the language used in the second Notice of Investigation.  The notice warning that Professor Dustin would be

46

investigated relative to the Duty of Honesty if he continued to deny NB's allegations was sent after one interview with the investigator that occurred prior to NB's agreement to participate (having previously refused to do so) and before he could respond to any of her statements.  Moreover, in violation of his mandated role as an independent factfinder, the investigator clearly collaborated with the Title IX office and, in the same manner that he solicited the testimony of NB, prompted the threat made in the second Notice.  This is clear evidence that the Investigator was biased, was predetermined in his belief of the female accuser over the accused male , and had no intention of following the letter or spirit of the Policy.

d.  Further doubt is cast by the fact the Duty of Honesty Policy promises protections to those whose good faith statements may be found less believable than the statements made by other parties in the course of an investigation. Here, these protections were extended to the accuser but denied to the accused.

e.  The College prohibited Professor Dustin from contacting – either directly or indirectly – potential witnesses in the Holy Cross community.  The effect of this, as College officials clearly knew, was that Professor Dustin and his attorney could not conduct their own review and prepare their own defense.  They were instead left only to respond to the report of the College's investigator.  This is further confirmation that the College had no intention of providing Professor Dustin with a fair and impartial investigation casting articulable doubt on the outcome.

f.  Professor Dustin was informed for the first time, on March 1, 2019, that

allegations of a sexual relationship with NB had been shared with Provost Freije by persons other than NB, and that those allegations alone – without any further review by the College or any complaint from NB herself – were what precipitated the interim measures and investigation. Several months later, when he was allowed to review with the investigator's completed report Professor Dustin learned that NB herself had shared these allegations with Provost Freije in <u>May of 2017</u> , and that the College had dismissed them after Freije consulted with the Title IX coordinator and the General Counsel - both of whom agreed that no investigation was warranted. The College's different treatment of the same allegations and sudden decision to launch a formal investigation following the publication of the Article and the ensuing campus unrest described above makes clear that the March 2019 interim measures and investigation were unrelated to any objective concerns the College could have had in regard to NB's allegations (about which they had received no additional information or complaints since 2017). A professor deemed safe to return to the classroom just three months earlier by the College was now being vilified for purely pretextual reasons as Holy Cross responded to campus unrest over sexual misconduct issues and the widespread publicity generated thereby.

g. NB made no complaint and declined to participate in the investigation at the time the College opened its investigation. It was only after being contacted by the Investigator in June of 2019 that she did so. NB never expressed any interest in filing a complaint in the intervening time (if anything, she expressed her reluctance to do so) and even when she did so she did not complain of being

sexually harassed. This is objective evidence casting articulable doubt on the outcome: the student involved never complained about harassment yet the same allegations resulted in diametrically opposed outcomes less than three years apart. The only intervening change - the campus turmoil fueled by ongoing media coverage and Professor Dustin's public identification as a "monster" who "preys on students" -- were the drivers in this matter. The College had a clear interest in publicly ridding itself of this "monster" which it pursued through a process that violated its own policy and Professor Dustin's rights.

h.  The Investigator was allowed to submit a completely revised report. This is not provided for in the Policy, and alone casts articulable doubt on the Investigator's conclusions. The revised report quotes from Professor Dustin's response to the initial report while withholding much of the material from that initial report to which Professor Dustin was responding. This effectively whitewashed the problems with the investigation that Professor Dustin identified, leaving the Determination Panel with an incomplete and distorted view of objections Professor Dustin validly raised regarding the investigator's impartiality and conclusions, presenting only the Investigators sanitized, revised version. This impeded the Panel's ability to play the role of "ultimate decision-maker" by conducting its own assessment of the facts and Professor Dustin's honesty and good faith, casting further doubt on the outcome.

i.  In January of 2020, Ms. Burl advised Professor Dustin that the Freije investigator wanted to review material from the Dustin investigation. In that notice, Ms. Burl revealed that this investigation was initiated by the Executive

Committee. From this fact, it is clear that Ms. Burl had a reason to deviate, over Professor Dustin's protestations, from the process that required the final sanction in his case to be determined by this very same Executive Committee that knew something about the NB allegations and their history. This knowledge, in combination with the knowledge of Professor Dustin and his distinguished career that was known to many of the Executive Committee members, would have given Professor Dustin the very sort of fair deliberation to which he was entitled, and which the Policy called for. Instead, the matter was presented to three board members selected by Burl who knew nothing other than what Burl told them as (i) they were not on the Executive Committee, and (ii) that is what Burl said in her notification. This is yet another clear reason why articulable doubt exists about this investigation, which was tampered with every step of the way by both the Title IX official "shepherding" the process and the Investigator who pursued and procured the testimony of NB, all as set for the above.

222. Events/circumstances suggest that gender bias was clearly a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty on Professor Dustin. These events/circumstances include, *inter alia:*

   a. Holy Cross imposed interim measures against Professor Dustin immediately upon receiving hearsay complaints from two former students about alleged victims who did not complain and would not participate in the matter. Even though there was no threat posed against any current students, and the College had explicitly found that no threat existed just three months earlier when Professor Dustin was returned to the classroom, the College made clear that this

time the male professor would be disciplined, "quickly" and harshly – even before the investigation began.

b.   Failure to afford Professor Dustin a presumption of innocence in the investigation as reflected in the Second Notice is further evidence of the gender bias at work here.  The notice, which purported to explain an investigation that was just underway, contained a threat in its fifth paragraph that Professor Dustin would be investigated for violating the College's "Duty of Honesty" policy if he continued to deny the charges against him.  That threat is clear evidence that the College was favoring the female complainant over the male respondent from the start of the investigation and reveals that the College failed to afford Professor Dustin a presumption of innocence.  Holy Cross clearly ignored/violated OCR's requirement that rights and opportunities in an investigation must be made equally available to both parties on equal terms, as Professor Dustin was being denied the right to so much as defend himself or – as the College made clear in this notice – he would be investigated for lying.

c.   Professor Dustin further believes, and therefore avers, that a similar warning was not provided to NB by either the Investigator when he prompted NB to participate after she had declined to do so, or the Title IX official who had warned Professor Dustin.  The College clearly made the decision to warn only Professor Dustin, on the basis of his gender.  The College was favoring the accusing female over the accused male, and this bias animated its actions throughout the investigation.

d.   Provost Freije, a female, was investigated in a process initiated and controlled by

the Executive Committee of the Board of Trustees.  She was exonerated in regard to her handling of the very charges that resulted in the termination of Professor Dustin, a male, following an investigation "shepherded" by the risk management director.

e. The importance of terminating males at this tumultuous time in Holy Cross's history is evidenced by the terminations of Professor Dustin, Professor Joseph Lawrence (terminated two days before his long-announced retirement date) and Coach William Gibbons, and the proceedings instituted against Professor Manoussakis which included highly-publicized interim sanctions.  All occurred in the same timeframe, viz., following the public disclosure of the Christie allegations and the ensuing campus tumult over the College's handling of sexual misconduct issues, all as described above in this complaint.  At the same time, Provost Margaret Freije, a female, was exonerated following an investigation of the NB/Dustin matter that resulted in Professor Dustin's termination. Meanwhile, the College refused to investigate Professor May Sim, a female, who lied about her efforts to instigate complaints against her fellow professors in the Philosophy Department (including Professor Dustin) which conduct was called to the attention of the College's General Counsel. The "Duty of Honesty" was demonstrably violated by Sim in that case, but the College ignored this violation by a female faculty member.  Clearly, the College was targeting males in its quest to quell the campus tumult, while simultaneous treating females differently and with deference.

f. Further evidence of gender bias is found in the manner in which the College

addressed the poster-campaign mounted by students at the College in response to the Article. Professor Joseph Lawrence brought a number of the posters to the office of Provost Freije and demanded that the students be stopped from their threatening, intimidating and libelous behavior. Freije took no action, notwithstanding the fact this action was a direct violation of the school's Policy. Instead, Professor Lawrence was reprimanded for his behavior (removing posters that had been placed contrary to College policy) and informed by Provost Freije's executive assistant that he must take the posters back, claiming that Freije had "never seen" them, even though they were brought to her office by Lawrence, posted prominently and had been broadcast in social media. Professor Dustin was being treated one way - not only subjected to investigation, but also interim measures – while female students, faculty, and administrators were allowed to violate the clear Policy proscriptions against harassing, retaliatory, and intimidating behavior lodged against a participant in an investigation.

223. Holy Cross's bias against Professor Dustin resulted in an erroneous finding of responsibility after a biased investigation, followed by his unjustified termination – all motivated by gender bias.

224. The tumult and unrest on campus following the Christie revelations, the Article, and extensive media coverage caused Holy Cross to face immense pressure to discipline male faculty and vindicate female complainants.

225. The Article's inclusion of allegations by a female student against the College and Professor Dustin caused embarrassment for the College and called public attention to the College's failings in relation to addressing sexual misconduct allegations. This caused

pressure on the College to discipline quickly and harshly male faculty, and other males, at the College.

226.   A college that is motivated to take action against an accused male in order to respond to or protect itself from negative publicity about sexual harassment is motivated by gender bias and engages in unlawful sex discrimination under Title IX. *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d. Cir. 2016) (stating that "fear of negative publicity or of Title IX liability[] are not necessarily . . . lawful motivations distinct from sex bias," and that an institution "that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute . . . in order to avoid . . . bad publicity[] has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex").

227.   This unlawful discrimination in violation of Title IX was the proximate cause of substantial injuries and damages sustained by Professor Dustin, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; and loss of future employment prospects.

228.   To state a claim for selective enforcement, a plaintiff must allege facts sufficient to support a reasonable inference that "'the severity of the penalty and/or the decision to initiate the proceeding was affected by [Harnois's] gender,'" *Haidak v. Univ. of Massachusetts- Amherst*, 933 F.3d 56, 74 (1st Cir. 2019), quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994), and – more specifically – that gender was a "motivating factor." *Haidak*, 933 F.3d at 74

229.   Here, as alleged in Pars. 117, 142, 143, and 146-149, the decision to initiate the disciplinary proceeding at issue here was solely due to Professor Dustin's gender.  Holy

Cross officials accepted hearsay allegations involving female students (who never complained and were not complaining at the time) -- which allegations served as a springboard for the College to publicly move on Father Boroughs' promise to act "Quickly" in these matters. Title IX officials took no steps to screen the hearsay allegations by speaking to the females involved before initiating this investigation; instead, they simply regarded the females as victims due to their gender, and Professor Dustin to be a male who should be disciplined.

230. The severity of the penalty further highlights the gender bias in play here. Professor Dustin was found not responsible for harassment - consistent with his denial that any harassment occurred. The College terminated him anyway, characterizing Dustin's denial to be a violation of "The Duty of Honesty" found in the Policy.

231. Violation of the Duty of Honesty carries with it a defined sanction: "may be subject to separate College disciplinary action." COMPLAINT EXHIBIT Q at Page 34. The College did not resort to separate disciplinary action, instead moving ahead with its clearly pre-ordained termination of Professor Dustin.

232. Gender bias was clearly a motivating factor for this severe action (the ultimate penalty in an employment matter), as the campus climate and the need for Holy Cross to respond to the allegations in the Article caused Holy Cross officials to believe they needed to display to the campus community they would act. Quickly. There was no other reason for the sanction of termination over a duty of honesty violation.

## COUNT TWO
## BREACH OF CONTRACT

233. Professor Dustin repeats and realleges each and every allegation set forth in Paragraphs 1-195 as if fully set forth herein.

234.   Professor Dustin was a tenured professor at Holy Cross at all times material to this
action, entitled to renewal of his contract annually "on the same or better terms or
conditions" except if the College were to notify him of its "intention to terminate [his
contract] according to the requirements for such notification set down in the STATUTES
OF THE FACULTY as amended from time to time." COMPLAINT EXHIBIT B.

235.   The Statutes of the Faculty provide for dismissal of a tenured faculty member for three
specific reasons only: (i) serious neglect of academic duties, (ii) serious violation of the
College's policies on scholarly misconduct or harassment, or (iii) for such public
misconduct as disqualifies him or her from continued association with the College.
COMPLAINT EXHIBIT C.

236.   The College charged Professor Dustin with sexual harassment of an alumna, doing so
twenty-three years after her graduation and under the pretext of an investigation by its
Title IX office of a violation of the College's Title IX policy – a policy which explicitly
provides that the College "will not tolerate discrimination or harassment … in its
community." COMPLAINT EXHIBIT Q at p. 2, Section III.

237.   The College instituted this investigation even though the alumna, NB, (i) was no longer
in its community and (ii) had "not filed a complaint …nor indicated she wishes to
participate in the investigation at the current time." COMPLAINT EXHIBIT D at Page 3.

238.   The College breached its tenure contract with Professor Dustin when it failed to
automatically renew his contract for the 2020-2021 academic year, as the College had no
valid basis under the provisions cited in the preceding paragraph to warrant such failure
and was – at the time of its failure to renew – acting in complete disregard of Professor
Dustin's rights under Chapter VII of the Statutes of the Faculty.

239. The College breached its tenure contract with Professor Dustin when, upon the conclusion of its investigation -- which resulted in a finding by the Determination Panel that Dustin was <u>not responsible for harassment</u> -- it nonetheless purported to dismiss him "for cause" in violation of the express provisions of the Statutes of the Faculty referenced in Paragraph 222, above.

240. The College purported to dismiss Professor Dustin notwithstanding that:

- He had not neglected his academic duties and was not charged with doing so.

- He had not engaged in scholarly misconduct and had been exonerated of a charge of harassment.

- The only charge against Professor Dustin related to alleged private conduct.

241. The actions of the College in regard to Professor Dustin's purported dismissal were in violation of the express terms of the Statutes of the Faculty, and therefore constituted a breach of the College's tenure contract with Professor Dustin.

242. The actions of the College described in Paragraphs 138 through 190, above constituted a violation of the Policy, and therefore constituted a breach of the College's tenure contract with Professor Dustin.

243. As a direct and consequential result of the College's breach and the foregoing conduct, Professor Dustin has sustained contract damages including but not limited to loss of income, loss of future income reasonably expected under the terms of his tenure contract, loss of a granted sabbatical and all damages related thereto, loss of at least one future sabbatical and all damages related thereto, together with other direct and consequential damages.

244. As a further direct and consequential result of the College's breach, particularly with

respect to the imposition of interim measures at the inception of the investigation, and

thereafter imposing the sanction of termination even though the investigation concluded

that Professor Dustin was not guilty of harassment, Professor Dustin was prevented from

completing work necessary to (i) conclude his research on Thoreau and the related book

that he planned to publish, (ii) maintain his status in the field of philosophy, (iii) sustain

his academic status (now necessary for re-employment), and (iv) maintain his annual

salary increases which were based largely on research and publication.

**COUNT THREE**
**BREACH OF IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**

245.   Professor Dustin repeats and realleges each and every allegation set forth in

Paragraphs 1-195, 199-218, and 221-229 as if fully set forth herein.

246.   Professor Dustin's tenure contract with the College was negotiated and executed in

this commonwealth, and the terms were intended by both parties to be fully performed

within this commonwealth.  COMPLAINT EXHIBIT B.

247.   Under Massachusetts law, a covenant of good faith and fair dealing is implied in all

contracts such as Professor Dustin's.

248.   This covenant provides that "neither party shall do anything that will have the effect

of destroying or injuring the rights of the other party to receive the fruits of the contract."

*Anthony's Pier Four, Inc. v. HBC Associates,* 411 Mass. 451, 471-472 (1991).

249.   Holy Cross breached the covenant of good faith and fair dealing implied in Professor

Dustin's contract when it commenced an investigation of Professor Dustin arising out of

hearsay reports of "gift giving" and "gazing at female students," inter alia, made by two

male students following observations they made in the mid-90's and had not previously

complained about.  It was not fair of the College to even so much as begin this investigation, since none of the female students mentioned in the hearsay reports (some of whom were unnamed) indicated any cause for complaint nor had the hearsay reporters indicated that they had spoken directly with those students about their otherwise unsupported insinuations.

250.   Opening this investigation and publicizing that it was doing so, constituted a serious breach of the implied covenant of good faith and fair dealing implied in Professor Dustin's contract because (i) the College knew or should have known that the students identified in the hearsay allegations did not themselves complain of feeling harassed, and in fact refused to participate in the investigation of the hearsay allegations; (ii) the allegations themselves were decades old, and did not involve "members of the community" - the protected class under the Policy; and, (iii) in the case of one of NB, Provost Freije had reviewed the allegations in 2017 with the Title IX coordinator and the General Counsel and concluded no further action was necessary or appropriate.

251.   Massachusetts courts have further held the implied covenant of good faith and fair dealing requires school disciplinary hearings to be "conducted with basic fairness." *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 725 (1st Cir. 1983) (citing *Coveney v. President & Trs. of Holy Cross Coll.*, 388 Mass. 16, 19 (1983)); *Schaer v. Brandeis Univ.*, 432 Mass. 474, 481(2000).

252.   Consistent with the implied covenant of good faith and fair dealing and the related notion of basic fairness, the College's Policy, at all times material to this action, specifically provided that:

- The College will designate an investigator "to conduct a prompt, fair and

impartial hearing".  COMPLAINT EXHIBIT Q at p. 23, at Par VII(B)(3)(d).

- "[I]nformation [regarding disciplinary outcomes] should remain confidential except in situations in which disclosure is necessary to protect the safety of the community." Id. at p. 28, Section VII(B)(6).

- "Display or circulation of written materials or pictures degrading to an individual" is classified as behavior that "might be considered sexual harassment" of a coercive nature and is prohibited. Id. at p. 17.

- The College will not "tolerate retaliation in any form against any person for their participation or involvement in the reporting, investigation, and or resolution of matters reported" pledging to "address retaliatory conduct immediately." Id. at p. 34, Par 9(f).

- (Retaliation is extensively addressed on pp. 19-20 and is deemed "a serious violation of this Policy.")

253.   In reviewing a college disciplinary process under basic fairness principles, the inquiry focuses on two issues: The first is procedural fairness — i.e., whether the process afforded the accused a fair and reasonable opportunity to defend himself. The second is substantive fairness — i.e.,, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness.

254.   The process was not fair, prompt or impartial, as explained in Paragraphs 83-189.

255.   The process presumed Professor Dustin was being untruthful, as set forth in the June 19, 2019 Notice of Investigation from the Title IX Office, and by the imposition of interim measures before conducting any investigation at all.

256.   The College violated its own process on multiple occasions explained above,

including, by way of example, allowing the Investigator to prepare and submit a completely revised report to the Determination Panel at the conclusion of the investigation; and, failing to submit Professor Dustin's final appeal to the Executive Committee of the Board of Trustees at the conclusion of the process.

257.   The College further violated its process obligation when it failed to maintain the confidentiality of the investigation. Father Boroughs sent out a campus-wide email announcing the investigation and the imposition of interim measures, thereby causing irreversible prejudice to potential witness and adjudicators in a clear violation of the express terms of the Policy and the protections afforded under Title IX.

258.   The College further violated its process obligations when it allowed students to display or circulate written materials or pictures degrading to Professor Dustin, while also allowing Professors Cahill and Yuhl to send false, defamatory and degrading emails about Professor Dustin to the faculty at the inception of an investigation in which Professor Dustin was participating, all in violation of the express terms prohibiting such conduct set out in the Policy.

259.   The College further violated its process obligations when it failed to address the foregoing prohibited conduct immediately, notwithstanding its Policy statement that such actions were a "serious violation of the Policy."

260.   The College further violated its process obligations when it subsumed an alleged duty of honesty violation into the investigation itself, found a violation, and included that finding and a punishment of termination in what purported to be an investigation of harassment charges.  Professor Dustin was entitled to notice of this alleged violation in a separate action, with specific information as to how and what he said was considered to

be untruthful so that he could defend himself against this charge.

261.   Unlike the prohibition against retaliation, it is nowhere stated that violations of the so-called Duty of Honesty constitute a "serious violation" of the sexual misconduct policy itself.  Moreover, where it is mentioned, it is stated that protections against additional allegations relating to the Duty of Honesty are afforded to those who make "good faith" statements even if those statements are ultimately found to be less believable than those of other parties. Those protections were afforded to the accuser but denied to Professor Dustin. This is all the more egregious as an alleged violation of the Duty of Honesty was the sole basis upon which the College relied in terminating Professor Dustin, a tenured professor.

262.   Violation of the Duty of Honesty is an "Additional Matter" in the Policy, is not considered sexual misconduct or harassment under the Policy, and is explicitly to be addressed by a "separate College disciplinary action."  COMPLAINT EXHIBIT Q at p. 34, Par 9(a).

263.   As set forth in Paragraphs 238 through 245, and in various of the incorporated paragraphs above, the process followed by the College in this matter failed to afford Professor Dustin a fair and reasonable opportunity to defend himself, was not carried out with basic fairness and the College therefore breached the implied covenant of good faith and fair dealing throughout the proceedings that resulted in the termination of Professor Dustin.

264.   In addition to the foregoing, each of the different levels of review provided for under the Policy concluded the same punishment was warranted notwithstanding the fact that Professor Dustin was exonerated of the charge of harassment by the Determination Panel, the attorney reviewing at the second level vacated the failure to report finding due

to a process error, and the three select Board Members therefore had nothing before them other than a Duty of Honesty issue that required a <u>separate</u> investigation.

265.   The termination outcome was clearly pre-ordained, pretextual and not supported by the evidence at every level of review.  Moreover, the termination outcome was in violation of the express provisions of the Statutes of the Faculty.   It was clearly driven by the unfair process referenced above, with the ultimate outcome tainted by bias and unfairness as evidenced by the actions described in detail, above.

266.   Further evidence of substantive unfairness is the imposition of interim measures at the inception of the Investigation, notwithstanding the fact that Professor Dustin was awarded a sabbatical just two weeks before.  As a result of his sabbatical, Professor Dustin would have been out of the classroom and therefore posed no safety concerns to students particularly where, in this case, the alleged victims were all alumna and departed from the campus in any event.

267.   The decision to impose interim measures was irrational, not related to any good faith interest whatsoever, and made solely and exclusively so President Boroughs could announce Professor Dustin's removal from campus, in furtherance of the Boroughs/Holy Cross efforts to quell the campus tumult over the College's mishandling of sexual misconduct issues.

268.   The actions set forth in the Count at Paragraphs 230-252 (which includes incorporated paragraphs) clearly demonstrate that Holy Cross went well beyond breaching its contract with Professor Dustin when it purported to investigate him on harassment charges.  The investigation was not carried out in good faith or with basic fairness, included numerous irregularities, and was little more than a march to a pre-ordained outcome – all in

violation of the College's obligations under the doctrine of good faith and fair dealing imputed in every Massachusetts contract and in furtherance of President Boroughs' promise to an angry faculty and student body, made prior to the investigation's commencement, that he would act quickly in these matters.

269.  Father Boroughs and his Executive team acted in a manner that not only had "the effect of destroying" Professor Dustin's contract rights, they destroyed his reputation and his otherwise stellar and decorated academic career in service to the College.

270.  As a direct and proximate result of the College's breach and the foregoing conduct, Professor Dustin has sustained contract damages including but not limited to loss of income, loss of future income reasonably expected under the terms of his tenure contract, loss of a granted sabbatical and all damages related thereto, loss of at least one future sabbatical and related damages, together with other direct and consequential damages.

## COUNT FOUR
## PROMISSORY ESTOPPEL

271.  Professor Dustin repeats and realleges each and every allegation set forth in Paragraphs 1-195, 199-218, and 221-229 as if fully set forth herein.

272.  Professor Dustin relied in good faith on the College's express and implied representations in its Sexual Misconduct Policy that he would be treated fairly, free from harassment and retaliation, and his privacy would be protected if he participated in the investigation that resulted in his termination.

273.  Moreover, the express provisions of the policy – in particular those set forth in the "Additional Matters" section -  and the representations of Denielle Burl over the course of the investigation which she "personally shepherded" that she was acting in good faith

64

and in accordance with the policy on behalf of the College were intended to induce and did in fact induce Professor Dustin to continue to participate in the investigation.

274.   At the time he chose to participate in the Investigation, Professor Dustin knew he had done nothing wrong, knew that the facts would bear this out, and relied on the College and its representations that it would conduct a fair Investigation, compliant with the Policy, all to his detriment.

275.   While the Investigation confirmed that he was not responsible for the charges leveled against him, the College nonetheless used an ambiguous provision of the Policy, found in the "Additional Matters" section, as the sole basis to terminate him.

276.   Having failed to enforce other "Additional Matters" provisions as referenced above, and having failed to conduct a prompt, fair and impartial investigation – a principal at the very core of the Policy – the College is estopped from relying on the "Duty of Honesty" provision to terminate Professor Dustin.

277.   As a further direct and proximate result of the College's failure to enforce the provisions referenced above, and having failed to conduct a prompt, fair and impartial investigation, Professor Dustin has sustained, and continues to sustain, damages, injuries and losses.

## RELIEF REQUESTED

WHEREFORE, Professor Dustin respectfully requests that this honorable court enter judgment against the defendants jointly and severally, as follows:

1.      A judgment under Counts One and Four that declares that the actions of Father Boroughs and Holy Cross in the investigation and termination of Professor Christopher Dustin were contrary to the College's contractual and related obligations,

its own Policy, rules and regulations, and contrary to law; and, that declares that the College's disciplinary process and application of its Sexual Misconduct Policy to Professor Dustin violated applicable provisions of Title IX.

2.      A judgment under all Counts finding that Holy Cross breached its contract with Professor Dustin and/or breached the related covenant of good faith and fair dealing implied in every Massachusetts contract, and upon such finding, ordering the College of the Holy Cross to rescind the termination of Professor Dustin and restore the honors and awards bestowed upon him and requires the College of the Holy Cross to expunge the entire disciplinary proceeding from its records.

3.      A judgment under Count One and Count Three that declares the conduct of Father Boroughs and the Members of his Executive Team, the Title IX office and each of the officials involved in this matter who worked in that office, Margaret Freije and Denielle Burl to be wrongful, willful, intentional, and reckless; and, prohibits the College from referencing the proceedings outlined herein in the event of third-party inquiry.

4.      A judgment under all Counts against Holy Cross awarding damages in an amount to be determined at trial, together with statutory interest from the date of the breach for contract damages awarded, and statutory interest as otherwise provided for as to the claims herein, together with costs and attorney's fees, all as permitted by law; and such other and further relief as this honorable court deems appropriate and just.

5.      A judgment under Counts Three and Four against Father Boroughs, indvidually awarding damages in an amount to be determined at trial, together with statutory interest, costs and attorney's fees, all as permitted by law; and such other and further relief as this honorable court deems appropriate and just.

**PLAINTIFF, CHRISTOPHER DUSTIN, DEMANDS A JURY TRIAL AS TO ALL ISSUES FOR WHICH THE RIGHT OF A TRIAL BY JURY EXISTS.**

By his attorney

*James S. Timmins*

_____
James S. Timmins BBO # 547512
55 Willard Street
Quincy MA 02169
(617)376-0700
jtimmins@cronintimmins.com

DATED: June 3, 2021

In making our recommendations, we reviewed the entire Policy as well the Title IX Q&A, paying particular attention to issues shared by committee members as those that had been raised by members of the College community, and each of the "next steps" in the Q&A.

In addition to the recommendations described below, the Committee also considered a range of other issues relating to the Policy as to which we felt no recommendation was in order. For example, we considered whether the Policy should include mandatory, minimum sanctions for certain categories of sexual misconduct, but we determined not to make any recommendation to that effect (because any particular category of sexual misconduct can encompass a wide range of behavior; any particular finding of misconduct may involve any number of significant mitigating or aggravating circumstances; and we believe that the imposition of mandatory, minimum sanctions may have a potential chilling effect on the reporting of misconduct and may improperly influence the findings of Determination Panels). For another example, we considered whether a person found responsible for sexual misconduct should have the right to appeal the sanction(s) imposed on the grounds that a sanction is excessive or otherwise improper, but we determined not to allow for an appeal on that basis (because allowing such appeals would delay the final resolution of the matter; would invite second-guessing of the Sanctioning Official's judgment; and would be inconsistent with the approach taken by most colleges and universities).

We are pleased to note that with respect to each of the points we address in this memorandum, and those we considered but determined not to address, there was a broad consensus among the members of our Committee.

While the Committee was asked to report only to you, with the understanding that you would share our recommendations with the rest of the Executive Team, the Committee requests that you also make our report available to the broader College community. Plainly the College's Sexual Misconduct Policy is a matter of keen and current interest to many in our community, and we believe that transparency in relation to any significant review or revision to the Policy is important to maintaining and strengthening the community's trust in the College's approach to issues of sexual misconduct.

Finally, the Committee notes that the College's review of its Sexual Misconduct Policy occurs in the shadow of anticipated, significant changes to the Department of Education's Title IX regulations. Those regulations may require the College substantially to revise various aspects of its Policy. It is important that the College be poised to address promptly and effectively any new regulations when they are

2

announced.  On that point, we direct your attention to our recommendation below that the College consider forming a standing committee to periodically review the Policy and recommend changes as appropriate.  With new federal regulations anticipated, the formation of such a Committee soon is a matter worthy of consideration in the near term.

## A.    RECOMMENDED CHANGES TO THE POLICY

### 1.    The Opening Sections of the Policy

The first four sections of the Sexual Misconduct Policy broadly describe the College's commitment to non-discrimination, how the Policy serves as one part of that commitment, and the role of the Title IX Coordinator and Title IX Team.  We believe these opening sections could be improved by focusing specifically on sexual misconduct, without reference to other forms of discrimination, and by emphasizing other core values and principles relating to the Policy itself and the issues that the Policy aims to address.

Some members of the College community are skeptical about the College's motivations with respect to cases of sexual misconduct.  Some believe that the College would prefer that complaints not be made.  Some believe that the College's principal concerns in addressing cases of sexual misconduct are to avoid litigation and publicity.  Some believe that the College does not act with sufficient speed and seriousness when allegations of misconduct are substantiated.  We believe a restatement, and expanded statement, of the College's core principles and goals in addressing sexual misconduct will be helpful in addressing such concerns.

Thus, for example, the Policy's opening sections could emphasize that the College affirmatively wants all members of its community to come forward to report any credible allegations of sexual misconduct, so that the College can stop the conduct from occurring, prevent it from recurring, and remedy its effects, while acknowledging that in some cases complainants/victims will wish to remain anonymous and/or not pursue formal action.  For another example, the opening sections also could affirm the College's commitment that all reports of potential sexual misconduct will be addressed promptly, fairly, equitably, and thoroughly, with due regard for the rights of complainants, respondents, and witnesses.

The revised statement of core principles and goals also can serve another useful purpose:  providing a touchstone for assessing what the Policy provides, how it operates in practice, and how it might be changed.  Any consideration of these issues should take into account the College's core principles and goals – assessing

3

whether current policy or practice, or a proposed change in policy or practice, is consistent with and will help advance these principles and goals.

As noted above, we also believe that these opening sections can be improved by focusing them entirely on issues relating to sexual misconduct, rather than also addressing other forms of discrimination.  It is of course important for the College to make clear its commitment to non-discrimination in any form, and to provide information about policies and resources relating to other forms of discrimination, but that information is available elsewhere and need not be restated here.

A suggested restatement of those sections is attached at **Addendum A.**

## 2.    Conflicts of Interest for the Sanctioning Official

The Policy appropriately addresses how the Title IX Coordinator will handle conflicts of interest with respect to members of the Determination Panel (p. 25 of the Policy[2]) and the Appeals Panel (p. 29), but the Policy does not address this issue relative to the Sanctioning Official.

The issue of conflicts on the part of the Sanctioning Official *is* addressed in the Title IX Q&A, published at https://www. holycross.edu/campus-climate/title-ix-qa, which says the matter will be addressed by the Title IX Coordinator, who will appoint a different Sanctioning Official "[a]ny time that there is a determination of conflict of interest … ."

Language to this effect should appear in the Policy as well.  Our suggested revision is attached at **Addendum B.**

## 3.    Determining and Implementing Sanctions

### a.    The factors used to determine sanctions

The guidelines for determining sanctions (pp. 27-28 of the Policy) are very broad and grant substantial discretion to the Sanctioning Official.  We believe the Policy would benefit from additional language about how sanctions should be determined

---

[2] The Policy citations in this memorandum refer to the PDF version of the Policy, revised as of January 22, 2019, which is available on the Sexual Respect and Title IX web page, at https://www.holycross.edu/sexual-respect-and-title-ix/overview.  We note that the PDF version of the Policy includes some language which differs from the Policy language on the web page itself.  Although the differences appear not to be substantive, we recommend that the web page be updated to make the language entirely consistent with the PDF version of the current Policy.

4.      **Interim Measures**

The Policy briefly discusses the interim measures that may be available to complainants (p. 20) and respondents (p. 21) before a complaint has been resolved. There is also a brief discussion of this issue in the Q&A. The Policy states that the Title IX Coordinator is responsible for assessing and determining any interim measures. In practice, the Title IX Coordinator does so in consultation with other College personnel. We recommend that this consultation be included in the Policy itself, as indicated in the suggested language at **Addendum E**.

We also recommend that the Policy include a more expansive discussion of the circumstances in which interim measures can be appropriate – specifically, that such measures can be appropriate not only to address the "safety and health needs" of the Complaining Party, but also to preserve the Complaining Party's ability fully to participate in his or her educational experience or employment at the College – and the types of interim sanctions that may be imposed. These suggested revisions also appear at **Addendum E**.

5.      **The Provost's Role in Faculty Matters**

The Policy provides that in the event a Determination Panel makes a finding of responsibility with respect to a member of the teaching faculty, the Provost/Dean of the College will determine the appropriate sanction (p. 27), provided that a recommended sanction of dismissal is subject to appeal and ultimately is subject to review by the Executive Committee of the Board (p. 33). In practice, the Provost will consult with others as appropriate in determining the sanction. Consistent with our recommendation above, on page 4, we recommend that the Policy be revised to explicitly provide for such consultation, as noted in **Addendum C**.

There may be matters in which the Provost's role should be delegated to some other person(s), due to an actual or perceived conflict of interest, because the Provost is unavailable, or for some other reason. Delegation in the context of a conflict of interest would be addressed by the new language regarding conflict of interest relating to any Sanctioning Official, as proposed in Addendum B and discussed on page 3 above. The matter of delegation in other contexts currently is addressed in footnote 10 of the Policy (at p. 27), which says, "Consistent with Section 9(i), the Dean of the College, in consultation with the Title IX Coordinator, may designate another appropriate faculty member or administrator to serve in [the Provost's] role." (Section 9(i) says, in relevant part, "Where [any] College official or employee is listed as the designated point of contact for any role in the Sexual

Misconduct Policy, he or she may, in consultation with the Title IX Coordinator, designate another College official or employee to assume the role at issue, as necessary and appropriate.) Rather than allowing the Provost to delegate his or her role to "another appropriate faculty member or administrator," we recommend that the Policy provide for delegation to "a person who currently holds a leadership position in Academic Affairs," as we indicate in **Addendum C**. We recognize that if the person to whom the Provost's role is delegated has not already received appropriate training relative the role of the Sanctioning Official, the Title IX Coordinator will need to arrange for that training to take place.

**B.    RECOMMENDATIONS RELATING TO IMPLEMENTATION OF THE POLICY**

    **1.    Enhancing Awareness and Understanding of the Policy and How it Operates**

        **a.    Summary information about the Policy**

The Policy is decidedly thorough and comprehensive. It also is fair to say that it is long and dense. It will be helpful to have a succinct overview of the Policy's key provisions, perhaps accompanied by a flow-chart or diagram which depicts the routes that individual matters can take through the various informal and formal processes that are available under the Policy. It also will be helpful to have an improved and expanded Title IX Q&A, which addresses the most important and most frequent questions that people may have about the Policy and its operation.

        **b.    The informal resolution of complaints**

The Policy provides for an optional, informal resolution procedure, which can be used to address certain types of cases (p. 21). The Committee recommends that steps be taken to increase awareness of this option, including the reasons why it is available for some types of matters but not others, and to encourage its use in appropriate cases. One place to do this is in the Title IX Q&A.

        **c.    Coordination with other policies and procedures**

The Policy explains that if the Title IX Coordinator determines that reported conduct does not implicate the Policy, the Coordinator will so inform the Complaining Party and refer the matter to the appropriate administrator for handling consistent with the relevant College policy (p. 21). The Policy also addresses how the Title IX Coordinator will address cases which involve potential

violations of both the Sexual Misconduct Policy and other College policies, with respect to both students and employees (p. 35). A summary explanation of these points should be included in the Title IX Q&A.

### d.   The option to accept responsibility

The Policy provides for voluntary agreements, which allow a student who is accused of misconduct to accept responsibility and the College to impose sanctions without completing the full investigation and adjudication process (p. 24). The Committee recommends that steps be taken to increase awareness of this option and to encourage its use in appropriate cases.

### e.   Reporting issues

The Committee believes that the College community would benefit from a greater understanding and awareness of the different ways in which allegations of sexual misconduct reach the Title IX office, as well as the reasons why some matters never reach the office. This can be addressed in the Title IX Q&A.

The Committee also believes that the College community would benefit from a greater understanding of reporting by "responsible employees" – what needs to be reported and how it is reported to the Title IX office. The Policy provides information on this issue (pp. 5, 13-14), but it also should be addressed in the Title IX Q&A and should be a topic of additional, and recurring, training for all employees.

The College also should do more to make clear *why* it wants responsible employees to come forward – so that it can stop misconduct, prevent it from recurring, and address its effects. We have included language on this point in our suggested revisions to the opening sections of the Policy (**Addendum A**).

### f.   The anonymous/reluctant complainant/victim

The Committee believes that the College community would benefit from a greater understanding and awareness of how the College addresses situations in which a complaining or reporting party wishes to remain anonymous or otherwise declines to participate in some or all the investigation/adjudication process. The Policy provides a fairly extensive discussion of this issue (beginning on p. 12). It also is addressed in the Title IX Q&A. We believe it may be helpful to address this issue more prominently in both the Policy and the Title IX Q&A.

### 2.    Investigative Resources

As many schools have chosen to do, and as the proposed Title IX regulations would require, the College has adopted an investigator-driven model for addressing most allegations of sexual misconduct. For that model to be effective, the College must have ready access to capable investigators who are available to undertake and complete the work within a reasonable period. The Title IX Team has not always found that to be the case. The College already has identified the need to devote additional internal resources to the investigative role – both conducting investigations and assisting external investigators. It may need to devote additional resources to identifying and retaining external investigators or consider devoting even greater internal resources (existing or new) to this task.

### 3.    The Time to Complete Investigations

Investigations are taking a long time to complete. This is for a number of reasons, including the time available to investigators to work on individual matters; the exhaustive approach of some investigators; and the time allowed to parties for various stages of the process, including reviewing and responding to witness lists, responding to requests for interviews, and reviewing and responding to the investigator's report. The Committee believes that more can and should be done to accomplish the timely completion of investigations without prejudice to the rights of both Complaining and Responding Parties to a fair, thorough, and effective investigation.

To the extent that delays in completion seem to be associated with particular investigators, the Title IX office should be encouraged to counsel those individuals or, if warranted, stop referring matters to them.

It also has been noted that both the Title IX office and individual investigators liberally grant extensions to parties and witnesses whenever they are requested, at all stages of the process. This should change, such that extensions are granted only for demonstrated "good cause" or the like.

It also has been noted that complaining and responding parties are permitted to identify an unlimited number of witnesses, each of whom must be interviewed as part of the investigative process. This, too, should change, such that the parties are required to demonstrate to the investigator why each witness is necessary to interview and investigators understand their authority to determine whether the evidence a witness is likely to offer will be irrelevant, cumulative, or otherwise unnecessary.

9

The Title IX Q&A addresses the question "why do investigations take so long?" The Committee recommends including in the Q&A an affirmative statement to the effect that the College is committed to reducing the time it takes to complete investigations, and when possible to completing investigations within the semester in which a complaint is brought forward, with due regard to the rights of both Complaining and Responding Parties to a fair, thorough, and effective investigation.

### 4.    Determination Panels

The Title IX Office sometimes has found it difficult to identify individuals who are available and willing to serve on the three-member Determination Panel. These panelists are drawn from a pool of College faculty and other employees who are trained to decide cases pursuant to the Policy. These cases can require a significant amount of time and attention – a significant commitment above and beyond the panelists' regular job duties. The College may wish to consider making it possible for a smaller group of panelists to devote a greater amount of time to panel service by relieving the panelists from certain job duties, or reducing those duties, during a fixed period of panel service.   The formation of a Sexual Misconduct Board consisting of trained Title IX panelists, similar in function to the Community Standards Board and Committee on Academic Standing, would help address this issue.

### 5.    Annual Report

The Title IX Office prepares an annual report relating to the cases that it handles. The Committee believes it would be appropriate to formally recognize/require in the Policy that such a report will be made. Language to this effect is included in our suggested revisions to the opening sections of the Policy, in **Addendum A.**

## C.    ISSUES FOR FURTHER CONSIDERATION

### 1.    Who "owns" the Policy

Although it was the President who established our Committee and charged it with reviewing and making recommendations with respect to the Policy, it is not the President who has direct responsibility for implementing the Policy or for making any changes to it. Those responsibilities appear to rest with the Vice President for Administration and Finance, who oversees the Title IX Office. That is consistent with the approach generally taken at other institutions – i.e., ultimate responsibility for the Sexual Misconduct Policy rests with the senior administrator to whom the

10

concern the College recognized when it decided that students no longer should participate on determination panels.

### 3. Whether the College should establish a confidential "ombudsperson" to address concerns of students and staff

Faculty who have questions about the Policy, or how individual issues relating to the Policy may be addressed, can raise them confidentially with the office of the Faculty Ombudsperson (p. 10). Other employees and students of course can discuss any questions they may have with the Title IX Office. However, it is a fair question whether creating a confidential resource separate from the Title IX Office would encourage additional victims to come forward for information about options and resources. This may be a good question to include in the next campus climate survey.

### 4. Whether the College should establish a student "Title IX advisory board"

The Committee has heard that some students are not reporting incidents of sexual misconduct because they "do not trust the process" to address their issues in a timely and effective manner. The Committee recommends that the College consider establishing a student "Title IX advisory board," which would actively seek out and convey to College administrators, including but not limited to the Title IX Office, student viewpoints on all aspects of the College's approach to sexual misconduct issues. The Committee believes that such an advisory board could significantly enhance the College's awareness and understanding of student concerns in this area and thus do a better job addressing them.

### 5. Changes to the Policy

The Committee believes it has been useful for this group of teaching faculty, administrators, and students to come together to formally review and make recommendations for improving the College's Sexual Misconduct Policy and the manner in which it is implemented. The Committee believes that a similar effort should occur at least annually. The College may wish to establish a standing Sexual Misconduct Policy review committee to do this work, with the understanding and expectation that committee members will consult as appropriate with their respective constituencies. In the event such a committee is formed, this Committee recommends that any teaching faculty positions be filled by the Academic Governance Committee and/or the Provost. This Committee also recommends that the membership of any such committee involve staggered terms,

reporting as a matter of law or College policy. In addition, the College strictly prohibits retaliation against any person who in good faith makes a report of sexual misconduct.

3. Every complaint of sexual misconduct will be addressed promptly, fairly, and equitably.

4. Complaints of sexual misconduct will be investigated, determinations of responsibility will be made, and sanctions for misconduct will be imposed by individuals who are appropriately trained, unbiased, and committed to discharging their responsibilities in accordance with the Policy.

5. The College periodically will review its policies, procedures, and practices to ensure that they are consistent with these core principles. To encourage community input, strengthen trust in the Title IX process, and foster awareness of changes in the Sexual Misconduct Policy, any substantive revisions to the Policy will be made in consultation with appropriate representatives from the faculty, staff and/or student body, except insofar as a change is required by law.

## C. The Title IX Coordinator and Title IX Team

The Title IX Coordinator is charged with coordinating the College's program to comply with Title IX of the Education Amendments of 1972. This includes leading the College's efforts to respond to reports of conduct that could trigger the Sexual Misconduct Policy. The Title IX Coordinator and other members of the Title IX Team also are available to meet with any individual to provide information about the implementation of the Sexual Misconduct Policy (including the availability of interim measures, the investigation, and the resolution/sanction process), as well as discussing other resources within the College community and beyond. The Title IX Team, including the Title IX Coordinator, Deputy Title IX Coordinators, and/or other qualified members of the College community, will assist, as necessary, with these efforts.

The Title IX Coordinator at least annually will report to the College community relevant information relating to the Sexual Misconduct Policy, such as the number and types of matters investigated, the number and types of cases in which findings of responsibility were made, the

number and types of sanctions imposed, and the time frames in which cases were resolved.

**The College's Interim Title IX Coordinator is:**

> Jamie Hoag
> Interim Director of Title IX Initiatives and Title IX Coordinator
> Hogan Campus Center, Room 505
> 508-793-3336
> jhoag@holycross.edu

Where the Title IX Coordinator is listed as the designated point of contact for any role in the Sexual Misconduct Policy, he or she may designate a Deputy Title IX Coordinator or another appropriate member of the College community to assume the role at issue, as necessary. Each of these individuals is available to receive a report from any member of the College community who believes the Sexual Misconduct Policy has been violated. The Deputy Title IX Coordinators also can assist others, including Responding Parties and witnesses, in understanding the College's Sexual Misconduct Policy and procedures.

[list of the Deputy Title IX Coordinators]

17

## ADDENDUM B – CONFLICTS OF INTEREST
## FOR THE SANCTIONING OFFICIAL

The following is a suggested, revised version of Section VII.B.5.(a), which currently appears at p. 20 of the Sexual Misconduct Policy.  The suggested, new language, which essentially tracks the language relating to conflicts in connection with the Determination Panel (p. 25) and the Appeals Panel (p. 29), is highlighted in yellow.

    **(a) Sanctioning Decision.**  The College employees responsible for determining sanctions are as follows.  As soon as possible, but no later than three (3) calendar days after delivery of the Determination Panel's notification of decision, the Parties should inform the Title IX Coordinator (in writing) of any conflicts of interest in regard to the Sanctioning Official.  The Title IX Coordinator, in consultation with other College officials as appropriate, will determine whether a disqualifying conflict of interest exists, in which case the Title IX Coordinator will appoint a different Sanctioning Official.  The Title IX Coordinator's decision regarding any conflicts is final.

18

## ADDENDUM C – SANCTION TYPES AND FACTORS

The following is a suggested, revised version of what now appears in Section VII.B.5. of the Sexual Misconduct Policy (pp. 26-28). Language that is materially new or different from the current Policy is highlighted in yellow.

### 5. Determining Sanctions

(a) **Sanctioning Decision.** The College employees responsible for determining sanctions are as follows:

    (i) **Students.** Sanctions regarding students and student groups, organizations and teams will be determined by the Associate Dean of Students (or his or her designee), who may do so in consultation with other College officials and after considering any prior College discipline of the Responding Party. Sanctions may be determined during the same meeting in which responsibility is determined, as set forth in Sections VII.B.4(c) and (d).

    (ii) **Teaching Faculty.** Sanctions regarding teaching faculty will be determined by the Dean of the College (or his/her designee) in consultation with other College officials as appropriate. The Title IX Coordinator will provide the Provost/Dean of the College ("Dean of the College") with a copy of the Determination Panel's written notification of its determination of responsibility as well as the Investigative Report and information concerning any prior College discipline of the Responding Party. If the Dean of the College (or his/her designee) determines that a sanction of dismissal is recommended, the sanction will be reviewed under Section VII.B.7(b). The Dean of the College will then provide written notification to the Title IX Coordinator of the action taken with regard to the faculty member.[10]

---

[10] Consistent with Section 9(i), the Dean of the College, in consultation with the Title IX Coordinator, may designate a person who currently holds a leadership position in Academic Affairs to serve in this role.

     (iii) **Exempt Employees, Other Than Teaching Faculty.**  Sanctions regarding exempt employees, as defined by the College, will be determined by the Employee's Vice President (or his/her designee) or in the case of an employee in the Athletics Department or who reports to the President, the President's designee.  The Director of Human Resources (or his/her designee) will be consulted, and other College officials may be consulted, on any sanction.  The Title IX Coordinator will provide the Sanctioning Official with a copy of the Determination Panel's written notification of its determination of responsibility as well as the Investigative Report and information concerning any prior College discipline of the Responding Party.

     (iv) **Non-Exempt Employees and Third Parties.**  Sanctions regarding non-exempt employees, as defined by the College, vendors, independent contractors and other third parties will be determined by the Director of Human Resources (or his/her designee), who may consult with other College officials.  The title IX Coordinator will provide the Sanctioning Official with a copy of the Determination Panel's written notification of its determination of responsibility as well as the Investigative Report and information concerning any prior College discipline of the Responding Party.

  **(b)  Types of Sanctions.**

     (i) **Employees, including Faculty Members.**  Sanctions imposed with respect to Responding Parties who are employees or faculty members may include, but are not limited to, one or more of the following:  dismissal from employment, non-renewal of an employment contract, suspension (without pay), probation, reprimand, warning, restitution, training and/or counseling, no-contact order, removal from an administrative appointment, removal of one or more job responsibilities, removal from a committee, removal from a leadership position, reassignment of advisees, prohibition against new advisees, limitation or loss of rights or privileges, loss of awards and/or honors, and/or community service.

20

(ii) **Students.**  Sanctions may include, but are not limited to, one or more of the following: expulsion, suspension, probation, reprimand, warning, restitution, education/counseling, no-contact order, restriction from extracurricular programs or activities, loss of leadership opportunity or positions in activities, housing restriction/relocation, loss or restriction from College employment, limitation or loss of rights or privileges, loss of awards and/or honors, and/or community service.

(iii) **Student Groups, Organizations and Teams.**  Sanctions for groups, organizations and teams may include, but are not limited to, one or more of the following: suspension, revocation or denial of registration or recognition, probation, reprimand, warning, restitution, education, restriction, limitation or loss of rights or privileges, loss of awards and/or honors, and/or community service.

**(c) Considerations.**

In determining an appropriate sanction, the College will take into account the nature and degree of sanction that may be necessary to stop the misconduct, prevent it from recurring, and address its effects and also may take into account any other factors that may lead to a fair and appropriate outcome under the circumstances.  Such factors may include, for example, but are not limited to:

- The nature and circumstances of the misconduct, including whether it involved violence, the threat of violence, or coercion; how severe or pervasive it was; whether it occurred once, more than once, or repeatedly; whether it was intentional, willful, or reckless; and whether or to what extent the Party found responsible intended or reasonably should have expected that the conduct would harm the Complaining party or others.

- The impact of the misconduct on the Complaining Party, including whether or to what extent the misconduct has interfered or may interfere with the Complaining Party's education, employment, or other opportunities at the College, and whether or to what extent the misconduct has resulted or may result in physical, emotional, or other harm.

21

- The impact of the misconduct on the College community, including whether or to what extent the misconduct has interfered or may interfere with an educational, employment, or other aspect of the College environment.
- Any mitigating or aggravating circumstances, such as whether the Party found responsible has a history of other misconduct and/or discipline at the College and whether the Party found responsible accepted responsibility and/or remorse for his or her conduct and its effects.
- The range of sanctions imposed in cases involving similar or analogous circumstances.

**(d)  Additional Remedies.**

The sanctioning authority ... may also identify additional remedies to address the effects of the conduct on the impacted Party.  Remedies may include extending or making permanent any interim or safety measures. If a Complaining Party or Responding Party declined or did not take advantage of a specific service or resource previously offered, the College may re-offer the service as applicable or necessary. The Title IX Coordinator also may consider broader remedial action for the campus community, such as increased supervision or monitoring, targeted or increased education and prevention efforts, and review of policies and procedures.  In addition, in the Title IX Coordinator may refer any matter raised, but not addressed hereunder, that may potentially violate any other College policy, rule, or procedure to the appropriate College officials to address such matters, irrespective of the finding under this Policy.

22

## ADDENDUM D – NOTIFICATION, IMPLEMENTATION AND ENFORCEMENT OF SANCTIONS

The following is a suggested, revised version of what now appears in Section VII.B.6. of the Sexual Misconduct Policy (p. 28).  Language that is materially new or different from the current Policy is highlighted in yellow.

### 6. Notification, Implementation and Enforcement of Investigation Outcome

Upon completion of Sections VII.B.4 or 5, as necessary, the Title IX Coordinator will inform the parties simultaneously and in writing of (i) the outcome of the disciplinary proceeding; and (ii) the procedures for either party to appeal the result of the disciplinary proceeding.  The Title IX Coordinator will also inform other College officials with a legitimate educational or employment interest about the outcome of the finding.  As a general matter, those other College officials will include the following:

- If a student has been found responsible – the student's class dean and other appropriate College officials.

- If a member of the Teaching Faculty has been found responsible – the individual's department chair, the director of any appropriate academic program and, if applicable, one or more class deans.

- If an exempt employee other than Teaching Faculty has been found responsible – the individual's direct supervisor.

- If a non-exempt employee has been found responsible – the individual's direct supervisor.

Notice to these other individuals will be accompanied by a statement that the information may not be further disclosed to anyone else without the specific approval of the Title IX Coordinator, except as necessary to protect the safety of one or more individuals.

The Title IX Coordinator, in consultation with the Sanctioning Official and other College employees as appropriate, is responsible for ensuring that any sanctions or additional remedies are implemented and enforced.

23

## ADDENDUM E – INTERIM MEASURES

The following is a suggested, revised version of what now appears in Section VII.B.1. of the Sexual Misconduct Policy (pp. 20-21).  Language that is materially new or different from the current Policy is highlighted in yellow.

### 1.  Initial Steps: Interim Measures

After receiving a report of conduct that could fall under the Sexual Misconduct Policy, the Title IX Coordinator or his or her designee[6], in consultation with other College personnel as appropriate, will take a number of initial steps.  These initial steps are not an investigation.  Rather, these initial steps will enable the College to assess the need to take any immediate action to address the safety, health and well-being of the Complaining Party[7] or others within the College community, and to determine the next steps for investigating the reported conduct.

These initial steps may include, but are not limited to, the following:

**(a)** The Title IX Coordinator will contact the Complaining Party and encourage him/her/zie/them to meet to discuss the nature and circumstances of the reported conduct, review relevant documentation that is available and address the need for any interim measures that may be necessary to provide for the Complaining Party's safety, health or well-being and to prevent interference with the Complaining Party's educational, employment, or other opportunities.  Such interim measures can include, for example, the issuance of no-contact orders, adjustments to academic schedules, changes to living, dining, transportation, working and/or immigration arrangements, statutorily provided leave to employees pursuant to Mass. G.L. c. 49, §52D.  The Title IX Coordinator will assess and implement interim measures in consultation with other College employees as appropriate.

**(b)** The Title IX Coordinator, in consultation with other relevant College employees, will assess the reported conduct to determine whether the circumstances pose a threat to the health or safety of the College community, or one or more members of the community, that warrants issuance of a timely warning, a stay-away order for any persons, or any other interim protections, including, but not limited to, the interim suspension of a student, placing an employee on paid or unpaid leave,

24

temporarily removing an individual from a leadership, advising, or other position, or temporarily suspending or restricting one or more aspects of an individual's activities or privileges prior to completing an investigation. During the interim action, the College reserves the right to prohibit the individual from entering upon the College's property or participating in any College activities absent written authorization from an appropriate College official. The failure of an individual to comply with an interim restriction is a violation of this Policy and may lead to additional disciplinary action. The decision to impose interim restrictions will be communicated by the Title IX Coordinator in writing and will be effective immediately.

(c)   The Title IX Coordinator will notify the Complaining Party about: (a) the availability of the Sexual Misconduct Policy; and (b) the right to report and the right to decline to report the matter to the Department of Public Safety and/or to local law enforcement if the conduct is potentially criminal in nature (and that such a report will not change the College's obligation to potentially investigate the matter, but it may briefly delay the timing of the investigation if a law enforcement agency requests that the College delay its process for a reasonable amount of time to allow it to gather evidence of criminal conduct).

(d)   The Title IX Coordinator will notify the Complaining Party of the available resources for seeking medical treatment, counseling, spiritual guidance, other interim measures and other resources. See Sections IV and V. See College and Community Resources.

(e)   If the Title IX Coordinator determines the reported conduct could, trigger the Sexual Misconduct Policy, he or she will contact the Complaining Party to discuss that determination. In connection with allegations of sexual misconduct, if, at this time, the Complaining Party requests that the process not move forward, the College will weigh that request against the College's obligation to address any risk of harm to the Complaining Party or other individuals in the community and the nature of the incident or conduct at issue. Except in limited circumstances in which a Complaining Party's request not to proceed to investigation is granted, the Title IX Coordinator will proceed to Section VII.V.3. If an investigation or informal resolution will be commenced (and at any other time the Title IX Coordinator determines is appropriate), the Title IX Coordinator will notify the Responding

25

Party of available resources for seeking medical treatment, counseling, spiritual guidance, interim measures, and other resources.

**(f)** If the Title IX Coordinator determines that the reported conduct would not, in any way, trigger the Sexual Misconduct Policy, he or she will advise the Complaining Party of such in writing and refer the reported conduct to the appropriate administrator for handling consistent with any other appropriate College policy.  (If new information is subsequently provided, the decision whether or not to investigate the reported conduct may be reevaluated.)

71440455v.10

# COMPLAINT EXHIBIT B

# FACULTY CONTRACT

Agreement made this _____ *10 th* _____ day of _____ *March* _____, 1997, between the College of the Holy Cross, hereinafter called the College, party of the first part, and CHRISTOPHER A. DUSTIN  hereinafter called the Teacher, party of the second part.

### Witnesseth:

**First:**  The College appoints and employs the Teacher as full time **ASSOCIATE PROFESSOR** in the **DEPARTMENT OF PHILOSOPHY**, and the Teacher hereby accepts the said appointment and employment for the academic year, 1997-1998, to commence at the beginning of the academic year, and to terminate with Commencement of that year, upon the terms and conditions herein stated, and upon the terms and conditions set forth in THE STATUTES OF THE FACULTY, as amended from time to time, which are incorporated herein and made a part hereof.

**Second:**  The compensation to be paid the Teacher for his/her services as aforesaid shall be **FIFTY THOUSAND SEVEN HUNDRED THREE DOLLARS ($50,703.00)** payable in equal semi-monthly installments commencing on the fifteenth of September, 1997.

**Third:**  This contract shall be renewed on the same or better terms and conditions unless either party shall give notification of the intention to terminate it according to the requirements for such notification set down in the official STATUTES OF THE FACULTY, as amended from time to time.

IN WITNESS WHEREOF the College has caused its corporate seal to be affixed hereto and these presents to be signed by the Provost, and the Teacher has hereunto set his/her hand the day and year first written above.

THE COLLEGE OF THE HOLY CROSS

by _____
                    Provost

_____
                    Teacher

seal

# COMPLAINT EXHIBIT C

## CHAPTER VII: DISMISSAL OF MEMBERS OF THE TENURED FACULTY FOR CAUSE

**A.** A tenured member of the faculty may be dismissed for serious neglect of academic duties, for serious violation of the College's policies on scholarly misconduct or harassment or for such public misconduct as disqualifies him or her from continued association with the College. [99,100] The remaining provisions of this Chapter VII shall not apply to any matter that is adjudicated pursuant to the College's discrimination and harassment policies, including the Sexual Misconduct Policy.

**B.** If the Provost and Dean of the College, after consultation with the department Chair, (or other tenured faculty member in the department, if the Chair is implicated in the dismissal process)[101], determines that a tenured member of faculty should be dismissed for one of the reasons above stated, he or she shall so recommend in writing to the President. The Provost and Dean of the College shall include with this recommendation a written statement specifying the charges against the tenured faculty member and the facts pertaining to the case. He or she shall forthwith furnish to the accused tenured faculty member a copy of all papers so submitted to the President.

**C.** If the President determines that in the best interests of the College immediate action is required, he may summarily suspend the accused tenured faculty member, but without loss of salary.

**D.** The President shall give written notice to the accused tenured faculty member that he or she has the right to a hearing on the charges before the subcommittee on appeals (see Chapter III.C.1.a.(1)), provided that the individual makes written request to the President within ten days after the sending of such a notice.

**E.** If no such request for a hearing is made, the President shall refer the case to the Board of Trustees for decision. If request for a hearing is duly made, the President shall refer the case for hearing to the subcommittee on appeals, and shall transmit to the subcommittee the recommendation for dismissal, received from the Provost and Dean of the College[102], with statement of charges and facts.

**F.** Upon the referral of the case to it, the subcommittee shall as soon as practical conduct a hearing. The subcommittee shall prescribe rules of procedures for the conduct of such hearings and shall inform the accused tenured faculty member of such rules prior to the commencement of the hearing. The subcommittee may, with the approval of the President, retain counsel to assist it at the hearing. If the accused tenured faculty member so requests, prior to the commencement of the hearing, or if the subcommittee determines it to be necessary, a stenographic record of the testimony shall be made. A transcript of such testimony shall, if the accused tenured faculty member so requests, be furnished at his or her expense.
The accused tenured faculty member shall have the right to the assistance of counsel or an advisor, the right to be present at the hearing at all times when evidence is being presented to the subcommittee, and the right to have the subcommittee call witnesses on his or her behalf. No member of the subcommittee shall consult any person as to any matter in issue or discuss the case with any person apart from meetings of the committee. The hearing shall be private.

# COMPLAINT EXHIBIT D


**COLLEGE OF THE**
**Holy Cross**

March 1, 2019

*Transmitted via Email and Certified Mail*

Prof. Christopher Dustin
282 West Thompson Road
Thompson, CT 06277

RE:  **Notice of Investigation - Additional Allegations**

Dear Professor Dustin:

I write to notify you of additional allegations of sexual misconduct that have been reported to the College.  This notice letter is simply a notification of information received by the College and is not in any way a judgment about such allegations.  As we shared on February 1, 2019, a fact-finder has been engaged to conduct a thorough and impartial investigation and you will be afforded the rights in the Policy to respond to the additional allegations.

**SR Witness:**

Mr. Sean Redrow (SR) brought forth concerns about your behavior during incidents that allegedly took place on campus during 1994-1998. It is my understanding that the College has not previously investigated these concerns during SR's period of enrollment.

A brief initial summary of SR's allegations is that you engaged in inappropriate behavior of a sexual nature that was unwelcome, including, but not limited to, (a) making offensive or obscene comments about a sexual dream you had concerning a female student, which lead to orgasm; and (b) creating an uncomfortable environment through unwelcome gift giving to female students.

In reviewing the information that has been shared with the College to date, I have determined that these allegations potentially could implicate conduct prohibited by the College's Policy on Harassment as in effect from 1994-1998.   Specifically, they could constitute prohibited harassment. Please find the relevant policy enclosed.

**RM Witness:**

Dr. Ryan Malone (RM) brought forth concerns about your behavior during incidents that allegedly took place at various locations on and off campus while he was a student at the College from 1996-2000.  It is my understanding that the College has not previously investigated these concerns during RM's period of enrollment.

A brief initial summary of RM's allegations is that he witnessed you engage in inappropriate behavior of a sexual nature that was unwelcome, which occurred during trip for a Schola engagement to sing mass for the Alumni Club in Washington, DC during the 1996-97 academic year. This alleged conduct includes, but is not limited to, (a) excessive drinking of alcohol with students and (b) making sexual advances to a student participating in the Schola, (JB)[1].   Please note that that JB has not filed a complaint with this office nor indicated that she wishes to participate in the investigation at the current time.

Additional allegations reported by RM include unwelcome sexual conduct during 1998-1999 including, but not limited to (a) flirtatious gestures directed toward a student, (JG[2]), (b) unwelcome staring and gazing at female students, and (c) unsolicited gift giving directed at JG. Please note that that JG has not filed a complaint with this office nor indicated that she wishes to participate in the investigation at the current time.

In reviewing the information that has been shared with the College to date, I have determined that these allegations potentially could implicate conduct prohibited by the College's Policy on Harassment that was in effect during 1996 - 2000. Specifically, they could constitute prohibited harassment. Further, your conduct may implicate the College's policy regarding the use of alcohol while performing any job related activity, whether on or off College premises. Please find the relevant policy enclosed.

In addition, it was alleged to RM that you engaged in a sexual relationship with an unidentified student and rented the student an apartment in Worcester for the purpose of facilitating the relationship. The unidentified student is alleged to have been enrolled in one or more classes of a female faculty member (now deceased) with whom you had a close personal relationship. The sexual relationship was alleged to have occurred during the last year of the female faculty member's life (which was believed to have occurred five or more years ago). In reviewing the information that has been shared with the College to date, I have determined that these allegations potentially could implicate conduct prohibited by the College's Statutes of the Faculty Policy on Consensual Sexual Relations or the Sexual and Discriminatory Harassment Policy as in effect prior to 2015. Specifically, they could constitute prohibited consensual sexual relationship. Please find the relevant policies enclosed. Please note if further information becomes available regarding the identities of these parties, it will be provided to you.

**Reports to Margaret Freije**

The College has received allegations shared by multiple persons with Margaret Freije that you engaged in a sexual relationship with a student, (NB)[3], during the student's enrollment at the

---

[1] The Title IX Office will call you directly and share the identity of student JB but I am not including it in this letter to protect her privacy.
[2] The Title IX Office will call you directly and share the identity of student JG but I am not including it in this letter to protect her privacy.

[3] The Title IX Office will call directly and share the identity of student NB but I am not including it in this letter to protect her privacy.

College in 1996. In reviewing the information that has been shared with the College to date, I have determined that these allegations potentially could implicate conduct prohibited by the College's Policy on Harassment or other relevant college policies on standard of professional conduct that were in effect during 1996. Specifically, they could constitute prohibited harassment as a sexual relationship in which an inherent imbalance of power existed. Please find the relevant policy enclosed.

Please note that NB has <u>not</u> filed a complaint with this office nor indicated that she wishes to participate in the investigation at the current time.

<u>Investigation under the College's Sexual Misconduct Policy:</u>

Please note that these are my initial assessments based upon the review of the information that has been shared with me, which assessment was not an investigation or determination. This notice of allegations does not imply any judgment about responsibility or lack of responsibility on behalf of either party. The College makes determinations with respect to alleged misconduct pursuant to the College's process for investigating and resolving complaints.

The investigation and the determination of responsibility and other measures for this matter will proceed in accordance with the College's process for investigating allegations of sexual misconduct set forth in the College's current Sexual Misconduct Policy, which can be found at http://www.holycross.edu/sexual-respect-and-title-ix[4], using the definitions of the prohibited conduct as in effect while the individuals referenced above attended the College as described above. These definitions will be used since these definitions were in effect during the period in which alleged incidents occurred and of which individuals would have had notice.

<u>Investigator:</u>

The College has assigned Mr. Scott A. Roberts and Arielle Kristan, of Hirsch Roberts Weinstein LLP, Boston, MA to serve as the investigators. I will ask Mr. Roberts to schedule a time for you to speak with him.

<u>Advisor:</u>

You have informed me that Inga Bernstein is the advisor of your choice. The advisor may be present during any College disciplinary proceeding, including any related meeting, interview, or hearing, held pursuant to the Sexual Misconduct Policy. Changes to the advisor selected by a Party may be made for good cause with my prior approval, as determined in my sole discretion.

---

[4] As in all cases, the College retains the right to determine, in its sole discretion, if it will vary from the standard process described for investigating allegations of sexual misconduct if there are extenuating circumstances involving the Parties, or if I, in consultation with appropriate administrators, determines it is in the best interest of the College and/or the community to do so.

3

Advisors may not participate actively during the interview and may not speak or otherwise communicate on the part of the Party that the advisor is advising. However, the advisor may ask to suspend the interview briefly to provide private consultation related to the disciplinary proceeding in progress. Accommodations, including scheduling of interviews or reviews, generally will not be made for any advisors if they unduly delay the process.

In my communications to you on January 30, 2019, you were provided certain interim restrictions. In addition, I have approved your contact with Joseph Lawrence, Mary Catherine McDonald, and the Director of Human Resources, David Achenbach. Going forward, please direct any questions or concerns regarding academic matters to my attention in lieu of Margaret Freije.

**To the extent that you would like to request further adjustments to the initial interim restrictions, please call me at your earliest convenience. I would be happy to discuss them with you and make appropriate adjustments.**

**Confidential Resources:**

As an employee of the college, you have 24-hour access to confidential employee assistance counseling through KGA at 800-648-9557, kgreer.com.   Please let me know if you need assistance in connecting with resources or accommodations.

**Prohibition against Retaliation:**

Please note that the College prohibits retaliation against any persons for their participation or involvement in the reporting, investigation, and/or resolution of matters subject to the Sexual Misconduct Policy. Retaliation includes, but is not limited to, acts or words that constitute intimidation, threats, or coercion intended to pressure any individual to participate, not participate, or provide false or misleading information during any proceeding under the Sexual Misconduct Policy. It is recommended that parties err on the side of caution and avoid any interactions that could be perceived as retaliatory.

If you feel that you have been subject to retaliatory behavior, please contact me immediately at crogers@holycross.edu or 508-793-2596.

For more information, please see the Policy (www.holycross.edu/sexual-respect-and-title-ix).

Please let me know if you have any questions about resources, the process, or this letter.

Sincerely,

Cheryl Rogers
Assistant Director of Title IX Initiatives/Deputy Title IX Coordinator
Hogan 522, (508) 793-2596
crogers@holycross.edu

4

# COMPLAINT EXHIBIT E


COLLEGE OF THE
Holy Cross

June 19, 2019

***Transmitted via Email***

Prof. Christopher Dustin
282 West Thompson Road
Thompson, CT 06277

**RE: Notice of Investigation – Additional Allegations**

Dear Professor Dustin:

I write to notify you of additional allegations of sexual misconduct that have been reported to the College. This notice letter is simply a notification of information received by the College and is not in any way a judgment about such allegations. As we shared on February 1, 2019, a fact-finder has been engaged to conduct a thorough and impartial investigation and you will be afforded the rights in the Policy to respond to the additional allegations.

The College has received allegations shared by multiple persons with Margaret Freije that you engaged in a sexual relationship with a student, (NB), during the student's enrollment at the College in 1996. (NB) has agreed to participate in the investigation and has shared the following allegations with the College:

She reported that (1) you first kissed her during her junior year, in or about April 1995; (2) during her senior year (the 1995/1996 academic year), you engaged in sexual intercourse and sexual activity with NB on multiple occasions in various locations on campus and off campus; (3) you encouraged (NB) to take a course with you while engaged in an intimate relationship; (4) you were responsible for (NB) winning a philosophy award, which she states that she did not deserve.

In reviewing the information that has been shared with the College to date, I have determined that these allegations potentially could implicate conduct prohibited by the College's Policy on Harassment or other relevant college policies on standard of professional conduct that were in effect during 1995 and 1996. Specifically, they could constitute prohibited harassment as a sexual relationship in which an inherent imbalance of power existed.

In the course of the investigation to date, you have denied the existence of any sexual or romantic relationship with NB. If it is found by a preponderance of the evidence that a sexual or romantic relationship existed, the College will also review the allegation of whether you have knowingly made a false statement – either explicitly or by omission – about the existence of a romantic and/or sexual relationship during the investigation pursuant to Section 9(A) of the Process for Investigating and Resolving Complaints.

**Investigation under the College's Sexual Misconduct Policy:**
Please note that these are my initial assessments based upon the review of the information that has been shared with me, which assessment was not an investigation or determination. This notice of allegations does not imply any judgment about responsibility or lack of responsibility on behalf of either party. The College makes determinations with respect to alleged misconduct pursuant to the College's process for investigating and resolving complaints.

The investigation and the determination of responsibility and other measures for this matter will proceed in accordance with the College's process for investigating allegations of sexual misconduct set forth in the College's current Sexual Misconduct Policy, which can be found at http://www.holycross.edu/sexual-respect-and-title-ix[1], using the definitions of the prohibited conduct as in effect while the individuals referenced above attended the College as described above. These definitions will be used since these definitions were in effect during the period in which alleged incidents occurred and of which individuals would have had notice.

**Interim Measures:**
I would like to remind you that you are prohibited from contacting any current and/or former students and current and/or former employees of the College in any manner or media with a few modifications granted by the Office of Title IX Initiatives.

**Prohibition against Retaliation:**
Please note that the College prohibits retaliation against any persons for their participation or involvement in the reporting, investigation, and/or resolution of matters subject to the Sexual Misconduct Policy. Retaliation includes, but is not limited to, acts or words that constitute intimidation, threats, or coercion intended to pressure any individual to participate, not participate, or provide false or misleading information during any proceeding under the Sexual Misconduct Policy. It is recommended that parties err on the side of caution and avoid any interactions that could be perceived as retaliatory. If you feel that you have been subject to retaliatory behavior, please contact me immediately at crogers@holycross.edu or 508-793-2596.

**Confidential Resources:**
As an employee of the college, you have 24-hour access to confidential employee assistance counseling through KGA at 800-648-9557, kgreer.com.   Please let me know if you need assistance in connecting with resources or accommodations.

Sincerely,

Cheryl Rogers
Assistant Director of Title IX Initiatives/Deputy Title IX Coordinator
Hogan 522, (508) 793-2596; crogers@holycross.edu

---

[1] As in all cases, the College retains the right to determine, in its sole discretion, if it will vary from the standard process described for investigating allegations of sexual misconduct if there are extenuating circumstances involving the Parties, or if I, in consultation with appropriate administrators, determines it is in the best interest of the College and/or the community to do so.

2

# COMPLAINT EXHIBIT F

9/12/2020                                   Gmail - NB:CD - Notice of Outcome

 Gmail                                    Christopher Dustin <christopheradustin@gmail.com>

## NB:CD - Notice of Outcome
1 message

**Buri, Denielle** <dburi@holycross.edu>                          Sun, Jan 26, 2020 at 5:09 PM
To: Christopher Dustin <christopheradustin@gmail.com>

Dear Chris:

I am writing with the outcome of the Determination Panel in the outstanding Title IX matter entitled NB:CD.

Applying the preponderance of evidence standard, the Determination Panel found you responsible for two violations of College policies: (1) Failure to report a romantic and/or sexual relationship while in a supervisory role with respect to the complaining party in violation of the November 27, 1995 revision of the Faculty Information Manual; and (2) Violation of the 2018-2019 Sexual Misconduct Policy, Duty of Honesty.

Again applying the preponderance of evidence standard, the Panel found you not responsible for sexual harassment under the Faculty Information Manual (from 1994-1995), the Harassment on Campus Manual (August 1995 – forward), and/or the Faculty Information Manual (November 27, 1995 – forward). The Panel determined that conduct of a sexual nature occurred between you and the Complainant during the relevant period of time and occurred in a situation with a "clear imbalance of power." However, the panel determined that the conduct was not unwelcome and therefore did not violate the policies governing sexual harassment in effect at the time of the conduct.

**Sanctions**

In light of the findings of responsibility set forth above, the Sanctioning Officer, taking into account the considerations set forth in Section VII.B.5(a)(iv) of the Policy, assigned the following sanctions:

1. Recommendation that you should be dismissed for cause from your tenured faculty position at the College effective immediately.
2. You will not be permitted to be on any properties owned or leased by the College for any purposes or to participate in any events sponsored by the College. If there are personal effects belonging to you that are still on campus, the College will arrange to return those materials to you.
3. The College will notify you of the College's expectation that you will not contact any current or former Holy Cross students.
4. Any awards or honors issued to you by the College are hereby revoked, and you are ineligible for any naming opportunity, award, or honor in the future.

**Right to Appeal**

You have the right to request an appeal of the Panel's decisions and the recommended sanction of dismissal. For information on the appeal process, please see the Policy: www.holycross.edu/sexual-respect-and-title-ix.

The prohibition against retaliation continues to apply. The College prohibits retaliation against any persons for their participation or involvement in the reporting, investigation, and/or resolution of matters subject to the Sexual Misconduct Policy. We take retaliation extremely seriously and sanctions for retaliation can include dismissal from the

College. It is recommended that parties err on the side of caution and avoid any interactions that could be perceived as retaliatory. If you feel that you have been subject to retaliatory behavior, please contact me.

Chris, I know this has been a long process and that you have had to deal with at least three or more Title IX Coordinators on this matter.  I thank you for your patience with the process. Please feel free to reach out to me if you have any questions or concerns or if you would like to discuss.

Sincerely,

remains available on the web for historical purposes only.



## UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE FOR CIVIL RIGHTS

THE ASSISTANT SECRETARY

April 4, 2011

Dear Colleague:

Education has long been recognized as the great equalizer in America. The U.S. Department of Education and its Office for Civil Rights (OCR) believe that providing all students with an educational environment free from discrimination is extremely important. The sexual harassment of students, including sexual violence, interferes with students' right to receive an education free from discrimination and, in the case of sexual violence, is a crime.

Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, and its implementing regulations, 34 C.F.R. Part 106, prohibit discrimination on the basis of sex in education programs or activities operated by recipients of Federal financial assistance. Sexual harassment of students, which includes acts of sexual violence, is a form of sex discrimination prohibited by Title IX. In order to assist recipients, which include school districts, colleges, and universities (hereinafter "schools" or "recipients") in meeting these obligations, this letter[1] explains that the requirements of Title IX pertaining to sexual harassment also cover sexual violence, and lays out the specific Title IX requirements applicable to sexual violence.[2] Sexual violence, as that term is used in this letter, refers to physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent due to the victim's use of drugs or alcohol. An individual also may be unable to give consent due to an intellectual or other disability. A number of different acts fall into the category of sexual violence, including rape,

---

[1] The Department has determined that this Dear Colleague Letter is a "significant guidance document" under the Office of Management and Budget's Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007), *available at:*
http://www.whitehouse.gov/sites/default/files/omb/assets/regulatory_matters_pdf/012507_good_guidance.pdf.
OCR issues this and other policy guidance to provide recipients with information to assist them in meeting their obligations, and to provide members of the public with information about their rights, under the civil rights laws and implementing regulations that we enforce. OCR's legal authority is based on those laws and regulations. This letter does not add requirements to applicable law, but provides information and examples to inform recipients about how OCR evaluates whether covered entities are complying with their legal obligations. If you are interested in commenting on this guidance, please send an e-mail with your comments to OCR@ed.gov, or write to us at the following address: Office for Civil Rights, U.S. Department of Education, 400 Maryland Avenue, SW, Washington, DC 20202.
[2] Use of the term "sexual harassment" throughout this document includes sexual violence unless otherwise noted. Sexual harassment also may violate Title IV of the Civil Rights Act of 1964 (42 U.S.C. § 2000c), which prohibits public school districts and colleges from discriminating against students on the basis of sex, among other bases. The U.S. Department of Justice enforces Title IV.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202-1100
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

remains available on the web for historical purposes only.

sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX.

The statistics on sexual violence are both deeply troubling and a call to action for the nation. A report prepared for the National Institute of Justice found that about 1 in 5 women are victims of completed or attempted sexual assault while in college.[3] The report also found that approximately 6.1 percent of males were victims of completed or attempted sexual assault during college.[4] According to data collected under the Jeanne Clery Disclosure of Campus Security and Campus Crime Statistics Act (Clery Act), 20 U.S.C. § 1092(f), in 2009, college campuses reported nearly 3,300 forcible sex offenses as defined by the Clery Act.[5] This problem is not limited to college. During the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools.[6] Additionally, the likelihood that a woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.[7] The Department is deeply concerned about this problem and is committed to ensuring that all students feel safe in their school, so that they have the opportunity to benefit fully from the school's programs and activities.

This letter begins with a discussion of Title IX's requirements related to student-on-student sexual harassment, including sexual violence, and explains schools' responsibility to take immediate and effective steps to end sexual harassment and sexual violence. These requirements are discussed in detail in OCR's *Revised Sexual Harassment Guidance* issued in 2001 (*2001 Guidance*).[8] This letter supplements the *2001 Guidance* by providing additional guidance and practical examples regarding the Title IX requirements as they relate to sexual violence. This letter concludes by discussing the proactive efforts schools can take to prevent sexual harassment and violence, and by providing examples of remedies that schools and OCR may use to end such conduct, prevent its recurrence, and address its effects. Although some examples contained in this letter are applicable only in the postsecondary context, sexual

---

[3] CHRISTOPHER P. KREBS ET AL., THE CAMPUS SEXUAL ASSAULT STUDY: FINAL REPORT xiii (Nat'l Criminal Justice Reference Serv., Oct. 2007), *available at* http://www.ncjrs.gov/pdffiles1/nij/grants/221153.pdf. This study also found that the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol. *Id.* at xviii.
[4] *Id.* at 5-5.
[5] U.S. Department of Education, Office of Postsecondary Education, Summary Crime Statistics (data compiled from reports submitted in compliance with the Clery Act), *available at* http://www2.ed.gov/admins/lead/safety/criminal2007-09.pdf. Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person, forcibly and/or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. 34 C.F.R. Part 668, Subpt. D, App. A.
[6] SIMONE ROBERS ET AL., INDICATORS OF SCHOOL CRIME AND SAFETY: 2010 at 104 (U.S. Dep't of Educ. & U.S. Dep't of Justice, Nov. 2010), *available at* http://nces.ed.gov/pubs2011/2011002.pdf.
[7] ERIKA HARRELL & MICHAEL R. RAND, CRIME AGAINST PEOPLE WITH DISABILITIES, 2008 (Bureau of Justice Statistics, U.S. Dep't of Justice, Dec. 2010), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/capd08.pdf.
[8] The *2001 Guidance* is available on the Department's Web site at http://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf. This letter focuses on peer sexual harassment and violence. Schools' obligations and the appropriate response to sexual harassment and violence committed by employees may be different from those described in this letter. Recipients should refer to the *2001 Guidance* for further information about employee harassment of students.

remains available on the web for historical purposes only.

Page 3 – Dear Colleague Letter: Sexual Violence

harassment and violence also are concerns for school districts. The Title IX obligations discussed in this letter apply equally to school districts unless otherwise noted.

## Title IX Requirements Related to Sexual Harassment and Sexual Violence

### Schools' Obligations to Respond to Sexual Harassment and Sexual Violence

Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX.[9]

As explained in OCR's *2001 Guidance*, when a student sexually harasses another student, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently severe. For instance, a single instance of rape is sufficiently severe to create a hostile environment.[10]

Title IX protects students from sexual harassment in a school's education programs and activities. This means that Title IX protects students in connection with all the academic, educational, extracurricular, athletic, and other programs of the school, whether those programs take place in a school's facilities, on a school bus, at a class or training program

---

[9] Title IX also prohibits gender-based harassment, which may include acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping, even if those acts do not involve conduct of a sexual nature. The Title IX obligations discussed in this letter also apply to gender-based harassment. Gender-based harassment is discussed in more detail in the *2001 Guidance*, and in the 2010 Dear Colleague letter on Harassment and Bullying, which is available at http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[10] *See, e.g., Jennings v. Univ. of N.C.*, 444 F.3d 255, 268, 274 n.12 (4th Cir. 2006) (acknowledging that while not an issue in this case, a single incident of sexual assault or rape could be sufficient to raise a jury question about whether a hostile environment exists, and noting that courts look to Title VII cases for guidance in analyzing Title IX sexual harassment claims); *Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 n.4 (6th Cir. 2000) ("'[w]ithin the context of Title IX, a student's claim of hostile environment can arise from a single incident'" (quoting *Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 62 (D. Me. 1999))); *Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (explaining that rape and sexual abuse "obviously qualif[y] as...severe, pervasive, and objectively offensive sexual harassment"); *see also Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) (in the Title VII context, "a single act can create a hostile environment if it is severe enough, and instances of uninvited physical contact with intimate parts of the body are among the most severe types of sexual harassment"); *Turner v. Saloon, Ltd.*, 595 F.3d 679, 686 (7th Cir. 2010) (noting that "'[o]ne instance of conduct that is sufficiently severe may be enough,'" which is "especially true when the touching is of an intimate body part" (quoting *Jackson v. Cnty. of Racine*, 474 F.3d 493, 499 (7th Cir. 2007))); *McKinnis v. Crescent Guardian, Inc.*, 189 F. App'x 307, 310 (5th Cir. 2006) (holding that "'the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment'" in Title VII cases (quoting *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 436 (5th Cir. 2005))).

remains available on the web for historical purposes only.

Page 4 – Dear Colleague Letter: Sexual Violence

sponsored by the school at another location, or elsewhere. For example, Title IX protects a student who is sexually assaulted by a fellow student during a school-sponsored field trip.[11]

If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.[12] Schools also are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures. Because of these requirements, which are discussed in greater detail in the following section, schools need to ensure that their employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly. Training for employees should include practical information about how to identify and report sexual harassment and violence. OCR recommends that this training be provided to any employees likely to witness or receive reports of sexual harassment and violence, including teachers, school law enforcement unit employees, school administrators, school counselors, general counsels, health personnel, and resident advisors.

Schools may have an obligation to respond to student-on-student sexual harassment that initially occurred off school grounds, outside a school's education program or activity. If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures. Because students often experience the continuing effects of off-campus sexual harassment in the educational setting, schools should consider the effects of the off-campus conduct when evaluating whether there is a hostile environment on campus. For example, if a student alleges that he or she was sexually assaulted by another student off school grounds, and that upon returning to school he or she was taunted and harassed by other students who are the alleged perpetrator's friends, the school should take the earlier sexual assault into account in determining whether there is a sexually hostile environment. The school also should take steps to protect a student who was assaulted off campus from further sexual harassment or retaliation from the perpetrator and his or her associates.

Regardless of whether a harassed student, his or her parent, or a third party files a complaint under the school's grievance procedures or otherwise requests action on the student's behalf, a school that knows, or reasonably should know, about possible harassment must promptly investigate to determine what occurred and then take appropriate steps to resolve the situation. As discussed later in this letter, the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct. The specific steps in a school's

---

[11] Title IX also protects third parties from sexual harassment or violence in a school's education programs and activities. For example, Title IX protects a high school student participating in a college's recruitment program, a visiting student athlete, and a visitor in a school's on-campus residence hall. Title IX also protects employees of a recipient from sexual harassment. For further information about harassment of employees, see *2001 Guidance* at n.1.

[12] This is the standard for administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief. *See 2001 Guidance* at ii-v, 12-13. The standard in private lawsuits for monetary damages is actual knowledge and deliberate indifference. *See Davis v. Monroe Cnty. Bd. of Ed.*, 526 U.S. 629, 643, 648 (1999).

remains available on the web for historical purposes only.

Page 5 – Dear Colleague Letter: Sexual Violence

investigation will vary depending upon the nature of the allegations, the age of the student or students involved (particularly in elementary and secondary schools), the size and administrative structure of the school, and other factors. Yet as discussed in more detail below, the school's inquiry must in all cases be prompt, thorough, and impartial. In cases involving potential criminal conduct, school personnel must determine, consistent with State and local law, whether appropriate law enforcement or other authorities should be notified.[13]

Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution) before beginning an investigation. If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited.[14] The school also should tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

As discussed in the *2001 Guidance*, if the complainant continues to ask that his or her name or other identifiable information not be revealed, the school should evaluate that request in the context of its responsibility to provide a safe and nondiscriminatory environment for all students. Thus, the school may weigh the request for confidentiality against the following factors: the seriousness of the alleged harassment; the complainant's age; whether there have been other harassment complaints about the same individual; and the alleged harasser's rights to receive information about the allegations if the information is maintained by the school as an "education record" under the Family Educational Rights and Privacy Act (FERPA), 20 U.S.C. § 1232g; 34 C.F.R. Part 99.[15] The school should inform the complainant if it cannot ensure confidentiality. Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence. Examples of such steps are discussed later in this letter.

Compliance with Title IX, such as publishing a notice of nondiscrimination, designating an employee to coordinate Title IX compliance, and adopting and publishing grievance procedures, can serve as preventive measures against harassment. Combined with education and training programs, these measures can help ensure that all students and employees recognize the

---

[13] In states with mandatory reporting laws, schools may be required to report certain incidents to local law enforcement or child protection agencies.

[14] Schools should refer to the *2001 Guidance* for additional information on confidentiality and the alleged perpetrator's due process rights.

[15] For example, the alleged harasser may have a right under FERPA to inspect and review portions of the complaint that directly relate to him or her. In that case, the school must redact the complainant's name and other identifying information before allowing the alleged harasser to inspect and review the sections of the complaint that relate to him or her. In some cases, such as those where the school is required to report the incident to local law enforcement or other officials, the school may not be able to maintain the complainant's confidentiality.

remains available on the web for historical purposes only.

Page 6 – Dear Colleague Letter: Sexual Violence

nature of sexual harassment and violence, and understand that the school will not tolerate such conduct. Indeed, these measures may bring potentially problematic conduct to the school's attention before it becomes serious enough to create a hostile environment. Training for administrators, teachers, staff, and students also can help ensure that they understand what types of conduct constitute sexual harassment or violence, can identify warning signals that may need attention, and know how to respond. More detailed information and examples of education and other preventive measures are provided later in this letter.

**Procedural Requirements Pertaining to Sexual Harassment and Sexual Violence**

Recipients of Federal financial assistance must comply with the procedural requirements outlined in the Title IX implementing regulations. Specifically, a recipient must:

(A) Disseminate a notice of nondiscrimination;[16]

(B) Designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX;[17] and

(C) Adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee sex discrimination complaints.[18]

These requirements apply to all forms of sexual harassment, including sexual violence, and are important for preventing and effectively responding to sex discrimination. They are discussed in greater detail below. OCR advises recipients to examine their current policies and procedures on sexual harassment and sexual violence to determine whether those policies comply with the requirements articulated in this letter and the *2001 Guidance*. Recipients should then implement changes as needed.

(A) *Notice of Nondiscrimination*

The Title IX regulations require that each recipient publish a notice of nondiscrimination stating that the recipient does not discriminate on the basis of sex in its education programs and activities, and that Title IX requires it not to discriminate in such a manner.[19] The notice must state that inquiries concerning the application of Title IX may be referred to the recipient's Title IX coordinator or to OCR. It should include the name or title, office address, telephone number, and e-mail address for the recipient's designated Title IX coordinator.

The notice must be widely distributed to all students, parents of elementary and secondary students, employees, applicants for admission and employment, and other relevant persons. OCR recommends that the notice be prominently posted on school Web sites and at various

---

[16] 34 C.F.R. § 106.9.
[17] *Id.* § 106.8(a).
[18] *Id.* § 106.8(b).
[19] *Id.* § 106.9(a).

remains available on the web for historical purposes only.

Page 7 – Dear Colleague Letter: Sexual Violence

locations throughout the school or campus and published in electronic and printed publications of general distribution that provide information to students and employees about the school's services and policies. The notice should be available and easily accessible on an ongoing basis.

Title IX does not require a recipient to adopt a policy specifically prohibiting sexual harassment or sexual violence. As noted in the *2001 Guidance*, however, a recipient's general policy prohibiting sex discrimination will not be considered effective and would violate Title IX if, because of the lack of a specific policy, students are unaware of what kind of conduct constitutes sexual harassment, including sexual violence, or that such conduct is prohibited sex discrimination. OCR therefore recommends that a recipient's nondiscrimination policy state that prohibited sex discrimination covers sexual harassment, including sexual violence, and that the policy include examples of the types of conduct that it covers.

### (B) *Title IX Coordinator*

The Title IX regulations require a recipient to notify all students and employees of the name or title and contact information of the person designated to coordinate the recipient's compliance with Title IX.[20] The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints. The Title IX coordinator or designee should be available to meet with students as needed. If a recipient designates more than one Title IX coordinator, the notice should describe each coordinator's responsibilities (*e.g.*, who will handle complaints by students, faculty, and other employees). The recipient should designate one coordinator as having ultimate oversight responsibility, and the other coordinators should have titles clearly showing that they are in a deputy or supporting role to the senior coordinator. The Title IX coordinators should not have other job responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest.

Recipients must ensure that employees designated to serve as Title IX coordinators have adequate training on what constitutes sexual harassment, including sexual violence, and that they understand how the recipient's grievance procedures operate. Because sexual violence complaints often are filed with the school's law enforcement unit, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures and any other procedures used for investigating reports of sexual violence. In addition, these employees should receive copies of the school's Title IX policies. Schools should instruct law enforcement unit employees both to notify complainants of their right to file a Title IX sex discrimination complaint with the school in addition to filing a criminal complaint, and to report incidents of sexual violence to the Title IX coordinator if the complainant consents. The school's Title IX coordinator or designee should be available to provide assistance to school law enforcement unit employees regarding how to respond appropriately to reports of sexual violence. The Title IX coordinator also should be given access to school law enforcement unit investigation notes

---

[20] *Id.* § 106.8(a).

remains available on the web for historical purposes only.

and findings as necessary for the Title IX investigation, so long as it does not compromise the criminal investigation.

### (C) *Grievance Procedures*

The Title IX regulations require all recipients to adopt and publish grievance procedures providing for the prompt and equitable resolution of sex discrimination complaints.[21] The grievance procedures must apply to sex discrimination complaints filed by students against school employees, other students, or third parties.

Title IX does not require a recipient to provide separate grievance procedures for sexual harassment and sexual violence complaints. Therefore, a recipient may use student disciplinary procedures or other separate procedures to resolve such complaints. Any procedures used to adjudicate complaints of sexual harassment or sexual violence, including disciplinary procedures, however, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution.[22] These requirements are discussed in greater detail below. If the recipient relies on disciplinary procedures for Title IX compliance, the Title IX coordinator should review the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.[23]

Grievance procedures generally may include voluntary informal mechanisms (*e.g.*, mediation) for resolving some types of sexual harassment complaints. OCR has frequently advised recipients, however, that it is improper for a student who complains of harassment to be required to work out the problem directly with the alleged perpetrator, and certainly not without appropriate involvement by the school (*e.g.*, participation by a trained counselor, a trained mediator, or, if appropriate, a teacher or administrator). In addition, as stated in the *2001 Guidance*, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. Moreover, in cases involving allegations of sexual assault, mediation is not appropriate even on a voluntary basis. OCR recommends that recipients clarify in their grievance procedures that mediation will not be used to resolve sexual assault complaints.

---

[21] *Id.* § 106.8(b). Title IX also requires recipients to adopt and publish grievance procedures for employee complaints of sex discrimination.

[22] These procedures must apply to all students, including athletes. If a complaint of sexual violence involves a student athlete, the school must follow its standard procedures for resolving sexual violence complaints. Such complaints must not be addressed solely by athletics department procedures. Additionally, if an alleged perpetrator is an elementary or secondary student with a disability, schools must follow the procedural safeguards in the Individuals with Disabilities Education Act (at 20 U.S.C. § 1415 and 34 C.F.R. §§ 300.500-300.519, 300.530-300.537) as well as the requirements of Section 504 of the Rehabilitation Act of 1973 (at 34 C.F.R. §§ 104.35-104.36) when conducting the investigation and hearing.

[23] A school may not absolve itself of its Title IX obligations to investigate and resolve complaints of sexual harassment or violence by delegating, whether through express contractual agreement or other less formal arrangement, the responsibility to administer school discipline to school resource officers or "contract" law enforcement officers. *See* 34 C.F.R. § 106.4.

remains available on the web for historical purposes only.

Page 9 – Dear Colleague Letter: Sexual Violence

### *Prompt and Equitable Requirements*

As stated in the *2001 Guidance*, OCR has identified a number of elements in evaluating whether a school's grievance procedures provide for prompt and equitable resolution of sexual harassment complaints. These elements also apply to sexual violence complaints because, as explained above, sexual violence is a form of sexual harassment. OCR will review all aspects of a school's grievance procedures, including the following elements that are critical to achieve compliance with Title IX:

- Notice to students, parents of elementary and secondary students, and employees of the grievance procedures, including where complaints may be filed;
- Application of the procedures to complaints alleging harassment carried out by employees, other students, or third parties;
- Adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence;
- Designated and reasonably prompt time frames for the major stages of the complaint process;
- Notice to parties of the outcome of the complaint;[24] and
- An assurance that the school will take steps to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

As noted in the *2001 Guidance*, procedures adopted by schools will vary in detail, specificity, and components, reflecting differences in the age of the school's students, school sizes and administrative structures, State or local legal requirements, and past experiences. Although OCR examines whether all applicable elements are addressed when investigating sexual harassment complaints, this letter focuses on those elements where our work indicates that more clarification and explanation are needed, including:

### (A) *Notice of the grievance procedures*

The procedures for resolving complaints of sex discrimination, including sexual harassment, should be written in language appropriate to the age of the school's students, easily understood, easily located, and widely distributed. OCR recommends that the grievance procedures be prominently posted on school Web sites; sent electronically to all members of the school community; available at various locations throughout the school or campus; and summarized in or attached to major publications issued by the school, such as handbooks, codes of conduct, and catalogs for students, parents of elementary and secondary students, faculty, and staff.

### (B) *Adequate, Reliable, and Impartial Investigation of Complaints*

OCR's work indicates that a number of issues related to an adequate, reliable, and impartial investigation arise in sexual harassment and violence complaints. In some cases, the conduct

---

[24] "Outcome" does not refer to information about disciplinary sanctions unless otherwise noted. Notice of the outcome is discussed in greater detail in Section D below.

remains available on the web for historical purposes only.

Page 10 – Dear Colleague Letter: Sexual Violence

may constitute both sexual harassment under Title IX and criminal activity. Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment or violence violates Title IX. Conduct may constitute unlawful sexual harassment under Title IX even if the police do not have sufficient evidence of a criminal violation. In addition, a criminal investigation into allegations of sexual violence does not relieve the school of its duty under Title IX to resolve complaints promptly and equitably.

A school should notify a complainant of the right to file a criminal complaint, and should not dissuade a victim from doing so either during or after the school's internal Title IX investigation. For instance, if a complainant wants to file a police report, the school should not tell the complainant that it is working toward a solution and instruct, or ask, the complainant to wait to file the report.

Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting. For example, a school should not delay conducting its own investigation or taking steps to protect the complainant because it wants to see whether the alleged perpetrator will be found guilty of a crime. Any agreement or Memorandum of Understanding (MOU) with a local police department must allow the school to meet its Title IX obligation to resolve complaints promptly and equitably. Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence (not the ultimate outcome of the investigation or the filing of any charges), the school must promptly resume and complete its fact-finding for the Title IX investigation.[25] Moreover, nothing in an MOU or the criminal investigation itself should prevent a school from notifying complainants of their Title IX rights and the school's grievance procedures, or from taking interim steps to ensure the safety and well-being of the complainant and the school community while the law enforcement agency's fact-gathering is in progress. OCR also recommends that a school's MOU include clear policies on when a school will refer a matter to local law enforcement.

As noted above, the Title IX regulation requires schools to provide equitable grievance procedures. As part of these procedures, schools generally conduct investigations and hearings to determine whether sexual harassment or violence occurred. In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints. The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* Like Title IX,

---

[25] In one recent OCR sexual violence case, the prosecutor's office informed OCR that the police department's evidence gathering stage typically takes three to ten calendar days, although the delay in the school's investigation may be longer in certain instances.

Rescinded. This document has been formally rescinded by the Department and remains available on the web for historical purposes only.

Page 11 – Dear Colleague Letter: Sexual Violence

Title VII prohibits discrimination on the basis of sex.[26] OCR also uses a preponderance of the evidence standard when it resolves complaints against recipients. For instance, OCR's Case Processing Manual requires that a noncompliance determination be supported by the preponderance of the evidence when resolving allegations of discrimination under all the statutes enforced by OCR, including Title IX.[27] OCR also uses a preponderance of the evidence standard in its fund termination administrative hearings.[28] Thus, in order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (*i.e.*, it is more likely than not that sexual harassment or violence occurred). The "clear and convincing" standard (*i.e.*, it is highly probable or reasonably certain that the sexual harassment or violence occurred), currently used by some schools, is a higher standard of proof. Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX. Therefore, preponderance of the evidence is the appropriate standard for investigating allegations of sexual harassment or violence.

Throughout a school's Title IX investigation, including at any hearing, the parties must have an equal opportunity to present relevant witnesses and other evidence. The complainant and the alleged perpetrator must be afforded similar and timely access to any information that will be used at the hearing.[29] For example, a school should not conduct a pre-hearing meeting during which only the alleged perpetrator is present and given an opportunity to present his or her side of the story, unless a similar meeting takes place with the complainant; a hearing officer or disciplinary board should not allow only the alleged perpetrator to present character witnesses at a hearing; and a school should not allow the alleged perpetrator to review the complainant's

---

[26] *See, e.g., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003) (noting that under the "conventional rule of civil litigation," the preponderance of the evidence standard generally applies in cases under Title VII); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-55 (1989) (approving preponderance standard in Title VII sex discrimination case) (plurality opinion); *id.* at 260 (White, J., concurring in the judgment); *id.* at 261 (O'Connor, J., concurring in the judgment). The *2001 Guidance* noted (on page vi) that "[w]hile *Gebser* and *Davis* made clear that Title VII agency principles do not apply in determining liability for money damages under Title IX, the *Davis* Court also indicated, through its specific references to Title VII caselaw, that Title VII remains relevant in determining what constitutes hostile environment sexual harassment under Title IX." *See also Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").

[27] OCR's Case Processing Manual is available on the Department's Web site, at http://www2.ed.gov/about/offices/list/ocr/docs/ocrcpm.html.

[28] The Title IX regulations adopt the procedural provisions applicable to Title VI of the Civil Rights Act of 1964. *See* 34 C.F.R. § 106.71 ("The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein by reference."). The Title VI regulations apply the Administrative Procedure Act to administrative hearings required prior to termination of Federal financial assistance and require that termination decisions be "supported by and in accordance with the reliable, probative and substantial evidence." 5 U.S.C. § 556(d). The Supreme Court has interpreted "reliable, probative and substantial evidence" as a direction to use the preponderance standard. *See Steadman v. SEC*, 450 U.S. 91, 98-102 (1981).

[29] Access to this information must be provided consistent with FERPA. For example, if a school introduces an alleged perpetrator's prior disciplinary records to support a tougher disciplinary penalty, the complainant would not be allowed access to those records. Additionally, access should not be given to privileged or confidential information. For example, the alleged perpetrator should not be given access to communications between the complainant and a counselor or information regarding the complainant's sexual history.

remains available on the web for historical purposes only.

Page 12 – Dear Colleague Letter: Sexual Violence

statement without also allowing the complainant to review the alleged perpetrator's statement.

While OCR does not require schools to permit parties to have lawyers at any stage of the proceedings, if a school chooses to allow the parties to have their lawyers participate in the proceedings, it must do so equally for both parties. Additionally, any school-imposed restrictions on the ability of lawyers to speak or otherwise participate in the proceedings should apply equally. OCR strongly discourages schools from allowing the parties personally to question or cross-examine each other during the hearing. Allowing an alleged perpetrator to question an alleged victim directly may be traumatic or intimidating, thereby possibly escalating or perpetuating a hostile environment. OCR also recommends that schools provide an appeals process. If a school provides for appeal of the findings or remedy, it must do so for both parties. Schools must maintain documentation of all proceedings, which may include written findings of facts, transcripts, or audio recordings.

All persons involved in implementing a recipient's grievance procedures (*e.g.*, Title IX coordinators, investigators, and adjudicators) must have training or experience in handling complaints of sexual harassment and sexual violence, and in the recipient's grievance procedures. The training also should include applicable confidentiality requirements. In sexual violence cases, the fact-finder and decision-maker also should have adequate training or knowledge regarding sexual violence.[30] Additionally, a school's investigation and hearing processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the fact-finder or decision-maker and the parties should be disclosed.

Public and state-supported schools must provide due process to the alleged perpetrator. However, schools should ensure that steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant.

   (C) *Designated and Reasonably Prompt Time Frames*

OCR will evaluate whether a school's grievance procedures specify the time frames for all major stages of the procedures, as well as the process for extending timelines. Grievance procedures should specify the time frame within which: (1) the school will conduct a full investigation of the complaint; (2) both parties receive a response regarding the outcome of the complaint; and (3) the parties may file an appeal, if applicable. Both parties should be given periodic status updates. Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint. Whether OCR considers complaint resolutions to be timely, however, will vary depending on the complexity of the investigation and the severity and extent of the harassment. For example, the resolution of a complaint involving multiple incidents with multiple complainants likely would take longer than one involving a single incident that

_____

[30] For instance, if an investigation or hearing involves forensic evidence, that evidence should be reviewed by a trained forensic examiner.

remains available on the web for historical purposes only.

Page 13 – Dear Colleague Letter: Sexual Violence

occurred in a classroom during school hours with a single complainant.

(D) *Notice of Outcome*

Both parties must be notified, in writing, about the outcome of both the complaint and any appeal,[31] *i.e.*, whether harassment was found to have occurred. OCR recommends that schools provide the written determination of the final outcome to the complainant and the alleged perpetrator concurrently. Title IX does not require the school to notify the alleged perpetrator of the outcome before it notifies the complainant.

Due to the intersection of Title IX and FERPA requirements, OCR recognizes that there may be confusion regarding what information a school may disclose to the complainant.[32] FERPA generally prohibits the nonconsensual disclosure of personally identifiable information from a student's "education record." However, as stated in the *2001 Guidance*, FERPA permits a school to disclose to the harassed student information about the sanction imposed upon a student who was found to have engaged in harassment when the sanction directly relates to the harassed student. This includes an order that the harasser stay away from the harassed student, or that the harasser is prohibited from attending school for a period of time, or transferred to other classes or another residence hall.[33] Disclosure of other information in the student's "education record," including information about sanctions that do not relate to the harassed student, may result in a violation of FERPA.

Further, when the conduct involves a crime of violence or a non-forcible sex offense,[34] FERPA permits a postsecondary institution to disclose to the alleged victim the final results of a

---

[31] As noted previously, "outcome" does not refer to information about disciplinary sanctions unless otherwise noted.

[32] In 1994, Congress amended the General Education Provisions Act (GEPA), of which FERPA is a part, to state that nothing in GEPA "shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964, title IX of Education Amendments of 1972, title V of the Rehabilitation Act of 1973, the Age Discrimination Act, or other statutes prohibiting discrimination, to any applicable program." 20 U.S.C. § 1221(d). The Department interprets this provision to mean that FERPA continues to apply in the context of Title IX enforcement, but if there is a direct conflict between the requirements of FERPA and the requirements of Title IX, such that enforcement of FERPA would interfere with the primary purpose of Title IX to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. *See 2001 Guidance* at vii.

[33] This information directly relates to the complainant and is particularly important in sexual harassment cases because it affects whether a hostile environment has been eliminated. Because seeing the perpetrator may be traumatic, a complainant in a sexual harassment case may continue to be subject to a hostile environment if he or she does not know when the perpetrator will return to school or whether he or she will continue to share classes or a residence hall with the perpetrator. This information also directly affects a complainant's decision regarding how to work with the school to eliminate the hostile environment and prevent its recurrence. For instance, if a complainant knows that the perpetrator will not be at school or will be transferred to other classes or another residence hall for the rest of the year, the complainant may be less likely to want to transfer to another school or change classes, but if the perpetrator will be returning to school after a few days or weeks, or remaining in the complainant's classes or residence hall, the complainant may want to transfer schools or change classes to avoid contact. Thus, the complainant cannot make an informed decision about how best to respond without this information.

[34] Under the FERPA regulations, crimes of violence include arson; assault offenses (aggravated assault, simple assault, intimidation); burglary; criminal homicide (manslaughter by negligence); criminal homicide (murder and

remains available on the web for historical purposes only.

Page 14 – Dear Colleague Letter: Sexual Violence

disciplinary proceeding against the alleged perpetrator, regardless of whether the institution concluded that a violation was committed.[35] Additionally, a postsecondary institution may disclose to anyone—not just the alleged victim—the final results of a disciplinary proceeding if it determines that the student is an alleged perpetrator of a crime of violence or a non-forcible sex offense, and, with respect to the allegation made, the student has committed a violation of the institution's rules or policies.[36]

Postsecondary institutions also are subject to additional rules under the Clery Act. This law, which applies to postsecondary institutions that participate in Federal student financial aid programs, requires that "both the accuser and the accused must be informed of the outcome[37] of any institutional disciplinary proceeding brought alleging a sex offense."[38] Compliance with this requirement does not constitute a violation of FERPA. Furthermore, the FERPA limitations on redisclosure of information do not apply to information that postsecondary institutions are required to disclose under the Clery Act.[39] Accordingly, postsecondary institutions may not require a complainant to abide by a nondisclosure agreement, in writing or otherwise, that would prevent the redisclosure of this information.

## Steps to Prevent Sexual Harassment and Sexual Violence and Correct its Discriminatory Effects on the Complainant and Others

### Education and Prevention

In addition to ensuring full compliance with Title IX, schools should take proactive measures to prevent sexual harassment and violence. OCR recommends that all schools implement preventive education programs and make victim resources, including comprehensive victim services, available. Schools may want to include these education programs in their (1) orientation programs for new students, faculty, staff, and employees; (2) training for students who serve as advisors in residence halls; (3) training for student athletes and coaches; and (4) school assemblies and "back to school nights." These programs should include a

---

non-negligent manslaughter); destruction, damage or vandalism of property; kidnapping/abduction; robbery; and forcible sex offenses. Forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the victim is incapable of giving consent. Forcible sex offenses include rape, sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses are incest and statutory rape. 34 C.F.R. Part 99, App. A.

[35] 34 C.F.R. § 99.31(a)(13). For purposes of 34 C.F.R. §§ 99.31(a)(13)-(14), disclosure of "final results" is limited to the name of the alleged perpetrator, any violation found to have been committed, and any sanction imposed against the perpetrator by the school. 34 C.F.R. § 99.39.

[36] 34 C.F.R. § 99.31(a)(14).

[37] For purposes of the Clery Act, "outcome" means the institution's final determination with respect to the alleged sex offense and any sanctions imposed against the accused. 34 C.F.R. § 668.46(b)(11)(vi)(B).

[38] 34 C.F.R. § 668.46(b)(11)(vi)(B). Under the Clery Act, forcible sex offenses are defined as any sexual act directed against another person forcibly or against that person's will, or not forcibly or against the person's will where the person is incapable of giving consent. Forcible sex offenses include forcible rape, forcible sodomy, sexual assault with an object, and forcible fondling. Non-forcible sex offenses include incest and statutory rape. 34 C.F.R. Part 668, Subpt. D, App. A.

[39] 34 C.F.R. § 99.33(c).

remains available on the web for historical purposes only.

Page 15 – Dear Colleague Letter: Sexual Violence

discussion of what constitutes sexual harassment and sexual violence, the school's policies and disciplinary procedures, and the consequences of violating these policies.

The education programs also should include information aimed at encouraging students to report incidents of sexual violence to the appropriate school and law enforcement authorities. Schools should be aware that victims or third parties may be deterred from reporting incidents if alcohol, drugs, or other violations of school or campus rules were involved.[40] As a result, schools should consider whether their disciplinary policies have a chilling effect on victims' or other students' reporting of sexual violence offenses. For example, OCR recommends that schools inform students that the schools' primary concern is student safety, that any other rules violations will be addressed separately from the sexual violence allegation, and that use of alcohol or drugs never makes the victim at fault for sexual violence.

OCR also recommends that schools develop specific sexual violence materials that include the schools' policies, rules, and resources for students, faculty, coaches, and administrators. Schools also should include such information in their employee handbook and any handbooks that student athletes and members of student activity groups receive. These materials should include where and to whom students should go if they are victims of sexual violence. These materials also should tell students and school employees what to do if they learn of an incident of sexual violence. Schools also should assess student activities regularly to ensure that the practices and behavior of students do not violate the schools' policies against sexual harassment and sexual violence.

**Remedies and Enforcement**

As discussed above, if a school determines that sexual harassment that creates a hostile environment has occurred, it must take immediate action to eliminate the hostile environment, prevent its recurrence, and address its effects. In addition to counseling or taking disciplinary action against the harasser, effective corrective action may require remedies for the complainant, as well as changes to the school's overall services or policies. Examples of these actions are discussed in greater detail below.

Title IX requires a school to take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should undertake these steps promptly once it has notice of a sexual harassment or violence allegation. The school should notify the complainant of his or her options to avoid contact with the alleged perpetrator and allow students to change academic or living situations as appropriate. For instance, the school may prohibit the alleged perpetrator from having any contact with the complainant pending the results of the school's investigation. When taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the

---

[40] The Department's Higher Education Center for Alcohol, Drug Abuse, and Violence Prevention (HEC) helps campuses and communities address problems of alcohol, other drugs, and violence by identifying effective strategies and programs based upon the best prevention science. Information on HEC resources and technical assistance can be found at www.higheredcenter.org.

remains available on the web for historical purposes only.

complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain. In addition, schools should ensure that complainants are aware of their Title IX rights and any available resources, such as counseling, health, and mental health services, and their right to file a complaint with local law enforcement.[41]

Schools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment. At a minimum, schools must ensure that complainants and their parents, if appropriate, know how to report any subsequent problems, and should follow-up with complainants to determine whether any retaliation or new incidents of harassment have occurred.

When OCR finds that a school has not taken prompt and effective steps to respond to sexual harassment or violence, OCR will seek appropriate remedies for both the complainant and the broader student population. When conducting Title IX enforcement activities, OCR seeks to obtain voluntary compliance from recipients. When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

Schools should proactively consider the following remedies when determining how to respond to sexual harassment or violence. These are the same types of remedies that OCR would seek in its cases.

Depending on the specific nature of the problem, remedies for the complainant might include, but are not limited to:[42]

- providing an escort to ensure that the complainant can move safely between classes and activities;
- ensuring that the complainant and alleged perpetrator do not attend the same classes;
- moving the complainant or alleged perpetrator to a different residence hall or, in the case of an elementary or secondary school student, to another school within the district;
- providing counseling services;
- providing medical services;
- providing academic support services, such as tutoring;

---

[41] The Clery Act requires postsecondary institutions to develop and distribute a statement of policy that informs students of their options to notify proper law enforcement authorities, including campus and local police, and the option to be assisted by campus personnel in notifying such authorities. The policy also must notify students of existing counseling, mental health, or other student services for victims of sexual assault, both on campus and in the community. 20 U.S.C. §§ 1092(f)(8)(B)(v)-(vi).

[42] Some of these remedies also can be used as interim measures before the school's investigation is complete.

remains available on the web for historical purposes only.

Page 17 – Dear Colleague Letter: Sexual Violence

- arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record; and
- reviewing any disciplinary actions taken against the complainant to see if there is a causal connection between the harassment and the misconduct that may have resulted in the complainant being disciplined.[43]

Remedies for the broader student population might include, but are not limited to:
*Counseling and Training*
- offering counseling, health, mental health, or other holistic and comprehensive victim services to all students affected by sexual harassment or sexual violence, and notifying students of campus and community counseling, health, mental health, and other student services;
- designating an individual from the school's counseling center to be "on call" to assist victims of sexual harassment or violence whenever needed;
- training the Title IX coordinator and any other employees who are involved in processing, investigating, or resolving complaints of sexual harassment or sexual violence, including providing training on:
  o the school's Title IX responsibilities to address allegations of sexual harassment or violence
  o how to conduct Title IX investigations
  o information on the link between alcohol and drug abuse and sexual harassment or violence and best practices to address that link;
- training all school law enforcement unit personnel on the school's Title IX responsibilities and handling of sexual harassment or violence complaints;
- training all employees who interact with students regularly on recognizing and appropriately addressing allegations of sexual harassment or violence under Title IX; and
- informing students of their options to notify proper law enforcement authorities, including school and local police, and the option to be assisted by school employees in notifying those authorities.

*Development of Materials and Implementation of Policies and Procedures*
- developing materials on sexual harassment and violence, which should be distributed to students during orientation and upon receipt of complaints, as well as widely posted throughout school buildings and residence halls, and which should include:
  o what constitutes sexual harassment or violence
  o what to do if a student has been the victim of sexual harassment or violence
  o contact information for counseling and victim services on and off school grounds
  o how to file a complaint with the school
  o how to contact the school's Title IX coordinator

---

[43] For example, if the complainant was disciplined for skipping a class in which the harasser was enrolled, the school should review the incident to determine if the complainant skipped the class to avoid contact with the harasser.

remains available on the web for historical purposes only.

- o   what the school will do to respond to allegations of sexual harassment or violence, including the interim measures that can be taken
- requiring the Title IX coordinator to communicate regularly with the school's law enforcement unit investigating cases and to provide information to law enforcement unit personnel regarding Title IX requirements;[44]
- requiring the Title IX coordinator to review all evidence in a sexual harassment or sexual violence case brought before the school's disciplinary committee to determine whether the complainant is entitled to a remedy under Title IX that was not available through the disciplinary committee;[45]
- requiring the school to create a committee of students and school officials to identify strategies for ensuring that students:
  - o   know the school's prohibition against sex discrimination, including sexual harassment and violence
  - o   recognize sex discrimination, sexual harassment, and sexual violence when they occur
  - o   understand how and to whom to report any incidents
  - o   know the connection between alcohol and drug abuse and sexual harassment or violence
  - o   feel comfortable that school officials will respond promptly and equitably to reports of sexual harassment or violence;
- issuing new policy statements or other steps that clearly communicate that the school does not tolerate sexual harassment and violence and will respond to any incidents and to any student who reports such incidents; and
- revising grievance procedures used to handle sexual harassment and violence complaints to ensure that they are prompt and equitable, as required by Title IX.

*School Investigations and Reports to OCR*
- conducting periodic assessments of student activities to ensure that the practices and behavior of students do not violate the school's policies against sexual harassment and violence;
- investigating whether any other students also may have been subjected to sexual harassment or violence;
- investigating whether school employees with knowledge of allegations of sexual harassment or violence failed to carry out their duties in responding to those allegations;
- conducting, in conjunction with student leaders, a school or campus "climate check" to assess the effectiveness of efforts to ensure that the school is free from sexual harassment and violence, and using the resulting information to inform future proactive steps that will be taken by the school; and

---

[44] Any personally identifiable information from a student's education record that the Title IX coordinator provides to the school's law enforcement unit is subject to FERPA's nondisclosure requirements.

[45] For example, the disciplinary committee may lack the power to implement changes to the complainant's class schedule or living situation so that he or she does not come in contact with the alleged perpetrator.

remains available on the web for historical purposes only.

- submitting to OCR copies of all grievances filed by students alleging sexual harassment or violence, and providing OCR with documentation related to the investigation of each complaint, such as witness interviews, investigator notes, evidence submitted by the parties, investigative reports and summaries, any final disposition letters, disciplinary records, and documentation regarding any appeals.

## Conclusion

The Department is committed to ensuring that all students feel safe and have the opportunity to benefit fully from their schools' education programs and activities. As part of this commitment, OCR provides technical assistance to assist recipients in achieving voluntary compliance with Title IX.

If you need additional information about Title IX, have questions regarding OCR's policies, or seek technical assistance, please contact the OCR enforcement office that serves your state or territory. The list of offices is available at http://wdcrobcolp01.ed.gov/CFAPPS/OCR/contactus.cfm. Additional information about addressing sexual violence, including victim resources and information for schools, is available from the U.S. Department of Justice's Office on Violence Against Women (OVW) at http://www.ovw.usdoj.gov/.[46]

Thank you for your prompt attention to this matter. I look forward to continuing our work together to ensure that all students have an equal opportunity to learn in a safe and respectful school climate.

Sincerely,

/s/

Russlynn Ali
Assistant Secretary for Civil Rights

---

[46] OVW also administers the Grants to Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program. This Federal funding is designed to encourage institutions of higher education to adopt comprehensive, coordinated responses to domestic violence, dating violence, sexual assault, and stalking. Under this competitive grant program, campuses, in partnership with community-based nonprofit victim advocacy organizations and local criminal justice or civil legal agencies, must adopt protocols and policies to treat these crimes as serious offenses and develop victim service programs and campus policies that ensure victim safety, offender accountability, and the prevention of such crimes. OVW recently released the first solicitation for the Services, Training, Education, and Policies to Reduce Domestic Violence, Dating Violence, Sexual Assault and Stalking in Secondary Schools Grant Program. This innovative grant program will support a broad range of activities, including training for school administrators, faculty, and staff; development of policies and procedures for responding to these crimes; holistic and appropriate victim services; development of effective prevention strategies; and collaborations with mentoring organizations to support middle and high school student victims.

# COMPLAINT EXHIBIT H

1/28/21, 5:05 PM



## COLLEGE OF THE Holy Cross

Visit the COVID-19 Response and Reopening website for the latest information and campus updates.

# Message From President Boroughs to College Community

From: Rev. Philip L. Boroughs, S.J., President
August 24, 2018

I am deeply saddened and disturbed to read the accounts of our alumni in today's Boston Globe, as I am sure those of you who have read it were as well. These alumni have shown tremendous courage to share their painful stories. I want them to know that I hear them. No one should have to experience what was related in today's article and I am profoundly sorry that they had these experiences with a person in a position of trust.

Words are not enough in moments like these, and while it is true that I will hold these members of our community in my heart and prayers, I also vow that the College will be aggressive and thorough in pursuing a full review of the issues and behaviors articulated in the Globe article. You have my commitment to address this situation head on. In addition to completing our current review into these specific allegations, we will immediately undertake a thorough review of culture, structure and/or procedures at the College to prevent misconduct. If issues are found, we will address them. Quickly.

I also want to assure you that the College took immediate steps as soon as these alumni came forward with allegations against Mr. Christie. We did not, however, know all the details contained in today's story. The College placed Mr. Christie on administrative leave the same day I received the letter, and barred him from campus and from interacting with College community members. Mr. Christie submitted a letter of resignation last week and will not be returning to the College. I am committed to completing the review of his conduct regardless of his resignation.

The College has a wide variety of confidential, pastoral and community resources and ways in which we can provide support for those who need it, and robust policies and processes in place to address sexual misconduct. We can and will continue to do more. If anyone would like to share their experiences, access support services or come forward with a report related to this matter or any other incident of sexual discrimination, harassment or assault, you may contact Tracy Kennedy, the College's Title IX Coordinator at 508-793-3336 or tkennedy@holycross.edu. Reporting misconduct is critical to our ability to maintain the environment of well-being, learning and accountability to which we are committed. The College will continue to provide education and training on sexual respect and our sexual misconduct policy.

We have much to do as a community and I know that many are hurting and in pain. This is a time for Holy Cross to come together to support each other and honestly address any culture issues that may exist at the College. I ask for your support as we work to address this very difficult issue.

Rev. Philip L. Boroughs, S.J.
President

<u>Notice of Nondiscrimination</u>

The College of the Holy Cross does not discriminate unlawfully in admission to, access to, treatment in or employment in its programs and activities on the basis of a person's race, religion, color, national origin, age, marital or parental status, veteran status, sex, disability, genetic information, sexual orientation, gender identity or any other legally protected status, including in the administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs. Individuals who feel that they have been discriminated against based upon any of these categories may contact the Director of the Office of Title IX and Equal Opportunity. The College's full Nondiscrimination Statement is available here.

Case 4:21-cv-11108-AK    Document 1-1    Filed 07/06/21    Page 125 of 235

Victims of alleged sex abuse by former Holy Cross organist say college response lacking - News - telegram.com - Worcester, MA                                    1/31/21, 2:45 PM

Yet more than three months later, Rev. Boroughs has yet to meet as requested with the five Organ Scholar alumni, they say. The college, they say, has been mum on its promised investigation; has yet to engage them in a requested conversation on the organ scholarship program, which they say "seems to be in a state of upheaval," and has denied their requests for counseling or funds for therapy.

"We are in pain, but Holy Cross has refused to provide us relief," the five wrote in a statement provided to the Telegram & Gazette last week by their spokesman, Jacob Street, Organ Scholar in Holy Cross' Class of 2010.

A spokesman for Holy Cross, John Hill, said the college "remains committed to a full and thorough investigation into the distressing experiences reported by our alumni." Mr. Hill said it would be inappropriate to comment on the specifics of the investigation while it is underway.

Asked via email whether or not Rev. Boroughs has met with the alumni, Mr. Hill did not respond.

The former Holy Cross Organ Scholars who raised the allegations are Mr. Street; Jeffrey Wood (Class of 2006); Brett Maguire (Class of 2002); Sean Redrow (Class of 1998); and Jennifer McPherson (Class of 2013). They represent half of the 10 alumni of the scholarship program. Three current Organ Scholars are enrolled at the school.

Holy Cross' Organ Scholarship, traditionally awarded every other year to a talented music major, provides full tuition (currently more than $52,000 annually, not counting room and board) for four years, and is highly coveted. CBS New York has described it as "perhaps the most prestigious scholarship for the organ in America," while the Bangor Daily News has called winning the scholarship the organist's equivalent to being named quarterback at Notre Dame.

With the scholarship comes the responsibility of playing the 52-foot-high, 10-ton baroque pipe organ in Holy Cross' St. Joseph's Chapel at Masses and other college events, and assisting the college organist with all aspects of the chapel music program.

Until three months ago, that meant studying and working closely with Mr. Christie, 66, considered by many to be one of the most distinguished organ teachers in the nation. (At his home in Natick this past week, Mr. Christie declined comment for this article.)

Mr. Christie has performed around the world with symphony orchestras and period instrument ensembles and as a solo recitalist. He was named International Performer of the Year in 2017 by the New York City chapter of the American Guild of Organists. He played at the funeral of Sen. Edward M. Kennedy at Boston's Mission Church in 2009. On his recommendation, Holy Cross installed the 3,814-pipe Taylor & Boody organ dedicated in its chapel in 1986.

He has had a say in who won the full-ride scholarship to Holy Cross: Newsday has described how Mr. Christie petitioned the dean to grant the scholarship, in a year it was not scheduled to be awarded, to a student whose playing had particularly impressed him.

And with his music connections — he had done more than 60 concert tours of Europe, and had served on international organ competition juries across the globe — Mr. Christie was said to hold significant sway over musicians' professional advancement, in New England and beyond.

Wesley Hall, a former student of Mr. Christie's at Oberlin College Conservatory, which is pursuing a Title IX investigation into its former organ professor and chair, told The Boston Globe he had studied extensively with Mr. Christie despite what he called the organist's repeated unwanted physical contact. "He's the best organ teacher in America, and he could destroy your dreams," Mr. Hall told the Globe.

Sex often entered into the equation, according to the Holy Cross Organ Scholar alumni who contacted the college and the Globe. They described Mr. Christie plying students with alcohol, physically groping students, frequently injecting sexual topics into conversation, and initiating long-term sexual relationships with two of the male Organ Scholars, who were under 21 at the time. Some of the sexual rendezvouses occurred in the pipe organ loft of St. Joseph's Chapel, they told the Globe.

"Christie has amazing artistic privilege ... at Holy Cross to hand select from the most talented young organ students, to groom them as he sees fit," Mr. Maguire, one of the Organ Scholar alumni who described sexual experiences initiated by Mr. Christie, said in a statement published by the Globe. "He has abused this position, using his power of selection to surround himself with insecure young men - teenagers - to satisfy his sexual appetites."

In a joint statement provided to the Telegram & Gazette Nov. 21 by their spokesman, Mr. Street, the five Holy Cross Organ Scholar alumni described what they said was their motivation for contacting Rev. Boroughs by letter on Aug. 15. They say they sought to "alert him to the abuse and harassment we suffered, so that no other Holy Cross student would be hurt by Christie, and to seek repairs for all affected Organ Scholars.

"We wanted to hold Christie accountable and to seek justice for ourselves," they wrote. "It was agonizing to come forward, knowing how it would disrupt our lives, the school, and the Organ Scholar program we cared so deeply about, but we felt we needed to move urgently to protect current students."

They made several requests in their August letter to the college, they said. They asked that Mr. Christie be removed from his position, not realizing he had just resigned. They asked to meet with Rev. Boroughs, "to ensure that he heard our concerns, empathized with our suffering, valued our voices in what we knew would be difficult conversations ahead, and was committed to truth and reconciliation through a fully transparent investigation process."

They also requested "financial repairs for therapy," which they asked be provided "to all Organ Scholars in need of it, not just those who signed the letter." They requested further financial "repairs" for two of the signed Organ Scholars "whose lives had been most affected."

And they requested a "voice in the conversation" about the organ scholarship program moving forward. "We could offer helpful perspectives on how to create a safe, enriching program for young organists," they wrote.

The college has been non-responsive, they say. "It has been more than 3 months since we delivered our letter to Fr. Boroughs, and Holy Cross has not honored our requests," the five wrote in their statement to the T&G. "Fr. Boroughs has not met with us, but instead referred us to the Title IX office. We have not been invited to participate in any conversation about the organ scholarship program, which seems to be in a state of upheaval. Holy Cross has denied our request for interim financial repairs or access to counseling."

Holy Cross' policy on sexual misconduct prohibits sexual discrimination or harassment and sexual violence. Title IX, the federal civil rights law, bars sex discrimination at educational institutions receiving federal funding, and has been given broad scope covering sexual harassment and sexual violence. Holy Cross has a Title IX coordinator, Tracy Kennedy, whose team is responsible for responding to reports of sexual misconduct on campus, investigating them, and weighing possible sanctions. That team currently is investigating allegations raised against Mr. Christie.

"To date, all 5 Organ Scholars who signed the letter have participated in good faith in Holy Cross's Title IX process," the alumni wrote. "We were asked not to share specifics of the Title IX investigation. When asked, the Title IX office has informed us that some form of repairs may theoretically be possible as an outcome of the investigation. The Holy Cross administration has not commented further on our request for repairs. We have no idea how long the investigation will take."

Three of the former Organ Scholars - Mr. Street, Mr. Redrow and Mr. Maguire - have retained Kristin Knuuttila, a Boston lawyer whose practice specializes in representing survivors of sexual assault and child sexual abuse. "We're currently participating in the Title IX investigation and exploring all of our options to further respond to the college," Ms. Knuuttila said.

Holy Cross' spokesman, Mr. Hill, was asked to respond to the statement from the five alumni.

"The College remains committed to a full and thorough investigation into the distressing experiences reported by our alumni," he said via email Thursday. "A careful investigation takes time. The reports brought forward in this case cover a number of different events over many years and involving many different people.

"The College has hired an external investigator, who is working diligently to conduct the many interviews and re-interviews required in a case like this," Mr. Hill continued. "It would be inappropriate for the College to comment on the specifics of the investigation or on any potential outcomes while the investigation is ongoing.

"We are also well underway with a separate review into any underlying issues with College procedures and culture that these stories may expose," he said. "That review is being conducted by an external investigator, who has so far made 11 visits to campus and spoken to more than 30

members of our faculty and staff. We have already made several changes to strengthen our practices here on campus in response to what we have learned."

An attorney retained to assist the college in its Title IX investigation, Elizabeth Sanghavi of Brookline, referred questions to Mr. Hill.

# COMPLAINT EXHIBIT J



# Sexual misconduct allegations raise concerns at Holy Cross

**By Sarah Connell Sanders**
**Reporter**
Posted Jan 24, 2019 at 5:00 AM

Former students at the College of the Holy Cross in Worcester say the school has not adequately responded to allegations of sexual misconduct against two professors.

In one case, multiple sources from inside Holy Cross have confirmed to Worcester Magazine the 2018 demotion of former Holy Cross Dean Christopher A. Dustin amid sexual misconduct allegations brought forward by a recent alumna. Without detailing the circumstances, the school recently announced Dustin will be on leave during the spring 2019 semester.

In a separate instance in August 2018, five former recipients of the College's Organ Scholarship came forward with serious allegations against former organ professor James David Christie.

Multiple sources from within Holy Cross indicate the cases of Dustin and Christie are emblematic of a much larger problem.

## 'HEARTBREAKING WAY TO LEAVE'

In the case of Dustin, a 2017 Holy Cross graduate speaking on the condition of anonymity said complications arose in 2015 when she was a junior and was invited to take Dustin's seminar, which she said is typically reserved for sophomores. Soon thereafter, according to the former student, she was handpicked by Dustin for a work-study position in his department despite the fact she was not on the list of students approved for work-study.

As a senior in fall 2016, the former student said she felt pressured to write her Senior Honors Thesis under Dustin's mentorship. What followed, she said, included romantic advances and explicit sexually-charged comments, which eventually gave way to intimidating behavior and an abuse of power regarding her thesis grade in spring 2017.

"At first, Professor Dustin would compliment me all the time," the former student said. "He did a good job at making me feel special. In hindsight, I know this was psychological grooming. But over time, this evolved into explicit romantic advances, many of which were over email. He repeatedly suggested we go on 'dates' or get drinks together. He bought me gifts, two of which included a bouquet of pink flowers [given to her on the day of a school-sponsored dinner] and an item which had the message 'I love you' inscribed on it."

Dustin's overtures turned more serious in nature, the former student said.

"As time went on," she said, "his language became more sexually charged. He told me I was 'hot' and said that he would 'love to see' my body. He told me he didn't want to 'share me' with anyone else and to stay away from certain other people. Once I began to resist his behavior more clearly, he reacted with anger and hostility, at one point calling me a 'real bitch' and making other derogatory remarks. All the while, we never talked about my thesis. The year culminated in the total waste of an academic opportunity and a humiliating thesis presentation. It was a heartbreaking way to leave Holy Cross."

According to the former student, in March 2017, two months before her graduation, the professor told her he was going to be appointed dean of the faculty. The following month, in April, she said she reported his behavior to Holy Cross's Title IX Office. In June that year, she said a member of the Title IX Office asked her if she had any interest in pursuing an informal resolution. She said she declined.

According to the former student, the formal investigation, including an appeal on behalf of procedural error, stretched out over 20 months, during which time the professor continued to work with female students. In addition, according to multiple sources, he was permitted to maintain his role as dean, advise theses and teach courses for the entire period during which the initial investigation was underway.

Following the formal investigation, according to documents provided to Worcester Magazine, the professor's interaction with female students was limited by the school. He was stripped of his title as dean and was no longer permitted to conduct private, one-on-one meetings or unsupervised communications with female students or junior employees, including e-mail. Still, he continued to teach on campus.

Most recently, Dustin is listed as having taken a leave of absence. Dustin did not respond to an email seeking comment for this story. A spokesperson for Holy Cross would not elaborate on Dustin's status, saying the school does not comment on matters of employment.

## ORGAN SCHOLARS

The school is also dealing with the fallout of allegations detailed in an August story in The Boston Globe by five Holy Cross Organ Scholars concerning Christie. The five had informed the College that Christie was "an imminent danger" to students on campus.

According to The Globe, Christie was immediately placed on administrative leave and submitted a letter of resignation. The article reported Christie had been at liberty to hand select and groom organ scholars at Holy Cross during which time he exhibited a consistent pattern of sexual harassment.

"Former students also described a sexually charged environment that included lewd comments, large amounts of alcohol, and unwanted touching over a period between 1994 and 2017," The Globe reported.

According to the five Organ Scholars, Holy Cross recently extended an offer of three counseling sessions to only one member of the group in response to their request of financial repairs for therapy. In a statement issued to Worcester Magazine, the Five Organ Scholars wrote, "This offer is an insult to that person and to all survivors, and demonstrates a shocking lack of concern and care for the other Organ Scholars suffering as a result of Holy Cross's negligence."

## 'LEGAL RIGHT TO SAFETY'

Members of the student body grew increasingly vocal regarding sexual misconduct on campus during the fall semester last year. The school shut down classes and activities for several hours on a Friday afternoon in November in the wake of an alleged bias-related assault on campus and other concerns.

In early December, a group identifying themselves as sexual assault survivors at Holy Cross hand delivered a list of demands to the office of president Rev. Philip L. Boroughs. The group expressed particular concern about allegations made against two unidentified faculty members. In their letter,

they sought to uncover the college's threshold for tolerating misconduct among faculty members with "unfettered access to students."

In a statement to Worcester Magazine regarding the letter, Holy Cross said, "… Fr. Boroughs and members of his executive team have responded to say that they take these issues seriously and are committed to addressing them. We will be reviewing the letter carefully and look forward to working with members of the community on this issues."

The survivors who appeared at Boroughs' door the morning of Tuesday, Dec. 4 bore a document stating, "We will not settle for a superficial, short-changed response. We commit to defending our legal right to safety and the necessary reallocation of the college's resources to ensure this safety."

The group represents an online community called Sexual Assault on the Hill, where accounts of alleged rape and sexual assaults are shared anonymously in the name of solidarity for survivors at Holy Cross.

A spokesperson from the Sexual Assault on the Hill account reached out to Worcester Magazine Dec. 2, saying, "Law protects students at educational institutions to learn in a safe environment, free from unlawful discrimination and violence. The reality is, there is no transparency in Title IX at Holy Cross. Moreover, even if individuals within Title IX at HC hold the best intentions, they must adjudicate crimes while also maintaining the public relations of our institution.

"Thus, it is clear that their decisions are compromised and there are severe conflicts of interest that could lead to the compromise of their decisions. We believe this is especially true in the case of professors."

According to Holy Cross, Boroughs is assembling a team to create a Sexual Respect and Conduct plan by March 31, which will incorporate feedback from community members and include concrete action steps. Boroughs' executive team has pledged to improve policies and processes related to Title IX.

"The College is in the process of hiring a full-time dedicated Title IX and Non-Discrimination Investigator," the school said.

# COMPLAINT EXHIBIT K

9/12

COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

WILLIAM P. GIBBONS
and LISA A. GIBBONS,

 Plaintiffs,

  v.

COLLEGE OF THE HOLY CROSS,
PRESIDENT, PHILIP L. BOROUGHS,
AND TRUSTEES OF THE
COLLEGE OF THE HOLY CROSS,

 Defendants

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

DEMAND FOR JURY TRIAL

Civil Action No. 19cu1394 B

**FILED**

SEP 12 2019

ATTEST _____ CLERK

(1)

## COMPLAINT AND DEMAND FOR JURY TRIAL

By this Complaint, Plaintiff William P. Gibbons ("Coach Gibbons") seeks damages against the College of the Holy Cross ("Holy Cross") for Breach of Contract, Breach of the Duty of Good Faith and Fair Dealing, Unjust Enrichment, Age Discrimination, Intentional and Negligent Infliction of Emotional Distress, and a violation the Personnel Record Statute. Plaintiff, Lisa A. Gibbons, seeks damages against the Defendant for loss of consortium.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff, William P. Gibbons, is a resident of Worcester, Massachusetts and currently resides in Worcester, Massachusetts. At all relevant times, he was in his 34th year as the Head Coach of Holy Cross Women's Basketball and employed by the College of the Holy Cross for thirty-eight (38) years in total. Plaintiff, Lisa A. Gibbons, is a resident of Worcester, Massachusetts and has been married to William P. Gibbons for 32 years.

1

2.      Defendant College of the Holy Cross ("Holy Cross") is a private, non-profit four-year undergraduate liberal arts college located in Worcester, Massachusetts, duly organized in Massachusetts.

3.      This Court has subject matter jurisdiction over this action pursuant to M.G.L. c. 212, § 4.

4.      Venue in this Court is proper pursuant to M.G.L. c. 223, § 1, because Plaintiffs reside in Worcester County, Massachusetts.

## FACTS COMMON TO ALL COUNTS

5.      Coach Gibbons and Holy Cross were parties to an Employment Agreement effective by its terms September 1, 2014 through June 30, 2019.  A true and correct copy of the Employment Agreement is attached as Exhibit A.

6.      Coach Gibbons was a highly respected coach, with thirty-eight years of experience and over 600 wins as a Division 1 Head Coach while employed by Holy Cross.  A copy of Coach Gibbons' Credentials and Accomplishments while employed by Holy Cross is attached as Exhibit B.

7.      On November 15, 2018, the Holy Cross Women's Basketball team played Boston College. The game was videotaped.

8.      During the game, a controversial foul was called on a Holy Cross player. While Coach Gibbons discussed the call with the referee, the assistant coaches made a substitution for a Holy Cross player.

9.      When Coach Gibbons ended his conversation and returned to the bench, he changed the assistants' substitution and directed another player to take the substituted player's place in the game, as is customary for a Head Coach to do. Coach Gibbons explained to the

2

Press Release") announcing its suspension of Coach Gibbons "as the result of an internal investigation into a personnel matter" on January 31, 2019. A copy of the Holy Cross Press Release is attached as Exhibit D.

98.     The Holy Cross Press Release was contemporaneous with its notification to Coach Gibbons of his suspension and made public before any appeal could be requested or heard, as Coach Gibbons was entitled to under the Employment Agreement.

99.     In the week leading up to January 31, 2019, Holy Cross, and its President, Rev. Boroughs, were under intense media scrutiny for its failure to investigate, in a timely and adequate manner, claims of student sexual assaults by some faculty members.   The day before Coach Gibbons was suspended unfairly, Holy Cross sent out a press release saying that one of their professors was placed on administrative leave for sexual harassment.

100.    To offset this deluge of negative publicity, Holy Cross rushed to publicly announce and implement its suspension of Coach Gibbons to create the public impression that it diligently investigated internal complaints, but it did so before it had thoroughly and fairly investigated the alleged claims and afforded the contractual appeal to which Coach Gibbons was entitled.

101.    Even though the alleged claim against Coach Gibbons occurred in a public forum and during an intercollegiate game, Holy Cross intentionally omitted in its press release and public statements any description of the alleged "unprofessional" conduct on which the suspension was based.

102.    These omissions were defamatory, were intentional, an attempt by Holy Cross to conceal the basis for its decision while it attempted to avoid ridicule, or at the very least, to minimize any public speculation, as to why it had suspended – and subsequently terminated – its

17

long-standing Women's Basketball Coach for admonishing an insubordinate assistant coach for her misconduct during a game.

103.    Holy Cross violated the terms of Coach Gibbons' Employment Agreement in order to create the false impression of prompt remedial action to counter-balance widespread concern on campus about Holy Cross' lax response to student sexual assault allegations.

104.    Holy Cross acted hastily in the matter of Coach Gibbons' suspension and based its decision to do so on a very poorly conducted investigation and in violation of a just and proper appeal procedure as explicitly stated in the Employment Agreement.

105.    By issuing a press release before Coach Gibbons was afforded a fair and proper contractual right to appeal in accordance with the Employment Agreement, by failing to provide the full and factual basis for his suspension, by failing to provide him with the opportunity to respond to the charges leveled against him, and by ordering Coach Gibbons not to disclose the underlying facts concerning Ms. Parks' behavior to anyone,  Holy Cross intentionally and recklessly created  a false impression to the public that Coach Gibbons had been found guilty of inappropriate sexual behavior or improper behavior toward a student.

106.    By and through Holy Cross' actions and the timing of them, Coach Gibbons and his family have received numerous statements from both HC employees and people in the community that they were under the impression that the Coach was suspended for "sexual misbehavior with a student."

107.    The timing and the content of the College's Press Release on January 31, 2019 totally destroyed Coach Gibbons' previously sterling personal and professional reputation, both locally and nationally.

18

# COMPLAINT EXHIBIT L

# Review of the College of the Holy Cross' Culture, Structures, and Procedures

## Summary

## July 2019

Holland & Knight
www.hklaw.com

College of the Holy Cross
July 2019
Page 11

campus and it was apparent to me that there were a significant number of people who knew (or felt that they knew) an extensive amount about certain individual matters. While the community may have the need to know certain information about a responding party, for example, it must be considered that sharing information about a certain responding party may also inadvertently disclose information about a complaining party. In most instances, absent an ongoing threat of physical harm, complaining parties should be provided appropriate discretion and autonomy about what aspects of their experience they wish to share with a larger community. If potential complaining parties believe that their experiences would be shared broadly or even within a certain department on campus without their consent or knowledge, it may make them hesitate to seek resources or accommodations or make a report. Similarly, individuals accused of misconduct should be allowed a level of privacy if they are found not responsible. Finally, in small communities, the liberal sharing of such information can create investigative challenges, insofar as individuals involved in the process may substitute public sentiment for their own experiences and may not be able to perform their appropriate neutral role.

Several individuals expressed reservations and concerns about the Title IX Office. When pressed, many community members reflected that the frustration was with the College's general response to sexual misconduct and that the Title IX Office bore the brunt of decades of institutional frustration. While some expressed legitimate concerns, others accused the Office of significant transgressions without presenting evidence or first-hand knowledge. The most recent Title IX Coordinator was also subjected to several personal attacks, including having intimidating signs posted on her office door, being publicly ridiculed in a video circulated on campus, having individuals confronting her at public College events that she attended with her family, and having event organizers fail to invite her to Title IX themed-events and then demanding her immediate presence in front of an audience. Regardless of personal feelings about any individual or topic, this behavior was also inappropriate.

<u>Recommendations</u>

1. <u>Increase Resources for the Title IX Office</u>: The Title IX Office is, generally speaking, understaffed given the critical role it plays on campus. I recommend that the College review this situation to identify ways to increase staffing appropriately. For example, the College may consider an additional Deputy Title IX officer and/or an internal investigator, or enhanced technology to streamline case processing and tracking. (I referenced the potential purchase of EthicsPoint or a similar incident reporting/tracking tool above, and that would also satisfy concerns in this area, as well.) In conducting this review, I did note that the College has sought to hire additional staff to fill these challenging roles in the past, but its

---

College publishes an Annual Security and Fire Safety Report pursuant to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act of 1990 (more commonly referred to as the "Clery Act"), which describes policies and tracks the number of reports of a broad range of inappropriate behavior. *See* https://www.holycross.edu/sites/default/files/files/publicsafety/holy_cross_2018_annual_security_and_fire_safety_r eports_1.pdf. Finally, the College provides timely warnings when certain crimes are reported to any campus security authority or the local police, when the College determines that the incident represents an on-going threat to the campus community, or, in some circumstances, when there is a pattern of crimes that could create a safety concern for the campus.

# COMPLAINT EXHIBIT M

Case 4:21-cv-11108-AK   Document 1-1   Filed 07/06/21   Page 144 of 235

Victims of alleged sex abuse by former Holy Cross organist say college response lacking - News - telegram.com - Worcester, MA                    2/15/21, 4:08 PM

# telegram.com
### WORCESTER, MASSACHUSETTS

# Victims of alleged sex abuse by former Holy Cross organist say college response lacking

**By Mark Sullivan**
**Telegram & Gazette Staff**
Posted Nov 30, 2018 at 7:05 PM
Updated Dec 1, 2018 at 8:37 AM

WORCESTER — They were past recipients of perhaps the most prestigious scholarship offered by the College of the Holy Cross. Their mentor was one of Holy Cross' most illustrious faculty members, among the most acclaimed organists of his generation.

When five former holders of Holy Cross' Organ Scholarship this past summer publicly accused the college's distinguished artist-in-residence, James David Christie, of sexual misconduct, a discordant note was sounded across the sacred music world.

Mr. Christie, organist for the Boston Symphony Orchestra, Oberlin College Conservatory and Wellesley College as well as Holy Cross, influential in classical music circles and, it was said, in making or breaking aspiring musicians' careers, was alleged to have pressed himself sexually on his student proteges at Holy Cross, even in the organ loft of the campus chapel.

The former Organ Scholars this past August wrote to Holy Cross' president, Rev. Philip Boroughs, and told their story to The Boston Globe, which reported their allegations of lewd comments, unwanted touching and sexual misconduct by Mr. Christie at the college between 1994 and 2017. Mr. Christie resigned his position at the college and was barred from campus.

Rev. Boroughs promised an "aggressive and thorough" review of the allegations as well as of the culture of the college with a view to preventing such misconduct. "If issues are found, we will address them. Quickly," the president wrote in a letter to the campus community Aug. 24.

"These alumni have shown tremendous courage to share their painful stories," Rev. Boroughs wrote. "I want them to know that I hear them."

Yet more than three months later, Rev. Boroughs has yet to meet as requested with the five Organ Scholar alumni, they say. The college, they say, has been mum on its promised investigation; has yet to engage them in a requested conversation on the organ scholarship program, which they say "seems to be in a state of upheaval," and has denied their requests for counseling or funds for therapy.

"We are in pain, but Holy Cross has refused to provide us relief," the five wrote in a statement provided to the Telegram & Gazette last week by their spokesman, Jacob Street, Organ Scholar in Holy Cross' Class of 2010.

A spokesman for Holy Cross, John Hill, said the college "remains committed to a full and thorough investigation into the distressing experiences reported by our alumni." Mr. Hill said it would be inappropriate to comment on the specifics of the investigation while it is underway.

Asked via email whether or not Rev. Boroughs has met with the alumni, Mr. Hill did not respond.

The former Holy Cross Organ Scholars who raised the allegations are Mr. Street; Jeffrey Wood (Class of 2006); Brett Maguire (Class of 2002); Sean Redrow (Class of 1998); and Jennifer McPherson (Class of 2013). They represent half of the 10 alumni of the scholarship program. Three current Organ Scholars are enrolled at the school.

Holy Cross' Organ Scholarship, traditionally awarded every other year to a talented music major, provides full tuition (currently more than $52,000 annually, not counting room and board) for four years, and is highly coveted. CBS New York has described it as "perhaps the most prestigious scholarship for the organ in America," while the Bangor Daily News has called winning the scholarship the organist's equivalent to being named quarterback at Notre Dame.

With the scholarship comes the responsibility of playing the 52-foot-high, 10-ton baroque pipe organ in Holy Cross' St. Joseph's Chapel at Masses and other college events, and assisting the college organist with all aspects of the chapel music program.

Until three months ago, that meant studying and working closely with Mr. Christie, 66, considered by many to be one of the most distinguished organ teachers in the nation. (At his home in Natick this past week, Mr. Christie declined comment for this article.)

Mr. Christie has performed around the world with symphony orchestras and period instrument ensembles and as a solo recitalist. He was named International Performer of the Year in 2017 by the New York City chapter of the American Guild of Organists. He played at the funeral of Sen. Edward M. Kennedy at Boston's Mission Church in 2009. On his recommendation, Holy Cross installed the 3,814-pipe Taylor & Boody organ dedicated in its chapel in 1986.

He has had a say in who won the full-ride scholarship to Holy Cross: Newsday has described how Mr. Christie petitioned the dean to grant the scholarship, in a year it was not scheduled to be awarded, to a student whose playing had particularly impressed him.

And with his music connections — he had done more than 60 concert tours of Europe, and had served on international organ competition juries across the globe — Mr. Christie was said to hold significant sway over musicians' professional advancement, in New England and beyond.

Wesley Hall, a former student of Mr. Christie's at Oberlin College Conservatory, which is pursuing a Title IX investigation into its former organ professor and chair, told The Boston Globe he had studied extensively with Mr. Christie despite what he called the organist's repeated unwanted physical contact. "He's the best organ teacher in America, and he could destroy your dreams," Mr. Hall told the Globe.

Sex often entered into the equation, according to the Holy Cross Organ Scholar alumni who contacted the college and the Globe. They described Mr. Christie plying students with alcohol, physically groping students, frequently injecting sexual topics into conversation, and initiating long-term sexual relationships with two of the male Organ Scholars, who were under 21 at the time. Some of the sexual rendezvouses occurred in the pipe organ loft of St. Joseph's Chapel, they told the Globe.

"Christie has amazing artistic privilege ... at Holy Cross to hand select from the most talented young organ students, to groom them as he sees fit," Mr. Maguire, one of the Organ Scholar alumni who described sexual experiences initiated by Mr. Christie, said in a statement published by the Globe. "He has abused this position, using his power of selection to surround himself with insecure young men - teenagers - to satisfy his sexual appetites."

In a joint statement provided to the Telegram & Gazette Nov. 21 by their spokesman, Mr. Street, the five Holy Cross Organ Scholar alumni described what they said was their motivation for contacting Rev. Boroughs by letter on Aug. 15. They say they sought to "alert him to the abuse and harassment we suffered, so that no other Holy Cross student would be hurt by Christie, and to seek repairs for all affected Organ Scholars.

"We wanted to hold Christie accountable and to seek justice for ourselves," they wrote. "It was agonizing to come forward, knowing how it would disrupt our lives, the school, and the Organ Scholar program we cared so deeply about, but we felt we needed to move urgently to protect current students."

They made several requests in their August letter to the college, they said. They asked that Mr. Christie be removed from his position, not realizing he had just resigned. They asked to meet with Rev. Boroughs, "to ensure that he heard our concerns, empathized with our suffering, valued our voices in what we knew would be difficult conversations ahead, and was committed to truth and reconciliation through a fully transparent investigation process."

They also requested "financial repairs for therapy," which they asked be provided "to all Organ Scholars in need of it, not just those who signed the letter." They requested further financial "repairs" for two of the signed Organ Scholars "whose lives had been most affected."

And they requested a "voice in the conversation" about the organ scholarship program moving forward. "We could offer helpful perspectives on how to create a safe, enriching program for young organists," they wrote.

The college has been non-responsive, they say. "It has been more than 3 months since we delivered our letter to Fr. Boroughs, and Holy Cross has not honored our requests," the five wrote in their statement to the T&G. "Fr. Boroughs has not met with us, but instead referred us to the Title IX office. We have not been invited to participate in any conversation about the organ scholarship program, which seems to be in a state of upheaval. Holy Cross has denied our request for interim financial repairs or access to counseling."

Victims of alleged sex abuse by former Holy Cross organist say college response lacking - News - telegram.com - Worcester, MA

2/15/21, 4:08 PM

Holy Cross' policy on sexual misconduct prohibits sexual discrimination or harassment and sexual violence. Title IX, the federal civil rights law, bars sex discrimination at educational institutions receiving federal funding, and has been given broad scope covering sexual harassment and sexual violence. Holy Cross has a Title IX coordinator, Tracy Kennedy, whose team is responsible for responding to reports of sexual misconduct on campus, investigating them, and weighing possible sanctions. That team currently is investigating allegations raised against Mr. Christie.

"To date, all 5 Organ Scholars who signed the letter have participated in good faith in Holy Cross's Title IX process," the alumni wrote. "We were asked not to share specifics of the Title IX investigation. When asked, the Title IX office has informed us that some form of repairs may theoretically be possible as an outcome of the investigation. The Holy Cross administration has not commented further on our request for repairs. We have no idea how long the investigation will take."

Three of the former Organ Scholars - Mr. Street, Mr. Redrow and Mr. Maguire - have retained Kristin Knuuttila, a Boston lawyer whose practice specializes in representing survivors of sexual assault and child sexual abuse. "We're currently participating in the Title IX investigation and exploring all of our options to further respond to the college," Ms. Knuuttila said.

Holy Cross' spokesman, Mr. Hill, was asked to respond to the statement from the five alumni.

"The College remains committed to a full and thorough investigation into the distressing experiences reported by our alumni," he said via email Thursday. "A careful investigation takes time. The reports brought forward in this case cover a number of different events over many years and involving many different people.

"The College has hired an external investigator, who is working diligently to conduct the many interviews and re-interviews required in a case like this," Mr. Hill continued. "It would be inappropriate for the College to comment on the specifics of the investigation or on any potential outcomes while the investigation is ongoing.

"We are also well underway with a separate review into any underlying issues with College procedures and culture that these stories may expose," he said. "That review is being conducted by an external investigator, who has so far made 11 visits to campus and spoken to more than 30

members of our faculty and staff. We have already made several changes to strengthen our practices here on campus in response to what we have learned."

An attorney retained to assist the college in its Title IX investigation, Elizabeth Sanghavi of Brookline, referred questions to Mr. Hill.

# COMPLAINT EXHIBIT N

# COMPLAINT EXHIBIT O

Demand More. - Google Docs

# Thank you for your interest, this document will be delivered to the administration of Holy Cross the morning of 12/4.

Submit your story: https://goo.gl/forms/LVbiWQY9fKBwLOa93

Link to share this document:

https://docs.google.com/document/d/1DkyCbD_BN2SACiDR0gLQG5OAH7c66NjENrjT8xgoDoM/edit?usp=sharing

---

To the administration of the College of the Holy Cross,

The events of the fall 2018 semester have illuminated the harsh realities present at our College, throughout our community. It is the responsibility of an educational institution to protect each student's right to learn in a safe environment, free from unlawful and immoral discrimination and violence. Current policies, procedures, and programming have not adequately protected our community from sexual violence, nor have they led to the structural support survivors are entitled to. As both your community members and consumers of educational services, we are entitled to greater transparency and further progress. On behalf of the community of the College of the Holy Cross community, we the curators of *@sexualassaultonthehill*, have compiled the the following list of demands in an effort to improve current survivor-support infrastructure. Please know that each demand is based on the insight offered to us by your community members. We demand detailed and explicit communication from the College—articulating the intensity and breadth of compliance of each demand—by January 20th, 2019. We maintain faith that you will remain committed to your community's plea.

1. We demand a comprehensive report stating how many incidents have been reported, the general nature of incidents reported, how many were found guilty and what the imposed penalties were. **We demand this report to account for all incidents since December 2015.** We demand this report conveys how many cases the Title IX office is currently judicating. We demand this report to include the Title IX office's budget and what its funding allocation is. We demand this report to include how this funding allocation compares to other aspects of the College as well as how it compares to other colleges. We are not a state school and are not funded by taxpayers' dollars, so we realize we are not guaranteed the same transparency as students from state schools are. However, tuition is $70,000 a year, and we, as the consumers, deserve transparency on the process and finances in place to ensure students' safety. We demand this report by January 20th, 2019.

2. We demand that the College **hires outside, wholly independent parties to conduct investigations for all sexual misconduct cases.** Currently, the College hires independent investigators at the their own discretion; this is not sufficient. Even if individuals within Title IX at Holy Cross hold the best intentions, they must adjudicate crimes while also maintaining the public relations of our institution. Thus, it is clear that there are severe conflicts of interest, compromising their decision. Other schools have adopted this practice to avoid such conflicts of interest and to best ensure students' safety. We demand transparency on the proposed timeline for implementing this demand. **We demand a report on the proposed outside parties that will conduct**

Demand More. - Google Docs

investigations. We demand that you prioritize this in the same way you have other areas of the College.

Separate, but related, we demand you release all campus climate investigations going forward and that you include how you funded these reports in a way that avoids conflicts of interest.

3. In the case that **staff, professors, and/or priests have engaged in sexual misconduct:** we demand to know what the protocol and threshold are for **relieving faculty members from their professional responsibilities.** In what cases would an appropriate response be demotion, but the accused party is still allowed unfettered access to students? Additionally, in the case that student leaders who are trusted with student safety have Title IX investigations against them: **what is the threshold for dismissing accused students from their positions of power?** What is the protocol when due to the nature of a campus position, the accused student will be in isolated places with students who are vulnerable?

4. We demand that **when there is a dangerous situation to students, both on campus and OFF campus, that the entire student body be alerted within 48 hours of the report.** We demand transparency on whom students should talk to when they hold knowledge that students are in imminent danger. We demand that the College hires a trained staff member who is responsible for communicating with all relevant parties in the case of imminent danger. The burden should not fall on a student or a group of students to coordinate with administrators and public safety. We further propose that in the case you do not have confirmation of said danger, that you instead frame the report to the student body as "serious allegations that could jeopardize their safety." We included the 48 hour timeframe to instill a sense of urgency when it comes to these reports; a safety notice a month after an incident is reported is not productive.

5. Education Secretary Betsy DeVos recently proposed amendments that call for a higher standard of proof. We **demand a stance on DeVos' proposition.** Additionally, DeVos proposes the accused be able to hire a separate investigator to cross-examine the survivor. **We demand commitment that you will do everything in your capacity to protect survivors from this unjust proposition.**

6. Survivors in our community have expressed the desire to **appeal directly to the Board of Trustees.** Survivors wish to communicate the lived experiences of students on the hill. This will help to provide insight on how to make our community on the hill safer for students. We demand that you allow this to happen at your first board meeting of the new year.

7. Currently, there is no individual managing strategic plans to determine how to end sexual violence on our campus. There is nobody reporting directly to the president with what needs to be done in terms of funding allocation or with plans of action to end sexual violence. We demand that we, as an institution, move past using Title IX as what appears to be a dumping ground for everything related to sexual violence. As has been outlined: Demand #1, which is calling for an audit, will help to clean the current system and add more accountability. Additionally, Demand #2 will ensure that unbiased, independent parties complete the investigation work that Title IX currently does in order to avoid conflicts of interest. **Our final demand related to Title IX reform has three parts. We demand A) that the office takes responsibility for the multi-dimensional management plans needed to end sexual violence or that the College hires a separate individual focused on prevention and management plans B) that there is an individual in charge of reporting to the president to ensure adequate funding and C) that the College is receptive to these needs.** Regarding point A, the popularity of @sexualassaultonthehill demonstrates that Title IX is not doing a sufficient job supporting students and ensuring their safety, and this suggests that the office is overstretched and

under-resourced. To reiterate the second part of point A, if adequately protecting us means hiring an additional

staff member or even creating a separate office focused on prevention needs, we demand this happen. Once again, we demand transparency on all management plans, including funding.

8.  **We demand a working group, with both faculty and student leaders, that identifies and implements best practices for issues relating to sexual violence.** This group could work on **improvements within the Counseling Center, Public Safety, Residence Life and Housing, Health Services and the Chaplains' Office.** Moreover, this group could **reevaluate current programming for sports teams and recognized student organizations in place to prevent sexual assault.** Lastly, this group could work with the administration to ensure that students' have a **physical safe space on campus staffed with specially-trained rape crisis counselors on site or on call 24 hours a day.** We've received numerous suggestions for change through @sexualassaultonthehill and are happy to provide these suggestions to the working group.

**We are survivors; we are allies.**

**We hold power in numbers.**

| Name, Class Year or Department | Name, Class Year or Department |
|---|---|
| Olivia Terranova, 2019 | Christian Krenek, 2012 |
| Jordana Irzyk, 2021 | Manuel Trejo, 2019 |
| Olivia Lozy, 2020 | Nancy Figuereo, 2019 |
| Katherine Ginsbach, 2011 | Katie Kerins, 2021 |
| Tessa Varvares, 2019 | Megan Sawicki, 2019 |
| Cate Longo, 2022 | Sarah Brink, 2019 |
| Cassidy Kaelin, 2018 | Matteo Mannara, 2019 |
| Emma Powell, 2020 | Kaylah Fernandez, 2019 |
| Carson Harold, 2019 | Julia D'Agostino, 2020 |
| Christine Morrison, 2020 | Pablo Hernandez, 2019 |
| Victoria De Leon, 2022 | Lauren Schonewolf, 2021 |
| Jesús Aguirre, 2016 | Madeleine Fontenay, 2021 |
| Julia Papanastou, 2018 | Sarah Paletta, 2015 |
| Briana Medina, 2022 | Greg Landry, 2019 |
| Patricia Corey, 2018 | Joe Pasko, 2019 |
| Michaela Lake, 2022 | Paulina Martin, 2021 |
| Diana Wall, 2022 | Katherine Elacqua, 2019 |

Demand More. - Google Docs

1/28/21, 6:37 PM

| | |
|---|---|
| Danibel Peralta, 2020 | Samantha Fields, 2019 |
| Mithra Salmassi, 2019 | Elizabeth Flynn, 2019 |
| Nathan D. Manna, 2021 | Amanda Fradsham, 2021 |
| Julia Spiegel, 2019 | Catherine Winn, 2021 |
| Alison Randall, 2019 | Nicholas Taliento, 2021 |
| Alexis Rappaport, 2019 | Hanna Ballantine, 2019 |
| Paige Petit, 2018 | Veronica Fitzgerald 2019 |
| Barbara Singh, 2019 | Meredith Coolidge, 2019 |
| Mary Grace Harris, 2022 | Eliza Oak, 2019 |
| Mitch Marcinauskis, 2021 | Adrian Cacho, 2019 |
| Sean McNamara, 2021 | Jazmin Torres, 2020 |
| Matthew Lauer, 2016 | Clare Collins, 2022 |
| Ben Whidden, 2020 | Megan Smith, 2020 |
| Lauren Murray, 2019 | Savannah Haverty, 2019 |
| Yen Nguyen, 2019 | Adam Coshal, 2020 |
| Audrey Holmes, 2019 | Patrick Wilks, 2019 |
| Alexander Grey, 2019 | James Garry, 2020 |
| Angelin Lucas, 2020 | Marie Moncata, 2019 |
| Victoria Allienello, 2021 | Shannon Cherpak, 2019 |
| Elena Miceli, 2020 | Eduardo Euceda 2022 |
| Katie Flanagan, 2021 | Karina Pliego, 2021 |
| Jane Branch, 2018 | Isabel Tehan, 2019 |
| Meltem Eracar, 2019 | Maria Claudia Schubert-Fontes, 2019 |
| Margaret Burd, 2020 | Emali Khalyat, 2019 |
| Caitlin Lillis, 2019 | Katherine Santoro, 2019 |
| Anastasia Vasko, 2019 | Karson Silver, 2019 |
| Tess Gallant, 2021 | Rebecca Beaulieu, 2018 |
| Anthony Saltarelli, 2018 | Tatiana Thompson, 2022 |

| | |
|---|---|
| Caroline Fital, 2021 | Allie Harris, 2017 |
| Matthew Freije, 2019 | Katherine Hegermiller, 2020 |
| Patrick Shea, 2021 | Kaitlyn Meehan, 2020 |
| Annie Hentschel, 2019 | Madeline DeBono, 2019 |
| Eleanor Conlon, 2021 | Laura Garcia, 2019 |
| Zhiran (Karen) Xu, 2019 | Kara Cuzzone, 2019 |
| Hannah Costa, 2022 | Caroline Ambrose, 2019 |
| Galen Comerford, 2019 | Isabella Cappabianca, 2019 |
| Jack McCabe, 2019 | Natalie Auteri, 2019 |
| Ryan Ferraro, 2019 | Mattie Carroll, 2019 |
| Leah Orozco, 2019 | Alfonso del Aguila, 2021 |
| Claire Fitzpatrick, 2021 | Ariana Licata, 2019 |
| Mary Kate Sebby, 2020 | Kara McCormack, 2017 |
| Kathryn Flanagan, 2019 | Ana Dulskiy, 2019 |
| Evan Megan, 2019 | Jennifer O'Brien, 2019 |
| Izzi Lambrecht, 2019 | Kayleigh Hoagland, 2018 |
| Maressa Park, 2022 | Michaela Boyle, 2021 |
| Meg Snee, 2018 | Caroline Carr, 2017 |
| Olivia Streaman, 2021 | Caroline Skou, 2020 |
| Emma Flanagan, 2021 | Francesca Panarelli, 2015 |
| Caroline Tyler, 2022 | Taylor Gull, 2016 |
| Elizabeth Larkin, 2021 | Julia Metzger, 2019 |
| Matthew Wolfe, 2020 | Jillian May, 2019 |
| Marija Stilinovich, 2021 | Stephanie McCrary, 2020 |
| Mia Yee, 2019 | Fatima Oseida, 2020 |
| Frank Thompson, 2020 | Caroline Ahearn, 2020 |
| Ania Howley, 2022 | Lessan Melke, 2019 |
| Hope Goodman, 2021 | Nicolas Jones, 2019 |

| | |
|---|---|
| Rosario Dawson, 2021 | Jennifer Symula, 2018 |
| Daimeliz Sepulveda, 2022 | Katherine Hayes, 2019 |
| Christine Church, 2020 | Owen Conroy, 2019 |
| Caroline Cormier, 2016 | Jackie Hart, 2019 |
| Michaela Carroll, 2016 | Erin Sullivan, 2018 |
| Hannah Grace Stokes, 2015 | Amy Schlegel, 2018 |
| Ajah Eills, 2021 | Brianna Spencer, 2019 |
| Vidya Madineedi, 2020 | Emily Iannaconi, 2017 |
| Jillian Silva-Jones, 2015 | Jaylene Mata, 2020 |
| Katie Foley, 2019 | Nan Kitiarsa, 2021 |
| Jeffrey Dickinson, 2019 | Siobhan Fennell, 2018 |
| James Gallagher, 2018 | Margot Reed, 2018 |
| Hamilton Wyatt-Luth, 2020 | Michael Shun, 2018 |
| Ashley Leger, Dinand Library | Liz Inman, 2015 |
| Kyle Kowalski, 2021 | Gary Senecal, Psychology |
| Alisa Lee, 2019 | Fernando Torralba, 2021 |
| Jennifer Collymore, 2019 | Anna Fagan, 2022 |
| Katarina Lee, 2019 | Emily Tieu, 2020 |
| Patrick Hogan, 2019 | Caitlyn Riley, 2021 |
| Shayan "Shay-Z" Zaheer, 2018 | Annabel Leasure, 2022 |
| Katy Hannigan, 2012 | Lily Puccia, 2019 |
| Nuryelis Herrera, 2020 | Suzanne Noone, 2019 |
| Louis Hurtado, 2019 | Cédric Dépestre, 2019 |
| Nora Cowherd, 2019 | Eva Skoufalos, 2019 |
| Carly O'Brien, 2017 | Liam O'Toole, 2020 |
| Xochitl Tapia, 2021 | Rossangelly Toro Carrillo, 2019 |
| Anna Desmarais, 2020 | Jason Millson, 2019 |
| Giovanna Messina, 2022 | Liam Prendergast, 2019 |

| | |
|---|---|
| Isabella Kronau, 2021 | Jake Mozeleski, 2022 |
| Rose Weiss, 2018 | Elizabeth Douglass, 2019 |
| Brianna Cummings, 2022 | Matthew Elacqua, 2021 |
| Lindsay Welch, 2016 | Charlie Gillis, 2021 |
| Jack Satti, 2018 | Caroline MacLachlan 2019 |
| Katherine Vanasse, 2022 | Maura Eagan, 2020 |
| Andrew Williamson, 2021 | Caroline Morano, 2017 |
| Brenda Ta, 2022 | Maya White, 2020 |
| Emily Zeno, 2019 | Sarah Malala, 2018 |
| Cassidy Bulger, 2019 | Riley Bergholtz, 2020 |
| Vonn Kerzch Alabado, 2020 | Katie O'Brien, 2019 |
| Meghan Gavis, 2022 | Katie Piro, 2019 |
| Henry Hvidsten, 2021 | Yesenia Gutierrez, 2021 |
| Daniel Clague, 2018 | Katherine Fazekas, 2022 |
| William Mulvaney, 2022 | Akemi Kawano, 2018 |
| Isabella Marciano, 2022 | Kristen Kelley, 2015 |
| Nicole Folan, 2020 | Kathryn Tracy, 2012 |
| Caitlin Keaveny, 2021 | Danielle Fucci, 2020 |
| Madeleine Thero, 2019 | Alyssa White, 2018 |
| Grace Burke, 2021 | Mishie Macy, 2021 |
| Margaret Thompson, 2019 | David Rodriguez, 2019 |
| Kathleen Fitzpatrick, 2019 | Johanna Mackin, 2020 |
| Ashley Tortorelli, 2019 | Deirdre Shepard, 2019 |
| Ajit Bhullar, 2018 | Oscar Gonzalez, 2021 |
| Meghan Casey, 2015 | Krystyna Constantino, 2021 |
| Charlotte Kurzweil, 2020 | Caleb Plummer, 2019 |
| Olivia Marran, 2020 | Jullia Pham, 2020 |
| Laura McBride, 2015 | Katherine Trymbulak, 2018 |

| | |
|---|---|
| Carley Boothe, 2020 | Connor McManus, 2020 |
| Alyssa Stone, 2022 | May Sim, Philosophy |
| Dora Calva, 2022 | Jonesy Zhang, 2022 |
| Máire White, 2020 | Emily Lam, 2018 |
| Caroline O'Connor, 2019 | Katarina Blonski 2020 |
| Margaret Goddard, 2019 | Mackenzie Breen, 2021 |
| Brandon Brito, 2020 | Madeline Lyons, 2019 |
| Jules Cashman, 2022 | Caroline Body, 2019 |
| Davey Sullivan, 2022 | Jan Berry, Chaplains Office |
| Jocelyn Buggy, 2022 | Evyn Lê Espiritu, Asian Studies |
| Catherine Brennan, 2020 | Ernest Rafael Hartwell, Spanish |
| Liza Goodman, 2021 | Ann Marie Leshkowich, Sociology & Anthropology/Asian Studies |
| Marissa Beney, 2019 | Sean Manning, 2019 |
| Bridget Harris, 2019 | Helen Pepin, 2021 |
| Caroline Rossi, 2019 | Rosamund Mitchell, 2020 |
| Lisa Hoang, 2020 | Anne Blaschke, History |
| Keyshawn O'Connell, 2020 | Yulianna Ocampo, 2021 |
| Sandy De Jesus, 2019 | Breanne LaCamera Reynolds, 2012 |
| Phoebe Ryan, 2019 | Emma Grugan, 2021 |
| Bridget Hobin, 2019 | Claire Fox, 2021 |
| Katelyn Lyons, 2018 | Vanessa Vu, 2019 |
| Chloe Gonzales, 2020 | Erin Leslie, 2019 |
| Toshanna Santos 2018 | Allison McGrath, 2022 |
| Andrea Ferreira Guilarte, 2015 | Mary McGregor 2019 |
| Deana Pileika, 2020 | Juan G. Ramos, Spanish and Latin American, Latinx, and Caribbean Studies |
| Rose Kirsch, 2019 | Sofia von Fedak, 2019 |
| Jany Gonzalez, 2022 | Sarah Barr, 2019 |
| Elena Arciprete, 2020 | |

| | |
|---|---|
| Christina Darko, 2021 | Ryan Fay, 2020 |
| Geraldine Connolly, 2019 | Alvaro Jarrin, Sociology and Anthropology |
| Margaret O'Hagan, 2021 | Michael Lyons, 2019 |
| Deirdre Kennedy, 2020 | Brooke Creedon, 2020 |
| Alissa He, 2019 | Connie Truong, 2018 |
| Abby McGrade, 2022 | Keith Plummer, 2017 |
| Lucia Ducci, MLL | Sam Ryder, 2019 |
| Ana-Sofia Reyes, 2017 | Emily Sullivan, 2019 |
| Isabella Oropeza 2018 | Elizabeth Sisko, 2019 |
| Grace Neilson, 2019 | Will Mulvaney, 2022 |
| Sarah Behrens, 2019 | Madison Ward, 2021 |
| Megan Siebecker, 2020 | Jorge Santos, English Department |
| Hannah Maguire, 2019 | Colleen Creevy, 2015 |
| Emily Arancio, 2020 | Elise Cobb, 2021 |
| Hana Ferrari, 2019 | Alice Galvinhill, 2020 |
| Sara Dilbarian, 2020 | Ayleen Santarin, 2020 |
| Cat Zachary, 2021 | Caitlin Pollard, 2017 |
| Noah Mailloux, 2020 | James Falconer, 2019 |
| Estelle Cadrain, 2021 | Adam DeCoste, 2019 |
| Cherylann Pasha, 2014 | Peter Fantozzi, 2019 |
| Anne Borzner, 2021 | Hannah Tallerico, 2022 |
| Mallaigh Ashton, 2021 | Chris Pappey, 2019 |
| Vanessa Moscatello, 2015 | Britt Axelson, 2021 |
| Nora Grimes, 2019 | Yiyuan Sun, 2021 |
| Lizzy Casavant, 2021 | Lily Reed, 2021 |
| Carlon Campbell, 2017 | Margaret Burns, 2021 |
| Ellie Juliand 2012 | Madeline Piccione, 2020 |
| Yining Mao 2021 | Emma Carberry, 2015 |

| | |
|---|---|
| Sylvester Dwyer 2021 | Olivia Cesarini, 2020 |
| Eile McGinn 2022 | Corinne Heffernan 2022 |
| Erica Mendoza, 2018 | Anna Morris, 2021 |
| Valentin De Jesus, 2021 | Elizabeth Griffin, 2021 |
| Timothy Gardner, 2017 | Patrick Mulligan, 2018 |
| Kristina Reardon, Center for Writing | Ryan Powell, 2021 |
| An Pham, 2018 | Kelsey Duffy, 2019 |
| Tabitha Fields, 2021 | Jacqueline Cannon, 2020 |
| Olga Grzebyk, 2022 | Olivia Klenn, 2019 |
| Caroline O'Day, 2016 | Vivian Ma, 2019 |
| Ryan Lee, 2019 | Megan Carney, 2018 |
| Mary Evelyn Quinlan, 2022 | Emma Wood, 2021 |
| Caroline Babinski, 2020 | Katherine Fitzgerald, 2021 |
| Delaney Wells, 2020 | Margaret Mirabella, 2019 |
| Kerry Larkin, 2020 | Kyle Irvine, 2021 |
| Dennis Liu, 2022 | Kim Devine, 2019 |
| Meaghan Lanctot, 2021 | Maggie Carey, 2017 |
| Matt Bouvier 2021 | Natalie McDonough, 2015 |
| Emily Corl, 2020 | Samantha Sweet, 2021 |
| Lily Russo, 2022 | Emma Berry, 2019 |
| Daisy Mendoza Sanchez, 2022 | Meghan Shaffer, 2020 |
| John Vaughan, 2022 | Alexandra Connelly, 2015 |
| Carissa Kumlander, 2019 | Angela Brown, 2014 |
| Kerry Grumka, 2021 | Carlito Espudo, 2018 |
| Jonathan Rivera, 2021 | Maeve Sweeney, 2018 |
| Ben Tayag, 2021 | Kate Golden, 2019 |
| Luke Walsh, 2019 | Emily Haskell, 2022 |
| Jacob Fisher | Frederico Sorcini, 2020 |

Demand More. - Google Docs

| | |
|---|---|
| Hannah McCormick, 2014 | Lindsay Sullivan, 2018 |
| Maryana Trinh, 2022 | Anthony Yakely, 2016 |
| Connor Murphy, 2021 | Michaela Fleming, 2020 |
| Dylan Blunck, 2021 | Dane Anderson, 2020 |
| Anthony Gonzales, 2021 | Kallie Laspesa, 2020 |
| Caroline Shannon, 2017 | Eileen McGowan, 2014 |
| Amanda Snow, 2016 | Caitlin Spind, 2020 |
| Jacob Wronski, 2018 | Jackson Skelley, 2020 |
| Meaghan O'Keefe, 2019 | Chloe Burkett, 2021 |
| Marie Robert  2021 | Adriana Guadana - Huizar, 2021 |
| Molly Dion, 2021 | Diana Dukhanova, Department of Modern Languages |
| Emily Fischer, 2016 | Megan Nemeth, 2018 |
| Patrick O'Keefe, 2021 | Maggie Ober, 2022 |
| Hannah Benson 2020 | Sydney Burr, 2020 |
| Alexandra Barnes, 2019 | Brittany Lane, 2017 |
| Quinn Fitzgerald, 2011 | Naomi Gaspard, 2015 |
| Allyson Kudenchak, 2019 | Meghan MacDonald, 2021 |
| Martina Umunna, 2018 | April Dunning, 2017 |
| Maya Collins, 2019 | Chris Connolly, 2019 |
| Leslie Dominguez, 2020 | Caroline Fredericks, 2021 |
| David Cotrone, 2013 | Nick Rhodes, 2021 |
| Thibaut Schilt, Modern Languages and Literatures | Sara Brisson, 2016 |
| Claudia Ross, Modern Languages and Literatures | Brian McDonough, 2020 |
| Timothy Duffy, 2006 | Michael Dahlquist, 2022 |
| Amanda Lambert, 2019 | Susan Elizabeth Sweeney, English |
| Meg Taing, 2016 | Courtney Esteves, 2019 |
| Fallon Parker, 2016 | Jessica Gallagher, 1999 |
| Chris Ricciardi, Experiential Learning | Caroline Jensen, 2019 |

1/28/21, 6:37 PM

Nurhaizatul Jamil, Postdoctoral Fellow (2016-2018),

Demand More. - Google Docs

1/28/21, 6:37 PM

| | |
|---|---|
| Estelle Kearns, 2022 | Soc & Anthro |
| Haytam Laroussi, 2022 | Karen Turner, History, emerita |
| Melissa Simplice, 2020 | Rachel McLellan, 2020 |
| Megan Miranda, 2017 | Sylvia Schmitz-Burgard, MLL/German Program |
| Abigail Hadlock, 2021 | Hannah Thompson, 2022 |
| Kazettie Colon, 2022 | Sean Sullivan, 2022 |
| Lydia Brown, 2018 | William Malloy, 2019 |
| Janaiya Green, 2021 | Grace Bradley, 2022 |
| Abbie Sagona, 2020 | Allison Carvalho, 2022 |
| Alisha Collazo, 2018 | Elena Olsen, 2022 |
| Eva Heyer, 2022 | Margaret Geertz, 2018 |
| Kevin Lux, 2017 | Noemi Vasquez, 2022 |
| Charles Krumsiek 2020 | Carley Buckley, 2018 |
| Bethania Jimenez, 2021 | Clare Reidy, 2013 |
| Abigail Kostecki, 2019 | John May, 2019 |
| Livia Graham, 2022 | Carolyn Fenerty, 2020 |
| Kate Benjamin, 2015 | Caitlin McGuire, 2016 |
| Francesca Stenard, 2016 | Teresa Murphy, 2019 |
| Lauren Wilson, 2019 | Zach Werner, 2017 |
| Sydney Grosskopf, 2020 | Tina Vo, 2020 |
| Katherine Probolus, 2015 | Hannah Brennan, 2019 |
| Katy McNamara, 2020 | Georgina Mendizabal, 2019 |
| Katherine Kalill, 2021 | Kim French, 2016 |
| Christine McLaughlin, 2021 | Claudia Chierichini, Department of Modern Languages |
| Tess Andrekus, 2018 | |
| Yanille Baez, 2013 | Margaret Gavin, 2016 |
| Arlyne Peña , 2021 | Rose Kelly, 2022 |
| Marygrace Pier, 2020 | Briana Mora, 2016 |

Demand More. - Google Docs

1/28/21, 6:37 PM

Nora McKenna, 2022


COLLEGE OF THE
Holy Cross

Rogers, Cheryl <crogers@holycross.edu>

## Update to the Holy Cross Campus Community
1 message

Boroughs, S.J., Phillip <HCPresident@holycross.edu>
To: "Philip Boroughs, S.J." <HCPresident@holycross.edu>
Bcc: Administrators@holycross.edu

Wed, Jan 30, 2019 at 7:59 PM

Dear Members of the Holy Cross Campus Community,

There have been many questions about a Worcester Magazine article regarding sexual harassment allegations against Professor Christopher Dustin. I want you to know that over many months the College conducted a thorough and extensive investigation, and he was found responsible and sanctioned for violating our policy. Misconduct by a faculty member betrays our core mission and the most important principles of our community. I am sorry that any student would experience a violation of the sacred trust between a student and faculty member.

As a result of new allegations pertaining to a previous academic year, the College has placed Professor Dustin on administrative leave. He will not be on campus and was told not to communicate with members of the campus community pending an investigation of the new allegations. The College is engaging an external investigator to conduct this investigation.

I understand how difficult it is for individuals to come forward with reports of this nature, and I commend and thank those involved for reporting and participating in the review process.

Over the course of this academic year, community members have raised important questions about how investigations are undertaken, how sanctions are determined and who determines them, how appeals work, and how victims are supported. We will continue to move forward with our planned review of our Title IX policy and processes, and are seeking external experts to assist in this effort. We have much work to do.

Please know this is a very painful moment for me and for all of us at the College. I am committed to addressing these challenges with you.

Sincerely,


Philip L. Boroughs, S.J.
President

2/14/2019                                          Gmail - Notice of Campus Communication

 **Gmail**                              Christopher Dustin <christopheradustin@gmail.com>

## Notice of Campus Communication
1 message

**Rogers, Cheryl** <crogers@holycross.edu>                    Wed, Jan 30, 2019 at 8:00 PM
To: christopheradustin@gmail.com
Cc: "Kennedy, Tracy" <tkennedy@holycross.edu>

Dear Professor Dustin,

I am writing to notify you that the College will be sending a communication to the campus community to address concerns that have developed since the article in the Worcester Magazine and recent allegations regarding sexual misconduct.

This communication will include notice of your administrative leave and no contact directives.

If you have any questions, please feel free to contact me tomorrow.

Kind regards,
--
Cheryl Rogers, J.D.
Assistant Director of Title IX Initiatives/Deputy Title IX Coordinator
College of Holy Cross/Hogan Center Room 522
1 College Street
Worcester, MA 01610
(508) 793-2596
crogers@holycross.edu
www.holycross.edu
www.holycross.edu/sexual-respect-and-title-ix
NOTE: This e-mail is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else.

# COMPLAINT EXHIBIT P

**REDACTED**

## Update following department chairs meeting    Inbox

 **Provost, Holy Cross** (sent b... 9:19 AM (5 hours ago)
to Margaret, bcc: Faculty

Colleagues,

At Friday's meeting of the department chairs and independent multidisciplinary directors, we discussed some of what has been happening at the College this semester.

I wanted to share some of this with you and I encourage you to speak with your department chair about Friday's meeting.

It goes without saying that this has been a very difficult year for the College. We all are and should be angry that any student would be harassed by a faculty member. We all should be angry that any student would sexually assault another student. We all should be angry if victims of sexual misconduct and discriminatory harassment believe that they have nowhere to turn.

Our students, through the ENGAGE summit and through their protest at the beginning of last week, have called us to be better. They are right. We should be better. We must do better.

The AGC recently announced the formation of an *ad hoc* committee on faculty sexual misconduct with a mandate to review the recent case of Professor Dustin, to review procedures for investigating allegations of sexual misconduct by faculty members and to review overall Title IX policies and procedures. I am grateful to Miles Cahill, Speaker of the Faculty, and the members of the AGC for their leadership in this situation. The

President has met with Miles to discuss how this review will inform the larger Title IX review announced by the President last December.

The students participating in the protest have made several demands. The President, Jane Corr, Michele Murray and I have met with the student leaders. As you know, the President sent a letter to all students acknowledging their concerns and apologizing for the pain they have experienced. Members of the Executive Team are continuing to work with the student leaders to determine next steps.

I have agreed to take the following steps:

· I will be bringing to the AGC a proposed policy for the removal of faculty awards. This policy, if approved by the AGC, will be included in the Faculty Handbook.

· I have made myself available to meet individually or in groups with students, particularly the students in the Montserrat class that Prof. Dustin taught last semester.

· I will be submitting a request to the AGC and the *ad hoc* committee for a review of specific questions and concerns regarding what standards are appropriate for the application of interim measures pending an investigation of a professor, what sanctions are appropriate for faculty members found responsible for violation of the sexual misconduct or discriminatory harassment policies, and, more generally, procedures for applying sanctions to faculty and the appropriate incorporation into the *Statutes of the Faculty* of AAUP recommendations in this area.

I know there is frustration with the process for addressing faculty misconduct. In particular there are questions about the length of time to complete an investigation and produce a finding, decisions regarding interim measures and final sanctions, and the process for making these decisions. Our existing policies and procedures are being tested, and there are likely to be changes that we will want to make for the future. The President has committed to an overall review of Title IX policies

and procedures that will include the input of students, faculty and staff.

Many of you may have other questions and concerns. I urge you to be in touch with the *ad hoc* committee appointed by the AGC to ask those questions. These are important matters that require careful and deliberative processing through the governance structures of the faculty, as well as the shared governance structures of the College. We must follow our policies and procedures and we must have policies and procedures that are credible to the community.

The College will be administering a campus climate survey to students, faculty and staff this semester. This is an opportunity for members of our community to express their concerns about issues of diversity, equity and inclusion as well as sexual respect in our campus culture. Many of you have your own questions and concerns about overall campus climate regarding issues of sexual respect and broader issues of diversity, equity and inclusion. I urge you to express these questions and concerns to members of the two planning groups that are being formed by the President.

We have much work to do as a community. I have much work to do as Provost. We have a responsibility to our current, former and future students to hold one another accountable for this work. I pray that we can do this work always with a commitment to upholding the dignity of each member of the community and with a goal of creating a community that supports the flourishing of all its members.

Margaret

# COMPLAINT EXHIBIT Q

# Sexual Respect and Title IX

The College of the Holy Cross is a community of trust based in the Jesuit tradition whose existence depends on strict adherence to standards of conduct set by its members. Among these are standards regarding human sexuality, any expression of which must affirm the integrity and dignity of oneself and others. Sexual misconduct, in all forms, violates the sanctity of the human body and spirit and will not be tolerated within the College community. The College is committed to providing an environment of well-being, learning, and accountability for its members by preventing the occurrence of sexual misconduct and addressing its effects.

## Overview of the College of the Holy Cross
## Sexual Misconduct Policy[1]

## I. Statement of Values

The College of the Holy Cross is a community of trust based in the Jesuit tradition whose existence depends on strict adherence to standards of conduct set by its members. Among these are standards regarding human sexuality, any expression of which must affirm the integrity and dignity of oneself and others. Sexual misconduct, in all forms, violates the sanctity of the human body and spirit and will not be tolerated within the College community. The College is committed to providing an environment of well-being, learning, and accountability for its members by preventing the occurrence of sexual misconduct and addressing its effects.

## II. Commitment to Non-Discrimination

The College rejects and condemns all forms of harassment, discrimination, retaliation and disrespect, and is committed to sustaining a welcoming environment for everyone and especially for those vulnerable to discrimination on the basis of race, religion, color, national origin, age, marital or parental status, veteran status, sex, disability, genetic information, sexual orientation or gender identity. It is the policy of the College to adhere to all applicable state and federal laws prohibiting discrimination. The College does not discriminate unlawfully in admission to, access to, treatment in or employment in its programs and activities on the basis of a person's race, religion, color, national origin, age, marital or parental status (including pregnancy or any pregnancy related conditions[2]), veteran status, sex, disability, genetic information, sexual orientation, gender identity or any other legally protected status, while reserving its right where permitted by law to take action designed to promote its Jesuit and Catholic mission. The

---

[1] This amended Sexual Misconduct Policy, including but not limited to the Process for Resolving Complaints of Sexual Misconduct, are effective as of September 5, 2018. Complaints made or claims reported prior to September 5, 2018 will generally be reviewed under the Sexual Misconduct Policy as in effect on the date of the complaint was made or claim reported to the Title IX Coordinator, unless otherwise determined by the Title IX Coordinator, in his/her sole discretion, with respect to continuing or ongoing violations or other pertinent circumstances.

[2] This includes the right to reasonable accommodations in connection with pregnancy or a condition related to pregnancy including, but not limited to, lactation, or the need to express breast milk for a nursing child. Please see the Reasonable Accommodation Procedures for Employees, Applicants for Employment and Third Parties (available at https://www.holycross.edu/sites/default/files/files/policyprocedure/adminfinance/final_procedures_for_applicant_and_employees_7-25-2018_1.pdf) for further information.

following person has been designated by the College to respond to general inquiries regarding the College's non-discrimination policies:

David Achenbach, Director of Human Resources
College of the Holy Cross
1 College Street
O'Kane Hall, Room B72
Worcester, MA 01610
508-793-3320
dachenba@holycross.edu

## III. How the College Will Address Sexual Misconduct

The College's commitment to non-discrimination includes an assurance that the College will not tolerate discrimination or harassment on the basis of sex, sexual orientation or gender identity, including, but not limited to sexual violence, dating or domestic violence, or stalking, or retaliation, in its community. The College follows through on that commitment, in part, through the implementation of a Sexual Misconduct Policy that defines prohibited conduct and the process by which the College will address such conduct in different circumstances. The College's Sexual Misconduct Policy is composed of several components:

- Definitions of Prohibited Conduct (https://www.holycross.edu/sexual-respect-and-title-ix/definitions)
- Process for Resolving Complaints of Sexual Misconduct (https://www.holycross.edu/sexual-respect-and-title-ix/policy)

The Sexual Misconduct Policy applies to all College community members, and all members of the College community are responsible for being familiar with and abiding by the Sexual Misconduct Policy at all times.

The College will also provide additional relevant resources for the community on the Title IX website. While separate from the Policy, these additional resources are part of the College's ongoing efforts to ensure an environment free of discrimination on the basis of sex.

## IV. Role of the Title IX Coordinator and the Title IX Team

The Title IX Coordinator is charged with coordinating the College's program to comply with Title IX. This includes leading the College's efforts to respond to reports of conduct that could trigger the Sexual Misconduct Policy. The Title IX Coordinator is also available to meet with any individual to provide information about the implementation of the Sexual Misconduct Policy (including the availability of interim measures, the investigation, and the resolution/sanction process), as well as discussing other resources within the College community and beyond. The Title IX Team, including the Title IX Coordinator, Deputy Title IX Coordinators, and/or other qualified members of the College community, will assist, as necessary, with these efforts.

**The College's Title IX Coordinator is:**

Tracy Kennedy
Director of Title IX Initiatives

2

Hogan Campus Center, Room 505
508-793-3336
tkennedy@holycross.edu

Where the Title IX Coordinator is listed as the designated point of contact for any role in the Sexual Misconduct Policy, he or she may designate a Deputy Title IX Coordinator or another appropriate member of the College community to assume the role at issue, as necessary. Each of these individuals is available to receive a report from any member of the College community who believes the Sexual Misconduct Policy has been violated. The Deputy Title IX Coordinators can also assist others, including Responding Parties and witnesses in understanding the College's Sexual Misconduct Policy and procedures.

**The College's Deputy Title IX Coordinators are:**

Cheryl Rogers
Assistant Director of Title IX Initiatives
Hogan Campus Center, Room 522
508-793-2536
crogers@holycross.edu

Alan Hurley
Associate Director of Human Resources/Benefits
Human Resources, O'Kane Room 72
508-793-2426
ahurley@holycross.edu

Paul Irish
Associate Dean of Students
Hogan Campus Center, Room 109
508-793-2669
pirish@holycross.edu

Ellen Keohane
Chief Information Officer
Smith Hall, Room 101
508-793-2477
ekeohane@holycross.edu

Rose Shea
Senior Associate Director of Athletics/Senior Woman Administrator
Luth Athletic Complex 243B
508-793-2318
rshea@holycross.edu

# V. College Resources and Other Community Resources

There are several departments within the College community that can be called upon to respond to incidents of behavior that could be subject to the Sexual Misconduct Policy and can serve as supports to

3

individuals in many different ways. **These resources are available to both Complaining Parties and Responding Parties.**

A. **Confidential On Campus Medical, Counseling and Pastoral Resources.** Some College resources are individuals designated as "confidential resources." These College employees serve in professional roles in which communications are provided confidential status under the law (e.g., licensed mental health care providers, licensed medical providers, pastoral counselors and clergy) and may not report identifying information about behavior that may implicate the Sexual Misconduct Policy without the consent of the individual who supplied the information in question or otherwise in compliance with law.[3] However, these confidential resources are instructed to inform individuals of their right to file a complaint under the Sexual Misconduct Policy and/or with the police and may assist in that process.

The following chart is designed to assist members of the College community in understanding the different reporting obligations held by different community members. Any questions as to the reporting status of an individual should be directed to the Title IX Coordinator.

| COMMUNITY MEMBER | STATUS | REPORTING OBLIGATIONS |
|---|---|---|
| **Health Services** Loyola Hall 508-793-2276 (M-F, 9:00-12:00; 1:00-5:00); Nights and Weekends:  Contact the Physician On Call at 508-334-8830 | Confidential Resource | None, unless they are being consulted outside the scope of their role within Health Services.[1] |
| **Counseling Center** Hogan 207 508-793-3363 (M-F, 9:00-12:00; 1:00-5:00); After hours, contact Public Safety (508-793-2222) and request to be put in touch with the Psychologist On Call. | Confidential Resource | None, unless they are being consulted outside the scope of their role within the Counseling Center.[1] |
| **Employee Assistance Program (for employees only)** 800-648-9557,  info@kgrccr.com | Confidential Resource | None, except as required by law. |

---

[3] Confidential resources generally will not share identifiable information without the reporting individual's permission, unless:
- Sharing is required to address an imminent risk of harm to the safety of the community at large, the individual sharing the information, or another member of the community;
- The individual alleged to have been harmed is a minor (under 18), in which case the Massachusetts Department of Children and Families must be notified.
- Elder or disabled individual abuse has been alleged.

Please note that such employees who receive reports when not functioning in their licensed or pastoral capacity (e.g., when acting as an administrator or teaching a course) are not considered confidential resources. Please see Section VI.B.

| COMMUNITY MEMBER | STATUS | REPORTING OBLIGATIONS |
|---|---|---|
| **Faculty Ombudspersons:**<br><br>Isabel Alvarez-Borland<br>ialvarez@holycross.edu, 508-793-3451<br><br>Mathew Schmalz<br>mschmalz@holycross.edu, 508-793-2557 | Confidential Resource for faculty members | Confidentiality is maintained as a matter of policy except as required by law or when there appears to be an imminent risk of serious harm. |
| *Pastoral Resources*<br><br>**Chaplains' Office**<br>Campion House<br>508-793-2448 (M-F, 9:00-5:00)<br>Nights and weekends, After hours, contact Public Safety (508-793-2222) and request to be put in touch with a Chaplain | Confidential Resources[1] | None, unless they are being consulted outside the scope of their role within the Chaplain's Office. |
| **Jesuit employees and other employees associated with a religious order or denomination** | *See note at right* | An employee who is associated with a religious order or denomination as someone who provides confidential counseling is a confidential resource when functioning within the scope of that recognition as a pastoral counselor but may not be a confidential resource when functioning in another capacity. For example, a priest acting in the capacity as an administrator or professor is not a confidential resource. In contrast, a priest hearing confession is a confidential resource. A priest engaging in a pastoral conversation may be a confidential resource if that role is clearly separated from other official duties |

**B.  Non-Confidential College Reporting Options and Resources for All Parties.**

To report a violation, make a complaint, or seek information about the process under the Sexual Misconduct Policy, please contact the Title IX Coordinator or a Deputy Title IX Coordinator (See contact information in Section IV above).

You may also make a report to, or discuss an allegation under this policy with, other College employees.  The College recognizes that individuals may feel most comfortable discussing incidents, situations and allegations with College employees whom the individual knows well.  However, it is important to note that College employees, other than the confidential resources

5

described above, are obligated by law to disclose reports and information concerning unlawful discrimination on the basis of sex, sexual orientation, gender identity, or marital or parental status (including pregnancy and pregnancy related conditions), sexual harassment (including, but not limited to, sexual violence, relationship violence, stalking and sexual misconduct), or retaliation toward any member of the College community that is shared with them to the Title IX Coordinator. These employees are known as "Responsible Employees." With the exception of the confidential resources listed above, all full-time and part-time faculty and employees and Residence Assistants are considered Responsible Employees.

Once a Responsible Employee learns about an incident, allegation or receives a report, the College is on notice and then may be required to investigate. Whenever possible, Responsible Employees will disclose their duty to report incidents before someone reveals information about an incident. The College encourages individuals to speak with a Responsible Employee so that an incident can be investigated and properly resolved.

C. **Criminal Reporting Options.** Individuals who believe that they may have been victims of a crime may file a criminal complaint with the Department of Public Safety (508-793-2222) and/or the local police department (911) where the incident occurred. An individual may make a criminal complaint and also file a complaint under the College's Sexual Misconduct Policy.

The College encourages individuals to report incidents to the police so the police can take appropriate measures to help individuals and prevent future crimes. However, individuals are never required to report an incident to the Department of Public Safety or the local police.

- Holy Cross Department of Public Safety, 3 City View Street, 508-793-2222. If you wish to file a report on campus, an officer in the Department of Public Safety is available to meet with you to receive your report.

- Worcester Police Department, 9-11 Lincoln Square (Exit 17 off I-290, turn left), 508-799-8606

- West Boylston Police Department, 39 Worcester Street, 508-835-3233

- District Attorney's Office, Child Abuse and Sexual Assault Unit, 255 Main Street, Worcester, MA, 508-792-0214

If anyone would like assistance in filing a report with the local police department, the Department of Public Safety will help. If you wish to file a report with off-campus authorities, you may choose to go directly to the local police department. The College will provide transportation for you to go to the police department to file a report with no questions asked unless your health or safety is at risk. You also may choose to have officers from the local police department come to campus. The College can arrange for a discreet and private place to meet for this purpose.

By filing a report, you are not committed to seeking criminal prosecution of the assailant. However, the College will evaluate its obligation to conduct an internal investigation as described in Section VI.A.1 below.

D. **Governmental Reporting Options.** If one wishes to file a complaint of unlawful sex discrimination, sexual harassment, including, but not limited to, sexual misconduct, sexual violence, relationship violence or stalking, or retaliation, outside of the College or in addition to a

complaint filed under the College's Investigation and Resolution Procedures, contact the
government agencies set forth below.

**U.S. Department of Education, Office of Civil Rights**
5 Post Office Square, 8th Floor
Boston, MA 02109
(617) 289-0111

**U.S. Equal Employment Opportunity Commission**
John F. Kennedy Federal Building
475 Government Center
Boston, MA  02203
(617) 565-3200/(800) 669-4000

**Massachusetts Commission Against Discrimination**

Worcester Office
484 Main Street
Room 320
Worcester, MA 01608
(508) 453-9630

Boston Office
One Ashburton Place
Sixth Floor, Room 601
Boston, MA 02108
(617) 994-6000

Springfield Office
436 Dwight Street
Second Floor, Room 220
Springfield, MA 01103
(413) 739-2145

New Bedford Office
800 Purchase Street
Room 501
New Bedford, MA 02740
(508) 990-2390

E.  **Additional Resources and Guidance for Individuals Who Have Experienced Sexual
Violence, Other Inappropriate Sexual Contact, Relationship Violence and/or Stalking.**

Individuals who have experienced sexual violence, other inappropriate sexual contact,
relationship violence, and stalking experience a wide range of normal feelings and have many
questions and concerns. No one deserves to be abused, assaulted or stalked. We want you to
know that you are not alone. There are many resources at the College and other local and national
resources to assist individuals.

7

**In an emergency, dial 911.** Immediately get to a safe place and call someone you trust.

1. **Consider Steps to Preserve Evidence.** Any person who has experienced sexual violence is encouraged to take steps to preserve evidence of the incident, as doing so may be necessary to the proof of the crime or to obtain a protective order. Your clothing and surroundings may contain valuable evidence. Try to refrain from going to the bathroom unless you save a urine specimen in a clean container. Try to refrain from drinking, showering, douching, brushing your teeth, combing your hair, changing your clothing, or straightening up anything. It is natural to want to do these things, yet it is important that a physician be able to examine you as you are from the incident. If you need to change your clothes, place each garment worn during the incident in a separate paper (not plastic) bag. If the incident involves any written or electronic communications (such as texts, pictures, videos, social media posts, phone calls), try to preserve copies and not delete the originals.

2. **Confidential Off-Campus Medical Attention after Sexual Assault or Other Violence.** Medical attention is strongly encouraged to treat any possible injuries, including internal injuries or infections, even if there is no visible injury. Please note that there are some medical actions that are more effective if taken within a few days after an incident, such as sexually transmitted infections, pregnancy testing, evidence collection and toxicology testing if there are signs that drugs or alcohol facilitated the offense. Prompt medical attention may be especially helpful to prevent the transmission certain of sexually transmitted infections, such as HIV, as long as medications are administered within the first 24-72 hours following an assault. Generally, one may discuss the incident with licensed medical personnel on a confidential basis.

   For these reasons, the College recommends that any person who has experienced sexual violence to obtain medical assistance at a hospital immediately after or within 72 hours of a sexual assault. These providers offer physical exams and provide sexual and reproductive health services (e.g., sexually transmitted infections and pregnancy testing). Sexual assault nurse examiners are available to collect evidence in the event the individual seeks to pursue criminal charges or a protective order.

   - St. Vincent's Medical Center, Emergency Room, 508-363-6025
   - University of Massachusetts-Memorial Hospital, Emergency Room, 508-334-6481
   - University of Massachusetts-University Campus, Emergency Room, 508-421-1750
   - University of Massachusetts-University Campus, Emergency Mental Health, 508-856-3562

   Department of Public Safety officers will transport you to the hospital without the need to disclose the purpose of the visit. You may also secure a cab through Health Services or be transported by friends to the hospital.

   A Sexual Assault Medical Examination is used to (a) collect evidence important in criminal prosecution or a civil case; and (b) treat possible injuries or illness sustained from the offense. Having the examination provides an opportunity to obtain any possible evidence necessary to support your case should you choose to handle the matter through the criminal justice or other legal process. This examination is a voluntary procedure and it does not commit you to any legal action. You are not required to make a police report. Any evidence collected during the examination is held up to six months in a confidential file which is

identified only by a number, not a name. It is an individual's right to ask for a sexual assault nurse examiner to perform the examination.

There is no charge for a sexual assault medical examination completed in a Massachusetts hospital within five days of a sexual assault occurring in the Commonwealth. The hospital where the examination occurred will work with the Massachusetts Victim Compensation & Assistance Division for the payment of any lab work, emergency room fees, physician fees during the hospital visit and/or medications prescribed. You may also be eligible for additional expenses associated with your aftercare deemed medically necessary as a result of the incident. This can include further medical treatment, medications, counseling, replacement bedding and clothing (taken during the administration of the kit), security measures, etc. To be eligible for these post-exam expenses, you will need to complete the MA Sexual Assault Forensic Kit Post Exam Application provided at the time of discharge.

If a victim-survivor did not obtain an examination, the MA Victim Compensation Fund may also cover the costs of the examination care as well as post-examination care (for example, for follow up care for sexually transmitted infection prevention, medication, and testing, counseling, security measures, lost wages, among others) but only if a standard Crime Victims Compensation application is completed and submitted from the victim-survivor. Additionally, a report must be filed with law enforcement. More information can be obtained at www.mass.gov/ago/vcomp.

The Director of Health Services is available to assist individuals in determining what resources are available. A confidential meeting can be scheduled by calling Health Services at 508-793-2276. The staff can provide immediate care in a safe environment and review available options with you. Transportation to a local hospital with a support person of your choice can be arranged.

Students can also go to Health Services, which is located in Loyola, as described below.

F.   **Confidential Support On-Campus for Complaining Parties and Responding Parties.**

1.   **Medical Services at Health Services.** Health Services is available to assist students with immediate needs and to review available medical options. Health Services can offer support, testing and treatment for sexually transmitted infections and follow up appointments for further testing if medically indicated. If medical care is sought weeks, months or years after an incident, Health Services can provide support and perform testing for sexually transmitted infections and treatment for students, if necessary.

     The College recommends that any person who has experienced sexual violence obtain medical assistance at a hospital immediately after or within 72 hours of a sexual assault as described above. The Director of Health Services at the College is available to assist survivors of sexual assault and other violence in determining what resources are available. A confidential meeting can be scheduled by calling Health Services at 508-793-2276. Transportation to a local hospital with a support person of your choice can be arranged.

2.   **Psychological Counseling at the Counseling Center.** Your visits to the Counseling Center are confidential and no information will be released without your permission

except as required by law.[4]  You and your therapist will review confidentiality so you are able to make an informed decision about what information you choose to share.

All of the psychologists in the Counseling Center are experienced in counseling both Complaining and Responding Parties in sexual assault, dating violence and domestic violence matters.  Psychological counseling is intended to help you process your emotions and thoughts related to the allegations, the incident and/or the investigation process.  The course of treatment is determined by your needs, which may change over time.  The goals of treatment may include establishing safety, regaining a sense of control, addressing depression and attending to any psychological symptoms that may result from this experience.  The therapist can also make you aware of your options and support you in making important decisions.

The length of time a person is in counseling depends on many factors: circumstances of the incident; other significant events in your life; how you choose to proceed; and social supports available to you.

3. **Pastoral Counseling.**  Your visits to the Chaplains' Office are confidential and no information will be released without your permission except as required by law.  Holy Cross chaplains[3] provide pastoral counseling for both Complaining Parties and Responding Parties. They also work with those who have been sexually assaulted or subjected to dating or domestic violence, or accused of the same, previous to their attending the College.  A chaplain can accompany individuals through their healing process by listening to their experience of what happened, affirming the dignity of the individual, and the belief that healing is possible. Questions commonly brought to pastoral counseling include: Why did God let this happen to me? Where is God now? How can I help my family and friends understand what is going on for me? Will I ever feel better again? Is it OK that I am angry with God and others?  How can I restore my sense of self-esteem? Will I ever be able to forgive or do I have to forgive?

4. **Faculty Ombudsperson.**  The Faculty Ombudsperson office is resource for faculty members only.  The Ombudsperson is available to assist any member of the faculty with any issues related to the College, including understanding available leave and other measures if they or their family members may be victim-survivors of domestic/dating violence, stalking, or sexual assault.  The Ombudsperson maintains confidentiality as permitted by law.  Please note that the Ombudsperson will report any imminent threat to the safety of the College community.

5. **Employee Assistance Program.**  KGA, Inc. is staffed by seasoned, licensed professionals who are committed to service delivery with personal attention.  They offer up to five sessions of confidential counseling for faculty and staff to support emotional well-being. The Employee Assistance Program maintains confidentiality as permitted by

---

[4] Confidential resources generally will not share identifiable information without the reporting individual's permission, unless:

- Sharing is required to address an imminent risk of harm to the safety of the community at large, the individual sharing the information, or another member of the community; or
- The individual alleged to have been harmed is a minor (under 18), in which case the Massachusetts Department of Children and Families must be notified.
- Elder or disabled individual abuse

Please note that such employees who receive reports when not functioning in their licensed or pastoral capacity (e.g., when acting as an administrator or teaching a course) are not prohibited from making a report.

law.  Please note that the Employee Assistance Program will report any imminent threat to the safety of the College community.

**G.  Consider Reporting, Complaint, and Investigation Support Options.**

- Complaint under this Policy.  To make a complaint under this policy, contact the Title IX Coordinator or a Deputy Title IX Coordinator as described in Section IV.

- Criminal Report.  To make a criminal complaint, dial 911 in an emergency or contact the Department of Public Safety or the Worcester Police Department as described in Section IV.C above.

- Advisors in Connection with Allegations of Sexual Violence, Other Inappropriate Sexual Contact, Relationship Violence and Stalking.  Each Party may have an advisor in connection with an allegation of Sexual Violence, Other Inappropriate Sexual Contact, Relationship Violence and/or Stalking being reviewed pursuant to the Process for Investigating and Resolving Complaints.  Please see Section VII.B.3(b) for more information.

**H.  Additional Off-Campus Support and Resources - Shelters, Hotlines, Advocacy, and Support.**  Many off-campus resources are available to support you.  These service providers are not required to report any information to the College and will generally maintain an individual's confidentiality.

Pathways for Change, 588 Main Street, Worcester, 800-870-5905 (24–hour hotline); Office 508-852-7600; TTY 888-887-7130.  Medical advocacy, peer support, police and court advocacy.

YWCA Daybreak/SAFEPLAN, One Salem Square, Worcester, MA Assault and Domestic Violence 508-755-9030 (24-hour hotline).  Court advocacy, counseling, emergency shelter, support groups.

For additional rape crisis programs in Massachusetts, please see:
http://www.mass.gov/eohhs/docs/dph/com-health/violence/rape-crisis-center-list.pdf.

Llamanos, Statewide Spanish Helpline, Rape Crisis Center of Central MA , 799 West Boylston Street, Worcester MA, 800-223-5001.

New Hope, Attleboro, MA Domestic Violence and Sexual Assault Hotline, 800-323-HOPE (4673).  Advocacy, emergency shelter, SAFEPLAN (24-hour hotline).

Violence Recovery Program (LGBT) at Fenway Health, 617-927-6250.  Provides counseling, support groups, advocacy, and referral services to lesbian, gay, bisexual and transgender victim-survivors of bias crime, domestic violence, sexual assault and police misconduct.

White House Initiative to Combat Sexual Assault on Campus https://www.notalone.gov/ (searchable listing of local resources and hotlines).

RAINN (Rape, Abuse, and Incest National Network) National Sexual Assault Hotline, 800-656-HOPE (4673) (24-hour hotline); www.rainn.org (online chat).

National Domestic Violence Hotline, 800-799-7233 (24-hour hotline); http://www.thehotline.org/ (online chat).

The National Stalking Resource Center, http//www.victimsofcrime.org/our-programs/stalking-resource center, Victim Connect Helpline, 855-484-2846; Office, 202-467-8700.

National Suicide Prevention Lifeline (800) 273-8255 (24-hour hotline) Lifeline Crisis Chat, http://chat.suicidepreventionlifeline.org/GetHelp/LifelineChat.aspx.

Resources for legal advice or representation or require immigration of visa assistance:

- Community Legal Aid, 405 Main Street, 4ᵗʰ Floor, Worcester, MA, 800-649-3718; www.communitylegal.org.  Free, civil legal assistance, including immigration and domestic violence, to low-income residents of central and western Massachusetts.
- Worcester County Bar Association Office, 508-752-1311; 800-622-9700.  For lawyer referral service, including a reduced fee program, for all types of legal representation.
- Mass Legal Help, www.masslegalservices.org/FindLegalAid.  Free legal aid for qualified individuals: immigration, domestic violence, shelter, etc.
- Public Defender Agency of Massachusetts, 340 Main Street, Worcester, MA, 508-368-1850.  *Criminal defense only.*  Free for those who qualify based on income.

# VI.   Additional Considerations

A.  **Privacy and Confidentiality: Treatment of Reported Information.**

1.  **Requests for Confidentiality or No Investigation.**  The College will act with discretion with regard to the privacy of individuals and the sensitivity of the situation when it receives a report of conduct that could trigger the Sexual Misconduct Policy.  Absent special circumstances, Title IX Coordinator and Deputy Title IX Coordinators will share information with College personnel who assist in implementing the College's policies and procedures.

There are certain instances in which the College has a broader obligation to the College community and may need to override an individual's request for privacy or a request that the College not investigate a matter or a request not continue with an investigation where a Complaining Party is unwilling to participate in further investigation. Because such requests could impact the College's ability to appropriately address and resolve the behavior in question, the College will weigh these requests very carefully.

In the case of sexual misconduct allegations, the Title IX Coordinator will evaluate the request for confidentiality or that an investigation/discipline not occur by considering a range of factors including, but not limited to, whether:

- There have been similar complaints about the same individual
- There appears to be a pattern of perpetration
- The alleged responding party has a history of violence
- The alleged responding party threatened further or future violence

12

- The misconduct was alleged to have been committed by multiple perpetrators
- The alleged responding party holds a position of power over the alleged victim or others
- The alleged victim is a minor
- Whether the alleged behavior may constitute Quid Pro Quo Harassment or create an Inappropriate Environment Based on Sex
- The College possesses no other means to obtain relevant evidence

The presence of one or more of these factors may lead the College to commence an investigation independently or continue an investigation. If so, the College will inform the Complaining/Reporting Party prior to proceeding and will to the extent possible share information only with the individuals responsible for handling the College's response and others involved in the investigation. In the event that a Complaining/Reporting Party requests that the College inform the Responding Party that the Complaining/Reporting Party asked the College not to investigate or seek discipline, the College will honor the request and inform the Responding Party that the College made the decision to proceed.

If the College does not proceed, the College will consider broader remedial action, such as increased or targeted education or prevention measures, increased monitoring, security or supervision, conducting surveys and/or revisiting its policies and practices.

2. **Disclosure of Sexual Misconduct at Public Awareness Events.** Public awareness events such as "Take Back the Night", candlelight vigils, "survivor speak outs" and other public forms in which individuals disclose incidents of sexual violence, dating or domestic violence or stalking are not considered notice to the College to trigger an obligation to investigate. However, such events may inform the College's prevention and education efforts.

**B. Duty to Report Sex Discrimination, Sexual Harassment, and Retaliation.**

All members of the College community are encouraged to report incidents of unlawful discrimination or harassment on the basis of sex, including, but not limited to, on the basis of sex, sexual orientation, gender identity or marital or parental status, as well as sexual violence, relationship violence, and stalking, and retaliation to the Title IX Coordinator or a Deputy Title IX Coordinator.

Each College trustee, administrator, faculty member, or employee, other than the confidential resources described above, are considered "responsible employees." This means that when they learn of an allegation of unlawful sex discrimination or sexual harassment (including, but not limited to, sexual misconduct, sexual violence, dating and domestic violence, and stalking), or retaliation toward any member of the College community, they are required to notify the Title IX Coordinator promptly. In addition, College employees who are designated as campus security authorities (CSAs) for the purposes of the Clery Act must provide the Department of Public Safety with non-identifying statistical information regarding all reported incidents of Clery crimes (including, but not limited to, sexual assault, dating violence, domestic violence, stalking and hate crimes). Any questions about the reporting or confidentiality status of an individual should be directed to the Title IX Coordinator.

College employees who serve in professional roles in which communications are provided confidential status under the law (e.g., licensed mental health care providers, licensed medical providers, pastoral counselors and clergy) are not obligated to report identifying information about behavior that may implicate the Sexual Misconduct Policy without the consent of the individual who

13

supplied the information in question or otherwise in compliance with law.[5] However, these confidential resources are instructed to inform individuals of their right to file a complaint under the Sexual Misconduct Policy and may assist in that process.  Please note that such employees who receive reports when not functioning in their licensed or confidential capacity (e.g., when teaching a course) are not prohibited from making a report. Finally, confidential resources may, consistent with their legal obligations and ethical requirements, provide limited statistical information about incidents without revealing personally identifiable information regarding the identities of the individuals involved to the Title IX Coordinator/Clery Act Compliance Coordinator.

Any questions as to the reporting or confidentiality status of an individual should be directed to the Title IX Coordinator.

For requirements regarding mandated reporting of child abuse and neglect, please see the Policy on Protection of Children at https://www.holycross.edu/compliance-and-risk-management/policy-protection-children.

C.   **Crime Log, Statistical Reporting, Emergency Notifications and Timely Warnings.**

The Clery Act requires the College to maintain a daily log of certain reported crimes that occurred on campus, College-controlled property, and public property immediately adjacent to campus, to publish an Annual Campus Crime Report concerning those reported crimes, and to issue emergency notifications and/or timely warnings.  The current Annual Campus Crime Report can be found on the webpage of the Department of Public Safety at https://www.holycross.edu/campus-life/public-safety/safety-security-fire-report .  In connection with such reports involving sexual assault, dating or domestic violence or stalking, Public Safety will include the reported crime in its crime log and annual campus crime report statistics without identifying the alleged victim-survivor or other information prohibited by law. Public Safety will also issue emergency notifications and/or timely warnings, as appropriate, without the name or other personally identifying information about the alleged victim-survivor.

D.   **Consensual Sexual Relationships Involving Employees.**

1.   **Employee Relationships with Students.** The personal relationships that a student develops with employees may play a fundamental role in that student's education at the College. Given the inherent authority that employees may have over students, a sexual, dating or romantic relationship between a student and an employee can easily raise concerns about sexual harassment. In light of these considerations and the fact that an employee might be called upon to teach, advise, evaluate or supervise any student, Holy Cross administrators, faculty, and staff should be aware that the College prohibits employees (excluding student employees) from engaging in sexual, dating, or romantic relations, even if consensual, with any College student. Any employee engaging in sexual, dating, or romantic relations with a student, even if consensual, may be found in violation of the College's Sexual Misconduct

---

[5] Confidential resources will generally not share identifiable information without the reporting individual's permission, unless:
- Sharing is required to address an imminent risk of harm to the safety of the community at large, the individual sharing the information, or another member of the community; or
- The individual alleged to have been harmed is a minor (under 18), in which case the Massachusetts Department of Children and Families must be notified.
- Elder or disabled individual abuse has been alleged.

Please note that such employees who receive reports when not functioning in their licensed or confidential capacity (e.g., when acting as an administrator or teaching a course) are not prohibited from making a report.

14

Policy. The College may make exceptions to this prohibition on a case-by-case basis and only in coordination with the Director of Human Resources and the Title IX Coordinator.

2. **Relationships between Supervisory Employees and Others.** Amorous relationships that might be appropriate in other circumstances have inherent dangers when they occur between supervisors and individuals whom they supervise. Such relationships are fundamentally asymmetric and unprofessional, and they raise serious concerns about validity of consent, conflict of interest and fair treatment. In addition, such relationships are to be avoided because they may create an impression on the part of colleagues of inappropriate or inequitable professional advantage or favoritism that is destructive of the working or learning environment and may raise doubts about the integrity of work performed. In addition to the prohibition of employee/student relationships described above, Holy Cross administrators, faculty, and staff should be aware that any sexual, dating or romantic involvement with any individual, including faculty, staff, or person engaged as volunteer, intern, or independent contractor, over whom they have direct supervisory responsibility, even if consensual, is prohibited by this policy. Even when both parties have initially consented to such a relationship, it is the administrator, faculty member, or staff member who, by virtue of his/her special supervisory responsibility, will be held accountable for the unprofessional relationship or abuse of authority. The Title IX Coordinator, together with either the Provost/Dean of the College with respect to faculty members, or the Director of Human Resources with respect to other employees will make exceptions to this prohibition in appropriate circumstances (e.g., a dual career couple recruited to work in the same scholarly area), with implementation of any necessary measures to avoid conflicts of interest or the appearance of conflicts of interest.

15

## VII.  How the College Will Address Unlawful Discrimination and Harassment on the Basis of Sex, including Sexual Misconduct and Retaliation

The College's commitment to non-discrimination includes an assurance that the College will not tolerate unlawful discrimination or harassment on the basis of person's sex, marital or parental status (including pregnancy and pregnancy related conditions), sexual orientation, gender identity or any other unlawful basis or retaliation in its community.

The College follows through on that commitment, in part, through the implementation of its Sexual Misconduct Policy and Process for Investigating and Resolving Complaints.  These policies and procedures apply to all College community members, and all members of the College community are responsible for being familiar with and abiding by them at all times.

## A.     Definitions of Prohibited Conduct Under the College of the Holy Cross Sexual Misconduct Policy

The following are the definitions of conduct that is prohibited under the College's Sexual Misconduct Policy.  If you have any questions about the definition or application of any of these terms, the Sexual Misconduct Policy in general, or the resources available to you as a member of the College community, please contact the Title IX Coordinator or a Deputy Title IX Coordinator.  The contact information for these individuals, as well as other individuals at the College who can provide support is provided in Sections IV and V.

Any individual, regardless of gender, sexual orientation, or gender identity, can experience or commit a violation, and these behaviors can occur between people of the same or different gender.

**Sex Discrimination**.  An intentional or unintentional act that adversely affects employment and/or educational opportunities because of a person's sex, marital or parental status (including pregnancy and pregnancy related conditions), sexual orientation or gender identity.  Discrimination may be classified as either disparate impact (facially neutral practices that fall more harshly on one group than another and cannot be justified by business necessity) or disparate treatment (treatment of an individual that is less favorable than treatment of others based upon unlawful discriminatory reasons.)

**Sexual Harassment**

Sexual harassment consists of two basic types:

**Quid Pro Quo Harassment**.  Any action in which submission to or rejection of unwelcome conduct of a sexual nature is made either explicitly or implicitly a term or condition of an individual's education, grades, recommendations, extracurricular programs or activities, or employment opportunities.

**Inappropriate Environment Based on Sex**.  Any unwelcome conduct of a sexual nature that is severe, persistent, or pervasive, and creates an intimidating, hostile or offensive living, working or educational environment, or has the purpose or effect of unreasonably interfering with an individual's employment, academic performance, education, or participation in extracurricular programs or activities.

16

In either type of sexual harassment noted above, the effect will be evaluated from both a subjective perspective, as well as the objective perspective of a reasonable person in the position of the person who experienced the conduct.

**Other Inappropriate Sexual Behavior.** Unwelcome conduct of a sexual nature that does not rise to the level of severe, persistent, or pervasive but is unreasonable in a living, working or educational environment. If Other Inappropriate Sexual Behavior is the only alleged violation of the Sexual Misconduct Policy with respect to a Responding Party, the Title IX Coordinator may determine, in his/her sole discretion, whether to conduct an investigation and if a violation is found, no sanction may be imposed other than warning, training or counseling.

**Forms of Sexual Harassment:** In some cases, sexual harassment is obvious and may involve an overt action, a threat, or reprisal. In other instances, sexual harassment is subtle and indirect, with a coercive aspect that is unstated. Some examples include the following:

- Sexual harassment can occur between persons of equal power status (*e.g.*, student to student, staff to staff) or between persons of unequal power status (*e.g.*, faculty member to student, coach to student-athlete). Although sexual harassment often occurs in the context of the misuse of power by the individual with the greater power, a person who appears to have less or equal power in a relationship can also commit sexual harassment.
- Sexual harassment can be committed by or against an individual or by or against an organization or group.
- Sexual harassment can be committed by an acquaintance, a stranger, or people who shared a personal, intimate, or sexual relationship.
- Sexual harassment can occur by or against an individual of any sex, gender identity, gender expression, or sexual orientation.

Examples of behavior that might be considered sexual harassment include, but are not limited to:

- Unwanted sexual innuendo, propositions, sexual attention or suggestive comments and gestures; inappropriate humor about sex or gender-specific traits; sexual slurs or derogatory language directed at another person's sexuality, gender, gender identity, sexual orientation or gender expression; insults and threats based on sex, gender, gender identity, sexual orientation or gender expression; and other oral, written or electronic communications of a sexual nature that an individual communicates is unwanted and unwelcome.
- Written graffiti or the display or distribution of sexually explicit drawings, pictures, or written materials; sexually charged name-calling; or the circulation, display, or creation of e-mails, text messages, or web sites of a sexual nature.
- Display or circulation of written materials or pictures degrading to an individual or gender group where such display is not directly related to academic freedom, or an educational/pedagogical, artistic, or work purpose.
- Unwelcome physical contact or suggestive body language, such as touching, patting, pinching, hugging, kissing, or brushing against an individual's body.
- Physical coercion or pressure of an individual to engage in sexual activity or punishment for a refusal to respond or comply with sexual advances.
- Use of a position of power or authority to: (1) threaten or punish, either directly or by implication, for refusing to tolerate harassment, for refusing to submit to sexual activity, or for reporting harassment; or (2) promise rewards in return for sexual favors.
- Acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex, sexual orientation, gender identity, or sex-stereotyping.

17

**Sexual Violence.** Physical sexual acts perpetrated against a person's will or where a person is incapable of giving consent. Physical sexual acts include, but are not limited to, vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact. This definition includes rape, sexual assault, sexual battery, and sexual coercion and includes assault with the specific intention to commit such an act. Sexual violence may involve individuals who are known to one another or have an intimate and/or sexual relationship (relationship violence), or may involve individuals not known to one another.

**Other Inappropriate Sexual Contact.** Having or attempting to have sexual contact of any kind other than that defined as "Sexual Violence" with another individual without consent. Other inappropriate sexual contact may include kissing, touching, or making other inappropriate contact with the breasts, genitals, buttocks, mouth, or any other part of the body that is touched in a sexual manner and without permission.

**Sexual Exploitation.** Any act committed through non-consensual abuse or exploitation of another person's sexuality for the purpose of sexual gratification, personal benefit or advantage or any other illegitimate purpose. Sexual exploitation may involve individuals who are known to one another, have an intimate or sexual relationship, or may involve individuals not known to one another. Examples include, but are not limited to, observing another individual's nudity or sexual activity or allowing another to observe consensual sexual activity without the knowledge and consent of all parties involved.

- **Inducing Incapacitation:** This includes the provision of alcohol or drugs to an individual, with or without that individual's knowledge, for the purpose of causing impairment or intoxication to allow another person to take advantage of that individual's impairment or intoxication.
- **Media-Based Misconduct:** Photographing or taping someone (via audio, video or otherwise) involved in sexual activity, or in a state of undress, without his or her knowledge or consent. Even if a person consented to sexual activity, photographing or taping someone without his or her knowledge and agreement goes beyond the boundaries of that consent. Dissemination of photographs or video/audio of someone involved in sexual activity, or in a state of undress, without his or her knowledge or consent constitutes a separate and additional act of sexual misconduct.
- **Miscellaneous:** The inappropriate behaviors listed above are not an exhaustive list. The College may consider any other conduct that has a sexual or gender-based connotation under the Sexual Misconduct Policy.

**Stalking.** More than one instance of unwanted attention, harassment, physical or verbal contact, or any other course of conduct directed at an individual that could be reasonably regarded as likely to alarm or place that individual in fear of harm or injury, including physical, emotional, or psychological harm. This includes cyber-stalking, a particular form of stalking in which electronic media such as the internet, social networks, blogs, texts or other similar forms of contact are used to pursue, harass, or make unwelcome contact with another person. Stalking and cyber-stalking may involve individuals who are known to one another or have an intimate or sexual relationship, or may involve individuals not known to one another.

**Relationship Violence (Domestic Violence and Dating Violence).** Relationship violence is any intentionally violent or controlling behavior of one individual by a person who is currently or was previously in a relationship with that individual. Relationship violence may include actual or threatened physical injury, sexual violence, psychological or emotional abuse, and/or progressive social isolation.

18

**Consent and Coercion.**
As used in the above definitions of prohibited conduct, consent and coercion have the following meanings:

The College's policy is that sexual interactions must be consensual. Consent is the affirmative and willing agreement to engage in a specific form of sexual contact with another person who is capable of giving consent. Consent cannot be obtained through: (a) the use of coercion, or (b) by taking advantage of the incapacitation or impairment of another individual, including someone who is incapacitated or impaired by intoxication or drugs, is underage, is unconscious, or is asleep. Consent requires an outward demonstration, through mutually understandable words or actions, indicating that an individual has chosen freely to engage in a sexual contact.

Coercion is defined for purposes of this section as the application of unreasonable pressure to take part in sexual activity or in any of the prohibited conduct listed in the Sexual Misconduct Policy. Unreasonable pressure can be exerted through physical or emotional force, intimidation, misuse of authority, tricks, or outright threats. When someone makes it clear that he or she does not want to engage in sexual activity or does not want to go beyond a certain point of sexual interaction, continued unreasonable pressure beyond that point may be considered coercive.

Silence, passivity, or the absence of resistance does not imply consent. Relying solely on non-verbal communication may result in confusion about whether there is effective consent. It is important not to make assumptions. If confusion or ambiguity arises during a sexual interaction, it is essential that each participant stops and verbally clarifies the other's willingness to continue.

Consent can be withdrawn at any time. When consent is withdrawn, sexual activity must cease. Prior consent does not imply current or future consent; even in the context of an ongoing relationship, consent must be sought and freely given for each instance of sexual contact. An essential element of consent is that it be freely given.

In evaluating whether consent was given, consideration will be given to the totality of the facts and circumstances including, but not limited to, the extent to which an individual affirmatively uses words or actions indicating a willingness to engage in sexual contact, free from intimidation, fear, or coercion; whether a reasonable person in the position of the individual alleged to have committed the conduct would have understood such person's words and acts as an expression of consent; and whether there are any circumstances, known or reasonably apparent to the individual alleged to have committed the conduct, demonstrating incapacitation or fear.

**Retaliation.**
Engaging in conduct that may reasonably be perceived to:

- adversely affect a person's educational, living, or work environment because of their good faith participation in the reporting, investigation, and/or resolution of a report of a violation of the Sexual Misconduct Policy; or
- discourage a reasonable person from making a report or participating in an investigation under the Sexual Misconduct Policy, any other College policy, or any other local, state, or federal complaint process, *e.g.*, filing a complaint with an entity like the U.S. Department of Education.

Retaliation includes, but is not limited to, acts or words that constitute intimidation, threats, or coercion intended to pressure any individual to participate, not participate, or provide false or misleading information during any proceeding under the Sexual Misconduct Policy. Retaliation may include abuse or

violence, other forms of harassment, and/or making false statements about another person in print or verbally with intent to harm their reputation.

Retaliation can be committed by any individual or group of individuals, not just a Responding Party or a Complaining Party. Retaliation may constitute a violation of the Sexual Misconduct Policy even when the underlying report made did not result in a finding of responsibility. Retaliation, even in the absence of provable discrimination or harassment in the original complaint or charge, constitutes a serious violation of this Policy.

**Other Violations.**
Engaging in other conduct which is prohibited by this Policy (e.g., recording the proceedings) or failure to comply with a duty or obligation set forth in, or imposed pursuant to, this Policy (e.g., duty of honesty, duty of cooperation or duty to report).

## B.    Process for Investigating and Resolving Complaints

This process describes how the College will investigate a report that an individual or group of individuals has engaged in conduct that could violate the College of the Holy Cross Sexual Misconduct Policy, and determine what, if any, safety measures and/or disciplinary sanctions are appropriate.

### 1.  Initial Steps; Interim Measures

After receiving a report of conduct that could fall under the Sexual Misconduct Policy, the Title IX Coordinator or his or her designee[6] will take a number of initial steps. These initial steps are not an investigation. Rather, these initial steps will enable the College to assess the need to take any immediate action to address the safety and health needs of the Complaining Party[7] and the College community, and to determine the next steps for investigating the reported conduct and the need for any interim measures.

These initial steps may include, but are not limited to, the following:

    (a)  The Title IX Coordinator will contact the Complaining Party and encourage him/her/zie/them to meet to discuss the nature and circumstances of the reported conduct, review relevant documentation that is available and address the need for any interim measures. Examples of interim measures with respect to sexual misconduct may include no-contact orders, requests for academic adjustments, changes to living, dining, transportation, working and/or immigration situations, statutorily provided leave to employees pursuant to M.G.L. c. 49,

---

[6] Where the Title IX Coordinator is listed as the designated point of contact for any role in the Sexual Misconduct Policy, he or she may designate a Deputy Title IX Coordinator or another qualified member of the College community to assume the role at issue, as necessary and appropriate. Where another College official or employee is listed as the designated point of contact for any role in the Sexual Misconduct Policy, he or she may designate another College official or employee to assume the role at issue, as necessary and appropriate.

[7] The individual who experienced conduct that may have violated the Sexual Misconduct Policy will be referred to as the "Complaining Party." The individual who is alleged to have violated the Sexual Misconduct Policy will be referred to as the "Responding Party." When the Complaining Party and the Responding Party are discussed collectively, they will be referred to as the "Parties" and may be referred to as a "Party." There may be instances where another person, who has not experienced but is aware of the occurrence of prohibited conduct, may bring a complaint under the Sexual Misconduct Policy, and that person is referred to as the "Reporting Party." In those limited circumstances, the College will determine which of the protections provided to the Complaining Party under the Sexual Misconduct Policy are also applicable to the Reporting Party.

§52D, and other actions to address the situations and the Complaining Party's immediate physical safety and emotional needs and concerns on an interim basis.

(b) The Title IX Coordinator will assess the reported conduct to determine whether the circumstances pose a threat to the health or safety of the College community that warrants issuance of a timely warning, a stay-away order for any persons, or any other interim protections, including, but not limited to, suspension of a student, placing an employee on leave, or restricting any individual from other privileges prior to completing an investigation. During the interim action, the College reserves the right to prohibit the individual from entering upon the College's property or participating in any College activities absent written authorization from an appropriate College official. The failure of an individual to comply with an interim restriction is a violation of this Policy and may lead to additional disciplinary action. The decision to impose interim restrictions will be communicated by the Title IX Coordinator in writing and will be effective immediately.

(c) The Title IX Coordinator will notify the Complaining Party about: (a) the availability of the Sexual Misconduct Policy; and (b) the right to report and the right to decline to report the matter to Department of Public Safety and/or local law enforcement if the conduct is potentially criminal in nature (and that such a report will not change the College's obligation to potentially investigate the matter but it may briefly delay the timing of the investigation if a law enforcement agency requests that the College delay its process for a reasonable amount of time to allow it to gather evidence of criminal conduct).

(d) The Title IX Coordinator will notify the Complaining Party of the available resources for seeking medical treatment, counseling, spiritual guidance, other interim measures and other resources. See Sections IV and V.

(e) If the Title IX Coordinator determines the reported conduct could trigger the Sexual Misconduct Policy, he or she will contact the Complaining Party to discuss that determination. In connection with allegations of sexual misconduct, if, at this time, the Complaining Party requests that the process not move forward, the College will weigh that request against the College's obligation to address any risk of harm to the Complaining Party or other individuals in the community and the nature of the incident or conduct at issue. Except in limited circumstances in which a Complaining Party's request not to proceed to investigation is granted, the Title Coordinator will proceed to Section VII.B.3. For further information, please see Section VI.A.1. If an investigation or informal resolution will be commenced (or such earlier time as the Title IX Coordinator determines is appropriate), Title IX Coordinator will notify the Responding Party of available resources for seeking medical treatment, counseling, spiritual guidance, interim measures, and other resources.

(f) If the Title IX Coordinator determines that the reported conduct would not, in any way, trigger the Sexual Misconduct Policy, he or she will advise the Complaining Party of such in writing and refer the reported conduct to the appropriate administrator for handling consistent with any other appropriate College policy. (If new information is subsequently provided, the decision whether or not to investigate the reported conduct may be reevaluated.)

2. **Optional Informal Resolution Procedure**.

*The following Informal Resolution Procedure may not be used in an effort to resolve allegations of Sexual Violence, Other Inappropriate Sexual Contact, Inducing*

21

*Incapacitation, Stalking or Relationship Violence, as each of those terms is defined in the Sexual Misconduct Policy.*

At any time prior to convening a Determination Panel, a Party may request an informal resolution of a complaint rather than an investigation by contacting the Title IX Coordinator in writing. All Parties and the Title IX Coordinator must agree to informal resolution for this option to be used. The Title IX Coordinator will assess the request for informal resolution against the severity of the alleged violation and the potential risks to campus community members. If the Title IX Coordinator determines that informal resolution is appropriate, the Title IX Coordinator will notify the Parties. The Title IX Coordinator will designate a College representative to facilitate a dialogue with the Parties in an attempt to reach a resolution. The allegation will be deemed resolved when the Parties expressly agree to an outcome that is acceptable to them which is approved by the Title IX Coordinator in consultation with other appropriate College administrators. A Party may withdraw from the informal resolution process at any time. The informal resolution process will be conducted in accordance with procedures specified by the Title IX Coordinator, as determined in his/her sole discretion.

The Title IX Coordinator may initiate an investigation at any time that deems it appropriate in his or her sole discretion.

3. **The Investigation Phase**

   (a) **Notice of an Investigation.** If it is determined that the reported conduct could trigger the Sexual Misconduct Policy and an investigation is required, the Title IX Coordinator will prepare a written notice to the Complaining Party and Responding Party that will include a brief description of the allegations, the portions of this Policy that are alleged to have been violated, and any interim measures in place about which either Party must be made aware. This written notice does not constitute a finding or a determination of responsibility.

   (b) **Information about Advisors in Connection with Allegations of Sexual Violence, Other Inappropriate Sexual Contact, Relationship Violence and Stalking.** In connection with an allegation of sexual misconduct involving sexual violence, other inappropriate sexual contact, relationship violence or stalking[8], each Party, including any Reporting Party, may have a single advisor of such Party's choice present during any College disciplinary proceeding, including any related meeting, interview, or hearing, held pursuant to the Sexual Misconduct Policy. Once an advisor has been selected by a Party, the Party must provide the name of the advisor to the Title IX Coordinator. Changes to the advisor selected by a Party may be made for good cause with the prior approval of the Title IX Coordinator, as determined in his/her sole discretion. Advisors may not participate actively while present at any disciplinary proceeding and may not speak or otherwise communicate on the part of the Party that the advisor is advising. However, the advisor may ask to suspend any meetings, interviews, or hearings briefly to provide private consultation related to the disciplinary proceeding in progress. An advisor is subject to the same confidentiality expectations applicable to others in attendance. Accommodations, including scheduling of interviews or

---

[8] Advisors are not permitted in connection with investigations of any other allegations of violations of the Sexual Misconduct Policy. Nothing in the College's Sexual Misconduct Policy is intended to undermine or alter any rights afforded to a union-represented employee, as provided by applicable law or any collective bargaining agreement, including, but not limited to, a union-represented employee's *Weingarten* rights.

reviews, generally will not be made for any advisors if they unduly delay the process. The advisor is not permitted to attend a meeting or proceeding without the Party without the prior approval of the Title IX Coordinator, as determined in his/her sole discretion. The College reserves the right to take appropriate action regarding any advisor who disrupts the process, or who does not abide by the restrictions on their participation as determined in the sole discretion of the Title IX Coordinator.  A union-represented employee who is a Responding Party may choose as an advisor a person who is not a union representative, if the Responding Party does not desire to have the union representative participate in the proceeding.

(c) **Support Services and Resources.**  The Title IX Coordinator will notify the Responding Party about (a) the availability of the Sexual Misconduct Policy, (b) available resources set forth in Sections IV and V, and (c) discuss interim measures.  The Parties should review Sections IV and V regarding the available support services and resources at the College and in the community. At the request of either Party or witness, the Title IX Coordinator can discuss further the support services, resources, and options available.

(d) **Designation of Investigator.**  The Title IX Coordinator will designate at least one investigator to conduct a prompt, fair, and impartial investigation of the reported conduct and prepare a report of investigative findings (the "Investigative Report").  At the College's discretion, the investigator may be an internal or an external investigator and more than one investigator may be assigned.  All investigators – internal or external – will be selected from a group of qualified and trained individuals employed by the College or engaged by the College for the purpose of conducting investigations under the Sexual Misconduct Policy. The Title IX Coordinator will provide the Parties with the name of the person(s) assigned to investigate the reported conduct (the "Investigator(s)").  As soon as possible, but no later than three (3) calendar days after delivery of the identity of the Investigator(s), the Parties should inform the Title IX Coordinator (in writing) of any conflicts of interest with regard to the selected Investigator(s).  The Title IX Coordinator will consider the nature of the conflict and determine if different individuals should be assigned as Investigator(s).  The Title IX Coordinator's decision regarding any conflicts is final.  The Title IX Coordinator may consult with other College personnel to discuss any conflicts of interest.

(e) **Nature of the Investigation.**  The investigation will include separate interviews with the Complaining Party, the Responding Party, and any witnesses whom the Investigator(s) believe will provide necessary and relevant information.  The investigation may include the review of documentation or other items relevant to the reported conduct.  The Investigator(s) will provide the Parties with written notice of meetings at which their presence is required.

(f) **The Parties' Identification of Potential Witnesses and Documentation.**  The Parties have the opportunity (and are expected) to provide the Investigator(s) with the identification of potential witnesses who have specific information about the reported conduct and with whom they would like the Investigator(s) to speak.  The Parties also have the opportunity (and are expected) to provide the Investigator(s) any documentation or other items or questions they would like to be considered or posed to any witness or the other Party.  All information and questions described in this section must be presented to the Investigator(s) in writing and include a brief description as to how the persons, documents, and/or items are relevant to the reported conduct.  This information must be provided to the Investigator(s) during the Investigation Phase and without delay upon becoming aware of it.  The Investigator(s) will exercise discretion in their determination of what information and questions to consider and

23

which potential witnesses identified by the Parties can provide relevant information to the investigation.

(g) **Investigation Prohibitions.** Neither Party will be permitted to question or cross-examine directly the other Party directly during the investigation or disciplinary proceedings; questions for the other Party may be submitted to the Investigator(s) as described above. Moreover, the Investigator(s) generally will not gather or consider information related to either Party's sexual history outside of the conduct in question except as relevant to the alleged policy violation, as determined in the sole discretion of the Investigator(s).

(h) **Responding Party Voluntary Agreement to Policy Violation.** At any point prior to the convening of a Determination Panel, a Responding Party may agree in writing to the alleged violation(s) of the Sexual Misconduct Policy and, in the cases of sexual harassment not involving sexual violence, other inappropriate sexual contact, sexual exploitation, stalking or relationship violence, a sanction proposed by the Vice President of Student Affairs (students), Provost/Dean of the College (faculty) or the Director of Human Resources (staff or third party), as applicable. In cases of sexual violence, other inappropriate sexual contact, sexual exploitation, stalking or relationship violence, the individuals responsible for imposing sanctions will determine and impose sanction(s) pursuant to Section VII.B.5(a) below.

## 4. Investigative Report and Determination of Responsibility by Determination Panel

(a) **Content of the Investigative Report.** At the conclusion of the Investigation Phase, the Investigator(s) will prepare an Investigative Report, which should include a summary of the factual information presented during the Investigation Phase and a separate section where the Investigator(s) point out relevant consistencies or inconsistencies (if any) between different sources of information. If necessary and appropriate, the Investigative Report may also include a separate section describing the Investigator(s)' perception of the demeanor of the individuals interviewed. The Investigative Report will not include a determination by the Investigator(s) as to whether a Party has violated the Sexual Misconduct Policy or what sanctions may be appropriate. These determinations will be made by the Determination Panel, as described below.

(b) **Review by the Parties.** The Parties will have an opportunity to review the Investigative Report and may submit written comments about the content of the Investigative Report, including any aggravating and/or mitigating circumstances the Parties wish to be considered, pursuant to Section 5(b)(iv) of this Policy, to the Title IX Coordinator within five (5) calendar days of the date they are notified that the Investigative Report is available for review. This review will take place at a secure location and in a secure manner determined by the College. The time to submit written comments can be extended for a brief period if the Title IX Coordinator concludes, in his/her sole discretion, that the additional time is warranted. Likewise, the secure location and manner of reviewing the Investigative Report can be modified if the Title IX Coordinator deems it necessary and appropriate. Each Party may have such Party's advisor review the Investigative Report with them in connection with an allegation of sexual misconduct involving sexual violence, other inappropriate sexual contact, relationship violence or stalking. Photographs or any other copies of the Investigative Report are not allowed by either Party or advisor. The comments submitted by the Parties may not exceed ten (10) double spaced pages (12-point font and one inch margins) unless a higher page limit is otherwise determined to be necessary and appropriate in the sole discretion of the Title IX Coordinator. Upon receipt of such submissions, if any, from the

24

Parties, the Title IX Coordinator will forward them to the Investigator for review. After reviewing the submissions, if any, from the Parties, the Investigator(s) may determine that either additional investigation is required or no further investigation is needed. If further investigation is conducted, the Investigator(s) will include any additional relevant information in the Investigative Report. The Investigative Report will then be submitted to the Title IX Coordinator. Any submissions made by either Party pursuant to this section, as well as any other documentation deemed relevant by the Investigator(s), will be attached to the Investigative Report.

(c) **Convening the Determination Panel.** The Title IX Coordinator will convene a three-member Determination Panel (the "Determination Panel") from a previously established pool of College community members trained to decide cases pursuant to this Policy and sexual misconduct cases. In no instance shall the Panel include students. In the event that a Responding Party is a teaching faculty member[9], at least one of the members of the Determination Panel shall be a tenured faculty member. The Title IX Coordinator will provide the Parties with the names of the persons assigned as the Determination Panel members for their case. As soon as possible, but no later than three (3) calendar days after delivery of the identity of the assigned Determination Panel members, the Parties should inform the Title IX Coordinator (in writing) of any conflicts of interest in regard to the selected members proposed to be assigned to the Determination Panel. If a conflict of interest is raised regarding any of the individuals assigned to the Determination Panel, the Title IX Coordinator will consider the nature of the conflict and determine if different individuals should be assigned to the Determination Panel. The Title IX Coordinator may consult with other College personnel to assess any conflicts of interest. The Title IX Coordinator's decision regarding any conflicts is final. The Title IX Coordinator will then submit the Investigative Report to the Determination Panel members and set a subsequent date for the Determination Panel to meet to determine responsibility.

(d) **Review and Determination by the Determination Panel.** The Determination Panel will make a determination as to whether or not the Responding Party is responsible for violating the Sexual Misconduct Policy by having engaged in some or all of the reported conduct. The Determination Panel has the authority to accept the Investigative Report without seeking additional investigation, or to ask the Investigator(s) to conduct additional investigation on specific points. The Determination Panel, in its discretion, may invite the Investigator(s) to attend a Determination Panel meeting if the Panel believes it would be helpful to have an opportunity to ask the Investigator(s) any questions arising from the Investigative Report. The Determination Panel also has the authority, in their discretion, to speak directly with any persons identified in the Investigative Report and shall meet with the Parties in the event that the matter may result in a suspension or dismissal. The Determination Panel, as the ultimate decision-maker in the matter, is provided broad discretion. In appropriate circumstances, the Title IX Coordinator may give special instructions to the Determination Panel.

(e) **Notification of Decision.** Upon reaching a determination of responsibility, the Determination Panel will provide a written notification of its decision to the Title IX Coordinator. If sanctions are necessary, they will be assigned in accord with Section VII.B.5 below. The notification will consist of a brief statement of the allegations and the determinations made by the Determination Panel and with respect to a Responding Party who is a student, any

---

[9] For purposes of this Policy, the "teaching faculty" is defined by reference to Chapter I, Section A of the Faculty Statutes.

sanctions that are imposed pursuant to Section VII.B.4. While the notification may, at the discretion of the Determination Panel, include a brief description of the determination process, it will not include any recommendations for sanctions with respect to Responding Parties who are employees or faculty members.

(f) **Standard of Proof.** All findings and determinations of responsibility for a violation of the Sexual Misconduct Policy under the Sexual Misconduct Policy will be made using a preponderance of the evidence standard. This standard requires the determination of whether it is more likely than not that a fact exists or a violation of the Sexual Misconduct Policy occurred.

Please note that the preponderance of the evidence standard is not the standard used for criminal culpability in most jurisdictions and a determination of responsibility under the Sexual Misconduct Policy does not equate with a finding of a violation of criminal laws. Conversely, lack of a prosecution or conviction in a criminal proceeding does not necessarily imply that the College's Sexual Misconduct Policy was not violated. The two procedures are significantly different and utilize different standards for determining violations.

(g) **Student Groups, Organizations and Teams.** A student group, organization or team may be held collectively responsible for a violation of this Policy when one or more members of the group or other individuals associated with the group, organization or team are found responsible for a violation of this Policy and the Determination Panel separately determines that:

- members of the group, organization or team acted in concert with respect to misconduct;
- the individual found responsible for committing the misconduct was either acting on behalf of the group, organization or team or engaged in an activity sponsored, financed or endorsed by the group, organization or team or its leaders;
- the misconduct grows out of, occurs during, or is related to any activity or event sponsored, financed or endorsed by the group, organization or team;
- any leader, officer, or team captain of group, organization or team had knowledge of the misconduct or incident before or while it occurred and failed to take corrective action; and/or
- a pattern of individual misconduct by members of the group, organization or team is found to exist.

The designated student leader or leaders (e.g., president, officer(s), or team captain(s)) shall represent the student group, organization or team throughout the process. There shall be no right of individual appeal of any member of the student group, organization or team to a group sanction.

## 5. Determining Sanctions

(a) **Sanctioning Decision.** The College employees responsible for determining sanctions are as follows:

(i) **Students.** Sanctions regarding students and student groups, organizations and teams will be determined by the Associate Dean of Students or his or her designee. The determination of the Associate Dean of Students or his or her designee will be shared

with the Parties as set forth in Section VII.B.6.  Sanctions may be determined during the same meeting in which responsibility is determined, as set forth in Sections VII.B.4(c) and (d).

**(ii) Teaching Faculty.**  The Title IX Coordinator will provide the Provost/Dean of the College ("Dean of the College") with a copy of the Determination Panel's written notification of its determination of responsibility as well as the Investigative Report.  The Dean of the College will determine an appropriate sanction(s). If the Dean of the College determines that a sanction of dismissal for is recommended, the sanction will be reviewed under Section VII.B.7(b). The Dean of the College will then provide written notification to the Title IX Coordinator of the action taken with regard to the faculty member.[10]

**(iii) Exempt Employees, Other Than Teaching Faculty.**  Sanctions regarding exempt employees, as defined by the College, will be determined by the Employee's Vice President (or his/her designee) or in the case of an employee in the Athletics Department or who reports to the President, the President's designee.  The Director of Human Resources (or his/her designee) will be consulted on any sanction.  The Title IX Coordinator will provide such official(s) with a copy of the Determination Panel's written notification of its determination of responsibility as well as the Investigative Report.

**(iv) Non-Exempt Employees.**  Sanctions regarding non-exempt employees, as defined by the College, vendors, independent contractors and other third parties will be determined by the Director of Human Resources (or his/her designee). The Title IX Coordinator will provide such official with a copy of the Determination Panel's written notification of its determination of responsibility as well as the Investigative Report.

**(b) Types of Sanctions.**

**(i) Employees, including Faculty Members.**  Sanctions imposed with respect to Responding Parties who are employees or faculty members may include, but are not limited to, one or more of the following:  dismissal from employment, non-renewal of an employment contract, suspension, probation, reprimand, warning, training and/or counseling, no-contact order, among others.

**(ii) Students.**  Sanctions may include, but are not limited to, one or more of the following:  expulsion, suspension, probation, reprimand, warning, restitution, education/counseling, no-contact order, restriction from extracurricular programs or activities, loss of leadership opportunity or positions in activities, housing restriction/relocation, and/or loss or restriction from College employment.

**(iii) Student Groups, Organizations and Teams.**  Sanctions for groups, organizations and teams may include suspension, revocation or denial of registration or recognition, probation, reprimand, warning, restitution, education, restriction, among other possible sanctions

---

[10] Consistent with Section 9(i), the Dean of the College, in consultation with the Title IX Coordinator, may designate another appropriate faculty member or administrator to serve in this role.

(iv) **Considerations.** In determining an appropriate sanction, the College may take into account the following:

- The nature and circumstances of the misconduct.
- The impact of the misconduct on the Complaining Party.
- The impact of the misconduct on the College community.
- The disciplinary history of the Party deemed responsible.
- Any other mitigating or aggravating circumstances in order to reach a fair and appropriate resolution in each case.
- Range of sanctions typically imposed for similar violations.

**Possible sanctions for those found responsible for sexual violence, other inappropriate sexual contact, domestic/dating violence, stalking and hate crimes:**

Community service
Reflection paper
Educational training
Probation
Suspension
Expulsion/termination of employment
Limitation of other rights, privileges or duties
*Except for expulsion/termination of employment, all sanctions may be combined with one or more other sanctions listed in Section VII.B.5(b)(i) or (ii) above.*

(v) **Additional Remedies.** The sanctioning authority described in Section VII.B.5(a) may also identify additional remedies to address the effects of the conduct on the impacted Party. Remedies may include extending or making permanent any interim or safety measures. If a Complaining Party or Responding Party declined or did not take advantage of a specific service or resource previously offered, the College may re-offer the service as applicable or necessary. The Title IX Coordinator also may consider broader remedial action for the campus community, such as increased supervision or monitoring, targeted or increased education and prevention efforts, and review of policies and procedures. In addition, in the Title IX Coordinator may refer any matter raised, but not addressed hereunder, that may potentially violate any other College policy, rule, or procedure to the appropriate College officials to address such matters, irrespective of the finding under this Policy.

## 6.  Notification of Investigation Outcome

Upon completion of Sections VII.B.4 or 5, as necessary, the Title IX Coordinator will inform the Parties simultaneously and in writing of (i) the outcome of the disciplinary proceeding; and (ii) the procedures for either Party to appeal the result of the disciplinary proceeding. The Title IX Coordinator will also inform other College officials with a legitimate educational or employment interest about the outcome of the finding. Notice to these other individuals will be accompanied with a request that the information should remain confidential except in situations in which disclosure is necessary to protect the safety of the community.

If the alleged victim is deceased as a result of a crime involving sexual assault, other nonconsensual sexual contact, stalking, domestic/dating violence or hate crime, the next of kin of such alleged victim will be provided the notice of outcome upon written request to the Title IX Coordinator.

28

### 7. Appeals

(a) **All Appeals (Other Than Appeals Involving a Responding Party Who Is a Teaching Faculty Member with a Recommended Sanction of Dismissal).**

The following appeal process applies to all appeals other than any appeal involving a determination in which a Responding Party is a Teaching Faculty Member with a recommended sanction of dismissal which are addressed under Section VII.B.7(b) below.

Within seven (7) calendar days of the delivery of the notice of the decision of responsibility and/or sanction, either Party may appeal the decision by submitting to the Title IX Coordinator a letter stating why the Party requesting the appeal believes the determination of responsibility and/or the sanctions were inappropriate. A Party appealing under this section may only appeal on the following grounds:

- **Procedural error** by the Investigator(s) or Determination Panel that materially prejudiced the Party requesting review; and/or
- **Newly discovered material information** that was not known to the Party requesting review and not available to the Investigator(s), the Determination Panel, or the individual determining the sanction, and which likely would have changed the finding of responsibility or the sanction imposed had it been available.

The Party submitting the appeal must set forth in detail the grounds for review and must attach all materials that he or she wishes to have considered in the appeal process. The Title IX Coordinator will provide an opportunity to review the appeal submitted by one Party to the other Party. This review will take place at a secure location and in a secure manner determined by the College. The other Party may submit materials that he or she wishes to have considered in the appeal process within seven (7) calendar days of receipt of the appeal. The appeal and appeal materials submitted by a Party may not exceed ten (10) double spaced pages (12-point font with one inch margins) unless a higher page limit is otherwise determined to be necessary and appropriate in the sole discretion of the Title IX Coordinator.

**The Appellate Officer(s):** In the instance of an appeal under this Section VII.B.7(a), the Title IX Coordinator will appoint one or more Appellate Officer or Officers (the "Appellate Officer(s)") from a previously established pool of College employees who have received training on sexual misconduct cases and appeals; in any case involving a teaching faculty member, there will be a three Appellate Officer panel, including at least one tenured faculty member (selected by the Title IX Coordinator in consultation with the chair of the Committee on Faculty Affairs).The Title IX Coordinator will provide the Parties with the names of the assigned Appellate Officer(s) for their case. As soon as possible, but no later than three (3) calendar days after delivery of the identity of the assigned Appellate Officer(s), the Parties should inform the Title IX Coordinator in writing of any conflicts of interest in regard to the assigned Appellate Officer(s). The Title IX Coordinator will consider the nature of the conflict and determine if different individual(s) should be assigned as the Appellate Officer(s). The Title IX Coordinator may consult with other College personnel to discuss any conflicts of interest. The Title IX Coordinator's decision regarding any conflicts is final.

The Appellate Officer(s) will decide the merits of the appeal and, in so doing, may consult with the Investigator(s), the Determination Panel, the individual(s) issuing the sanction, or

29

any other individual that the Appellate Officer(s) deems appropriate (and shall consult with any such individual who is alleged to have caused a procedural error). In appropriate circumstances, the Title IX Coordinator may give special instructions to the Appellate Officer(s).

Sanctions of all types (including, but not limited to, any form of suspension, dismissal, or separation from the College) can be imposed, in full or in part, while an appeal is pending at the sole discretion of the College.

The Appellate Officer(s) may deny the appeal and affirm all or part of the determination of responsibility or the determination of sanction, or the Appellate Officer(s) may refer the matter back to the Investigator(s), original or a new Determination Panel[11], and/or the individual determining the sanction for further consideration. If the matter is referred back to the Investigator(s), the Determination Panel, and/or the individual determining the sanction for further consideration, the Appellate Officer(s) will provide specific instructions with the referral. In the event of a referral for further consideration, the Title IX Coordinator will be consulted and further proceedings may be commenced, as appropriate under the circumstances and consistent with this Policy.

The decision of the Appellate Officer(s) regarding the appeal will be in writing and is final. The Title IX Coordinator will inform the Parties simultaneously and in writing of the outcome of the appeal.

**(b)  Appeals with respect to a Responding Party who is a Teaching Faculty Member Involving a Recommended Sanction of Dismissal.**

The following appeal process applies to appeals involving a determination in which a Responding Party is a Teaching Faculty Member with a recommended sanction of dismissal of the Teaching Faculty Member and is the sole method of appeal. The appeal will be reviewed the following procedure:

    **(i)**    Within seven (7) calendar days of the delivery of the notification of the investigation outcome and/or sanction, either Party may appeal the decision by submitting to the Title IX Coordinator a letter stating why the Party requesting the appeal believes the determination of responsibility and/or the sanctions were inappropriate. A Party appealing under this section may only appeal on the following grounds:

        **a.**    **Procedural error** by the Investigator(s) or Determination Panel that materially prejudiced the Party requesting review; and/or

        **b.**    **Newly discovered material information** that was not known to the Party requesting review and not available to the Investigator(s), the Determination Panel, or the individual determining the sanction, and which likely would have changed the finding of responsibility or the sanction imposed had it been available; and/or

---

[11] In the case of a finding of an appeal granted for a procedural error by the Determination Panel, a new Determination Panel will be used.

c. **That the sanction of dismissal was inappropriate** based on a consideration of the nature and circumstances of the misconduct, including the severity, frequency and duration, the impact of the misconduct on the Complaining Party and/or the College community, the disciplinary history of the Responding Party found responsible, and any other mitigating or aggravating circumstances and the need to take effective corrective action to prevent the reoccurrence of the violation(s) and remedy its effects.

The Party submitting the appeal must set forth in detail the grounds for review and must attach all materials that he or she wishes to have considered in the appeal process. The Title IX Coordinator will provide a copy of the appeal submitted by one Party to the other Party, and the other Party may submit materials that he or she wishes to have considered in the appeal process within seven (7) calendar days of receipt of the appeal. The appeal and appeal materials submitted by a Party may not exceed ten (10) double spaced pages (12-point font with one inch margins) unless a higher page limit is otherwise determined to be necessary and appropriate in the sole discretion of the Title IX Coordinator.

In the instance a Party appeals, the Chair of the Committee on Faculty Affairs in consultation with the Title IX Coordinator will convene a three-member Appeal Panel (the "Appeal Panel") consisting of tenured members of the Committee on Faculty Affairs (or other tenured faculty members from a previously established pool in the event there are not enough members of the Committee on Faculty Affairs to so serve) who have received training on sexual misconduct cases and appeals. The Title IX Coordinator will provide the Parties with the names of the persons assigned to the Appeal Panel for their case. As soon as possible, but no later than three (3) calendar days after delivery of the identity of the assigned Appeal Panel members, the Parties should inform the Title IX Coordinator (in writing) of any conflicts of interest in regard to the individuals proposed to be assigned to the Appeal Panel. The Title IX Coordinator will consider the nature of the conflict and determine if different individuals should be assigned to the Appeal Panel. The Title IX Coordinator shall consult with the chair of the Committee on Faculty Affairs to assess any conflicts of interest. The Title IX Coordinator's decision regarding any conflicts is final.

The Appeal Panel will decide the merits of the appeal and, in so doing, may consult with the Investigator(s), the Determination Panel, the Dean of the College issuing the sanction, or any other individual that the Appeal Panel deems appropriate.

Sanctions of all types (including, but not limited to, any form of suspension or separation from the College but excluding dismissal of a faculty member) can be imposed, in full or in part, while an appeal is pending at the sole discretion of the College.

31

The Appeal Panel may deny the appeal and affirm all or part of the determination of responsibility or the determination of sanction, or may refer the matter back to the Investigator(s), the original or a new Determination Panel[12], and/or the Dean of the College (regarding determination of the sanction) for further consideration.  If the matter is referred back to the Investigator(s), the Determination Panel, and/or the Dean of the College (regarding determination of the sanction) for further consideration, the Appeal Panel will provide specific instructions with the referral. In the event of a referral for further consideration, the Title IX Coordinator will be consulted and further proceedings may be commenced, as appropriate under the circumstances and consistent with this Policy.

Any Appeal Panel decision regarding the appeal under Section VII.B.7(b)(i)(a) (procedural error) or (b) (newly discovered information) is final. Any Appeal Panel decision regarding an appeal under Section VII.B.7(b)(i)(c) (recommended dismissal) and/or any Dean of the College's recommended sanction of dismissal under Section VII.B.4 will be referred to the President for review under immediately following section.

(ii)    President and Executive Committee Review of Recommended Sanction of Dismissal.

---

[12] In the case of a finding of an appeal granted for a procedural error by the Determination Panel, a new Determination Panel will be used.

a. If the Dean of the College recommended a sanction of dismissal and no appeal was requested, the President will refer the sanction recommendation to the Executive Committee of the Board for review and consideration.

b. If the Dean of the College recommended a sanction of dismissal and the Appeal Panel recommended a sanction less than dismissal, the President will determine whether to accept the Appeal Panel sanction recommendation (which shall then become the final sanction); impose a different sanction that is less than dismissal (which shall then become the final sanction) or recommend a sanction of dismissal for review and consideration by the Executive Committee of the Board.

c. If the Dean of the College and the Appeal Panel recommended dismissal, the President will refer the sanction recommendation(s) to the Executive Committee of the Board for review and consideration.

d. If the President refers a recommended sanction of dismissal to the Executive Committee of the Board, the referral will be communicated in writing by the President to the Complaining Party and Responding Party. The President will provide the Executive Committee with the Investigative Report, any response of the Complaining Party and/or Responding Party to the Investigative Report, the Determination Panel written findings, the recommendation of the Dean of the College of dismissal, and if applicable, the written appeal materials submitted by the Complaining Party and/or the Responding Party to the Appeal Panel, the Appeal Panel's written decision pursuant to Section VII.B.7(b)(i), and the Dean of the College's recommended sanction following such appeal. The Executive Committee may grant both the Responding Party and the Complaining Party the right to address the Executive Committee, if the Executive Committee deems it appropriate. The Executive Committee of the Board of Trustees will make the final determination of the sanction.

e. The Title IX Coordinator will inform the Parties simultaneously and in writing of the outcome of the appeal.

Training of the President and Executive Committee of the Board. Each of the President and the Executive Committee of the Board of Trustees shall receive training on sexual misconduct cases and appeals prior to reviewing any matter under this Section VII.B.7(b)(ii).

## 8. Timeframe for Completion of Investigation and Disciplinary Process

The College cannot promise the definitive timeframe of this process, but endeavor to complete its investigation and disciplinary process in a prompt manner. The U.S. Department of Education has made clear that the length of investigations may vary with the complexity and unique factors in each case. Examples of such factors include, without limitation, circumstances in which critical witnesses are unavailable or if law enforcement requests the College temporarily halt its investigation for a brief period of time. Accordingly, all timeframes set forth in this Policy may be altered by the Title IX Coordinator for good cause. The College's overarching goal is that all complaints be investigated in a prompt, fair, and impartial manner.

33

## 9.  Additional Matters

(a) **Duty of Honesty.**  All Parties and witnesses are obligated to be completely honest during the course of the entire process set forth in this Policy.  Any person who knowingly makes a false statement – either explicitly or by omission – in connection with any part of the process may be subject to separate College disciplinary action.  A report made in good faith, however, is not considered false merely because the evidence does not ultimately support the allegation of violation of the policy.

(b) **Duty of Cooperation.**  All Parties and witnesses are obligated to cooperate with the Title IX Coordinator and any persons charged with implementing the Sexual Misconduct Policy and these procedures.  Any person who knowingly interferes with the actions taken to implement the reporting, investigation, or resolution of matters under the Sexual Misconduct Policy may be subject to separate and/or additional College disciplinary action.

(c) **Respect for Privacy.**  The College values the privacy of individuals involved in the reporting, investigation, and/or resolution of matters subject to the Sexual Misconduct Policy.  The U.S. Department of Education has provided guidance indicating that there are situations in which it may be necessary for an institution to override a request for privacy or confidentiality in order to meet its obligations under the law.  In the event circumstances result in the College overriding a request for privacy or confidentiality to meet its obligations, the College will do so with the utmost sensitivity and respect for the circumstances and the individuals involved. See Section VI.A.1.

(d) **Recording the Proceedings.**  The Parties are not permitted to make video, audio, or other electronic, photographic, or digital recordings of any meetings or proceedings held under the Sexual Misconduct Policy or these procedures or the Investigative Report.  The Title IX Coordinator may make exceptions to this prohibition in limited circumstances if he or she concludes, in his or her sole discretion, that a recording is warranted, and upon written request of the Party seeking the recording that explains the need for the recording.

(e) **Follow-up with Reporting Party.**  Where the Title IX Coordinator deems appropriate, he or she may contact the Reporting Party to provide an update on the process, the timing and extent of which will be determined by the Title IX Coordinator and depend upon the nature of the allegations and the situation.

(f) **Prohibition against Retaliation.**  The College will not tolerate retaliation in any form against any persons for their participation or involvement in the reporting, investigation, and/or resolution of matters reported or subject to the Sexual Misconduct Policy.  The College will take appropriate steps to prevent and/or address retaliatory conduct immediately.  The College includes retaliation in its definition of prohibited conduct under this Policy.  See Section VII.A.

(g) **Amnesty for Students Reporting Sexual Violence, Relationship Violence and Stalking.**  The College encourages reporting under the Sexual Misconduct Policy and seeks to remove barriers to reporting.  Students may be hesitant to report sexual violence, relationship violence or stalking out of a concern that they, or witnesses, might be charged with a violation of the College's drug and alcohol policies or Community Standards.  While the College does not condone such behavior, the College places a priority on the need to address sexual violence, relationship violence and stalking.  The College generally will not

34

hold a student who in good faith reports or is a witness during an investigation of sexual violence, relationship violence and stalking under the Sexual Misconduct Policy accountable for disciplinary violations of the College's Community Standards that do not place the health and safety of any other person at risk or create a danger to the College community. The College retains the right to require students to attend counseling or drug/alcohol related courses even in circumstances in which disciplinary conduct will not be pursued under this part.

(h) **Special Situations.**

The College retains the right to determine, in its sole discretion, if it will address a report of conduct under the Sexual Misconduct Policy administratively and outside of the process described herein when the safety of the College community is at risk, if the material facts are undisputed, if there are extenuating circumstances involving either of the Parties, or if the Title IX Coordinator, in consultation with appropriate administrators, determines it is in the best interest of the College and/or the community to do so.  Without limiting the foregoing:

(i)  In certain cases where the conduct in question is not part of a broader pattern or an ongoing danger to the College community and the potential sanctions, even assuming all of the allegations are true, would not result in either Party being temporarily suspended or permanently separated from the College, the College maintains the discretion to resolve the matter through an individualized and streamlined process. In the instance that this occurs (specifically excluding all allegations of the following Policy violations: sexual violence, quid pro quo harassment, other inappropriate sexual contact, relationship violence, and stalking), the Title IX Coordinator may direct the matter to be investigated and/or resolved outside the process set forth in Section VII.B. In such case, the Title IX Coordinator may require an adequate, reliable and impartial investigation and resolution of the alleged Policy violations pursuant to the Discriminatory Harassment Policy (employees and third parties) or Community Standards (students) with the following additional provisions (a) the process will use the definitions of the Prohibited Conduct, the preponderance of evidence standard, and the potential sanctions set forth in this Policy; (b) both the Complaining Party and the Responding Party will have an opportunity to present witnesses and evidence as described in the applicable procedure; (c) there will be designated and reasonably prompt time frames for the major stages of the process; (d) there will be written notice to the Complaining Party and the Responding Party of the outcome of the complaint; and (d) the College will take steps to prevent recurrence of violation(s) and remedy discriminatory effects on the Complaining Party and others, if appropriate.

(ii)  When an investigative report in a student matter indicates that there may be possible Student Code of Conduct violations in addition to an alleged violation of the Sexual Misconduct Policy, the Title IX Coordinator will consult with the Director of Student Conduct and Community Standards or designee, to determine appropriate Community Standards violations. In these situations, the investigation and resolution procedure may follow the Sexual Misconduct Policy to determine whether violations of the Code of Conduct and Community Standards took place in addition to the alleged violation of the Sexual Misconduct Policy as determined by the Title IX Coordinator.

(iii) When an investigative report in employee or third party matter indicates that there may be possible violations of other College policies, rules, procedures or agreements, in addition to an alleged violation of the Sexual Misconduct Policy, the Title IX Coordinator will

35

consult with relevant College personnel, to determine appropriate violations. In these situations, the investigation and resolution procedure may follow the Sexual Misconduct Policy to determine whether violations took place in addition to the alleged violation of the Sexual Misconduct Policy as determined by the Title IX Coordinator.

(iv) If, following the receipt of an alleged violation of the Sexual Misconduct Policy, the Complaining Party declines to participate in the investigation or resolution process, the Title IX Coordinator may decide to administratively close the investigation at any point in the investigation and resolution process after consideration of the factors set forth in Section VI.A.1 in the Title IX Coordinator's sole discretion.

(i) **Delegation.** Where the Title IX Coordinator is listed as the designated point of contact for any role in the Sexual Misconduct Policy, he or she may designate a Deputy Title IX Coordinator or another qualified member of the College community to assume the role at issue, as necessary and appropriate. Where another College official or employee is listed as the designated point of contact for any role in the Sexual Misconduct Policy, he or she may, in consultation with the Title IX Coordinator, designate another College official or employee to assume the role at issue, as necessary and appropriate.

## C.    State Law Definitions

The following are excerpts compiled from the Massachusetts General Laws that describe how certain relevant behavior is defined in Massachusetts. These definitions are not identical to the definitions of conduct prohibited in the College's Sexual Misconduct Policy, but the College considered these definitions in developing its Policy.

### Massachusetts

**Sexual Harassment**
*(compiled from M.G.L. Ch. 151B)*

"Sexual harassment" means sexual advances, requests for sexual favors and verbal or physical conduct of a sexual nature when:

- Submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or enrollment or is used as a basis for employment or educational decisions, placement services or evaluation of academic achievement; or
- Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work or educational performance by creating an intimidating, hostile, humiliating or sexually offensive work or educational environment.

**Sexual Assault (Rape, Indecent Assault & Battery)**
*(compiled from M.G.L. Ch. 265, § 13 & 22)*

Sexual assault is defined under Massachusetts law as rape or indecent assault and battery.

Rape is defined as occurring when a person has "sexual intercourse or unnatural sexual intercourse with a person, and compels such person to submit by force and against his will, or compels such person to submit by threat of bodily injury or if either such sexual intercourse or unnatural sexual intercourse results in or is committed with acts resulting in serious bodily injury, or is committed by a joint enterprise..."

Indecent assault and battery occurs when one person touches another person in an "indecent" way. Examples of indecent assault and battery include touching a person's buttocks, breasts, or genitals without consent. The Commonwealth must prove that the defendant touched the alleged victim without justification or excuse; and that the touching was "indecent;" and that the alleged victim did not consent.

An indecent act is one that is fundamentally offensive to contemporary standards of decency.

**Stalking**
*(compiled from M.G.L. Ch. 265, § 43)*

The act of "willfully and maliciously engaging in a knowing pattern of conduct or series of acts over a period of time directed at a specific person which seriously alarms or annoys that person and would cause a reasonable person to suffer substantial emotional distress and makes a threat with the intent to place the person in imminent fear of death or bodily injury." Stalking includes, but is not limited to, acts or threats conducted by mail or by use of a telephonic or electronic communication device. Communications

37

include, but are not limited to, electronic mail, internet communications, instant messages or facsimile communications.

## Domestic and Dating Violence
*(compiled from M.G.L. Ch. 209A)*

"Abuse" is defined as "the occurrence of one or more of the following acts between family or household members:

- attempting to cause or causing physical harm;
- placing another in fear of imminent serious physical harm;
- causing another to engage involuntarily in sexual relations by force, threat, or duress."

Family or household members are defined as "persons who:

- are or were married to one another;
- are or were residing together in the same household;
- are or were related by blood or marriage;
- having a child in common regardless of whether they have ever married or lived together; or
- are or have been in a substantive relationship, which shall be adjudged in consideration of the following factors: (1) the length of time of the relationship; (2) the type of relationship; (3) the frequency of interaction between the parties; and (4) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship."

## Consent
*(not defined by M.G.L. in this context)*

In Massachusetts, it is illegal to have sex under any circumstances with someone who is incapable of giving consent due to incapacity or impairment; incapacity or impairment may be caused by intoxication or drugs, or because a victim is underage, mentally impaired, unconscious, or asleep.  For purposes of this policy, consent is an explicitly communicated, reversible, mutual agreement to which all parties are capable of making a decision.

Massachusetts has several laws that define the age of consent and the additional penalties that attach if a person is under the age of 16 or 14.  *E.g.*, statutory rape laws, indecent and assault and battery on a person under the age of 14.

## Retaliation *(referenced by M.G.L. in various contexts, e.g., Chap. 151B.)*

Retaliation is frequently addressed by the U.S. Department of Education's Office for Civil Rights (OCR).  OCR's legal standard for addressing retaliation claims is as follows:

A claim for retaliation must establish several elements. First, the facts must indicate that the complaining party engaged in a protected activity, *i.e.*, exercised a right or took some action that is protected under the laws OCR enforces, including Title IX. Second, the institution must be on notice of the protected activity. Third, the institution must take an adverse action against the complaining party. And fourth, there must be a causal connection between the protected activity and the adverse action. If any of these four elements cannot be established, then a claim of retaliation cannot be substantiated. If, on the other hand, all four elements are established, then OCR next analyzes whether there is a legitimate non-

discriminatory reason for the retaliatory action in question.  If no legitimate non-discriminatory reason is put forward, or if the reason is found to be a mere pretext for retaliation, then OCR may find that there was retaliation.

## New York

### What Is "Sexual Harassment"?
*(The Human Rights Law (HRL), codified as N.Y. Executive Law, art. 15, § 290 et seq., applies to all employers in New York State with regard to sexual harassment, and protects employees, paid or unpaid interns and non-employees, regardless of immigration status. A complaint alleging violation of the Human Rights Law may be filed either with the Division of Human Rights (DHR) or in New York State Supreme Court.)*

Sexual harassment is a form of sex discrimination and is unlawful under federal, state, and (where applicable) local law. Sexual harassment includes harassment on the basis of sex, sexual orientation, self-identified or perceived sex, gender expression, gender identity and the status of being transgender.

Sexual harassment includes unwelcome conduct which is either of a sexual nature, or which is directed at an individual because of that individual's sex when:

- Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment, even if the reporting individual is not the intended target of the sexual harassment;

- Such conduct is made either explicitly or implicitly a term or condition of employment; or

- Submission to or rejection of such conduct is used as the basis for employment decisions affecting an individual's employment.

A sexually harassing hostile work environment includes, but is not limited to, words, signs, jokes, pranks, intimidation or physical violence which are of a sexual nature, or which are directed at an individual because of that individual's sex. Sexual harassment also consists of any unwanted verbal or physical advances, sexually explicit derogatory statements or sexually discriminatory remarks made by someone which are offensive or objectionable to the recipient, which cause the recipient discomfort or humiliation, which interfere with the recipient's job performance.

Sexual harassment also occurs when a person in authority tries to trade job benefits for sexual favors. This can include hiring, promotion, continued employment or any other terms, conditions or privileges of employment. This is also called "quid pro quo" harassment.

Any employee who feels harassed should report so that any violation of this policy can be corrected promptly. Any harassing conduct, even a single incident, can be addressed under this policy.

39

# COMPLAINT EXHIBIT R



# COMPLAINT EXHIBIT S



COLLEGE OF THE
**Holy Cross**

The Office of the
Deans of the Faculty

REVISED: January 17, 2019
January 17, 2019

Professor Christopher Dustin
Department of Philosophy
*Delivered Electronically*

Dear Chris,

In response to the conversations you have had with the Provost, we are approving your Sabbatical Leave for the spring semester of the 2018-2019 academic year. We do so under the assumption that, despite your absence, the teaching and other duties of the Department of Philosophy can be met.

During the period of your Leave, under the provisions of Ch. IV of the *Statutes of the Faculty*, your salary will be continued at the full rate approved for the year 2018-2019. Gainful employment may not be accepted during a Sabbatical Leave without the expressed written consent of the Provost. Before departing for your Leave, please be sure to make arrangements with the Human Resources Department for your health insurance and TIAA deductions.

As you know, the *Statutes of the Faculty* require that you make a written report on your Sabbatical Leave to the Office of the Provost and Dean of the College by October 1 following your leave.

Let us add our personal congratulations, along with our encouragement for what we hope will be both an enriching and a productive intellectual experience.

Sincerely,

Mary Ebbott

Dean of the Faculty

Denise Schaeffer

Directory, Strategic Initiatives
Acting Dean of the Faculty

cc: Margaret Freije, Provost and Dean of the College
 Ms. Dorothy Hauver, Vice President for Administration and Finance
 Chair, Department of Philosophy
 Faculty File

 /dmh

# COMPLAINT EXHIBIT T

On Mon, Dec 23, 2019 at 11:04 AM Burl, Denielle <dburl@holycross.edu> wrote:

Good morning Chris:

I hope this email finds you well.

As you know, we were waiting on the revised investigative report in the Title IX matter entitled NB:CD. I have received that report and attached exhibits and they are ready for your review. You and I have already worked together on this part of the process, but I remind you that the full language of the procedure governing this stage of the investigation is found in Section 4 of the Procedure, entitled, "Investigative Report and Determination of Responsibility by Determination Panel", available at: https://www.holycross.edu/sexual-respect-and-title-ix/policy.

Under the procedure, the Parties are given five (5) days to review the Report and provide comments. In light of the holiday, this will be extended to ten days. Therefore, parties must review and provide any comments by Friday, January 3rd at 5:00 p.m. As you and I have discussed, you can review the Report at Bowditch and Dewey. Please let me know what date you would like to come in (presumably, before January 3rd) and I will arrange for that to happen. Any comments may not exceed ten (10) double spaced pages.

I appreciate that the timing of this report is challenging. However, I am also trying to meet our obligation to provide a *timely* investigation. For this reason, I am moving forward on the investigation during the holiday break.

Please let me know if you have any questions and the date(s) in which you would like to review your report. If I don't hear from you prior to Christmas, I wish you and your family a nice holiday.

Sincerely,

Denielle

Denielle Burl
Interim Deputy Title IX Coordinator
College of the Holy Cross

COMPLAINT EXHIBIT U

 **Gmail**                          Christopher Dustin <christopheradustin@gmail.com>

## Holy Cross - Title IX Update
1 message

**Burl, Danielle** <dburl@holycross.edu>                         Fri, Jul 24, 2020 at 12:57 PM
To: Christopher Dustin <christopheradustin@gmail.com>

Dear Chris:

I hope this email finds you and your family well during this difficult time.

I am writing on behalf of the President regarding your appeal under the Sexual Misconduct Policy in the matter entitled NB:CD and the next steps in that process.

As you know, Attorney Natasha Baker was retained by the College to review your March 2020 appeal. Ms. Baker was used in place of an Appeals Panel referenced in the College's *Sexual Misconduct Policy* because of your concern that faculty would be biased against you in their role of serving on an Appeals Panel for this matter. While the College did not (and does not) agree with your concern about bias, it sought to affirmatively address your concern by appointing an impartial attorney who is familiar with the requirements of Title IX of the Education Amendments of 1972, does not work with the College, and is geographically located in California. Ms. Baker noted that she had no knowledge of any media concerns that you raised as the basis of your concern with the faculty.

Ms. Baker has completed a thorough review of your appeal. She determined that there was a procedural error relating to the fact that the notices of investigation did not state that the investigation encompassed the specific charge of failing to report a sexual and/or romantic relationship while in a supervisory role over the Complaining Party pursuant to the 1995 Campus Manual and/or Faculty Information Manual (the "Failure to Report Violation"). As such, I am notifying you that the Failure to Report Violation is vacated by the College. Ms. Baker determined that the other asserted grounds for your appeal do not provide a valid basis for appellate relief. Ms. Baker determined that the sanction of dismissal to be appropriate. Accordingly, the appeal process is concluded.

After conducting a de novo review of the matter, following the vacating of the charge related to the failure to report, Acting Dean Loren Cass imposed the following recommended sanctions.

1. You should be dismissed for cause from your tenured faculty position at the College, effective immediately.

2. You will not be permitted to be on any properties owned or leased by the College for any purposes or to participate in any events sponsored by the College. If there are personal effects belonging to you that are still on campus, the College will arrange to return those materials to you.

3. You will be instructed not contact any current or former Holy Cross students.

4. Any awards or honors issued to you by the College are revoked, and you are ineligible for any naming opportunity, award, or honor in the future.

Because the recommended sanctions include your dismissal from the College, the next step of the College's process requires that I provide the recommended sanction of dismissal to the President to refer the matter to the Executive Committee of the Board of Trustees for a final review of the matter.

Throughout these proceedings, you have expressed concern regarding the impartiality of those involved, including the faculty, the President, and many others. Please note that the College disagrees with your assertion of lack of

impartiality.  Nevertheless,  in response to your concern,  I am exercising my authority under Section VII.B.9(h) to implement an alternative Board of Trustees committee to review this result.  The alternate committee will be composed of trustees Stephanie Coleman Linnartz, Harry K. Thomas Jr., and Rev. Gregory A. Kalscheur, S.J.  I have asked each of these individuals if they believe they can hear your matter without conflict, and they all stated that they would have no conflict, one way or another.  I am also offering to you an opportunity to raise conflict concerns you may have with any of these specific individuals, despite the fact that it is not a right afforded in the *Policy*.  In that regard, please  inform me in writing, within three (3) calendar days after receipt of this letter, of any conflicts of interest with regard to the selected individuals.  I will consider the nature of the asserted conflict and determine if different individuals should be assigned.  My decision on any conflict challenge is final.

If you have any questions, please do not hesitate to reach out to me.

Sincerely,


Denielle

# EXHIBIT V

Faculty; Speaker of the <speakerofthefaculty@holycross.edu>
To: Speaker of the Faculty <speakerofthefaculty@holycross.edu>
Bcc: Faculty@holycross.edu

Dear colleague,

At the Academic Governance Council (AGC) meeting of January 29, 2019, the AGC unanimously approved the following statement:

As faculty, we are entrusted with the welfare and education of our students, and we are called to protect their wellbeing. The Academic Governance Council of the College of the Holy Cross is deeply concerned about the claims made in the January 24, 2019 *Worcester Magazine* article, "Sexual misconduct allegations raise concerns at Holy Cross." The article reports allegations that a member of our faculty and administration engaged in reprehensible behavior towards a student that was manipulative and abusive, and damaged her academic and social experience at the College. The AGC today formed an internal subcommittee to develop a mandate for an *ad hoc* committee on faculty sexual misconduct. The membership of the *ad hoc* committee will include faculty from the AGC, Committee on Faculty Affairs (CFA), Gender, Sexuality, and Women's Studies (GSWS) and other members of the faculty.

We will provide more details as they develop. We have given the subcommittee one week to report back. If you have any questions, please feel to contact me (mcahill@holycross.edu), or any faculty representative on these committees.

Sincerely,

Mike Cahill
Speaker of the Faculty

# EXHIBIT W

<bbunke@holycross.edu>, Christopher Staysniak <cstaysni@holycross.edu>, Claudia Chierichini <cchieric@holycross.edu>, Cristi Rinklin <crinklin@holycross.edu>, Cynthia V. Hooper <chooper@holycross.edu>, Debra Gettelman <dgettelm@holycross.edu>, Ellen Lokos <elokos@holycross.edu>, Eric Fleury <efleury@holycross.edu>, Frances Maughan-Brown <fmaughan@holycross.edu>, Gary Senecal <gsenecal@holycross.edu>, James Welu <jwelu@holycross.edu>, Ji Hao <jhao@holycross.edu>, John B. Little <jlittle@holycross.edu>, Jonathan Mulrooney <jmulroon@holycross.edu>, Justin Poche <jpoche@holycross.edu>, Kendy M. Hess <khess@holycross.edu>, Kenneth Mills <kmills@holycross.edu>, Leah Cohen <lcohen@holycross.edu>, Mary Roche <mroche@holycross.edu>, Matthew Koss <mkoss@holycross.edu>, Matthew T. Eggemeier <meggemei@holycross.edu>, Michelle Mondoux <mmondoux@holycross.edu>, Morris Collins <mcollins@holycross.edu>, Munya Munochiveyi <mmunochi@holycross.edu>, Neal Lipsitz <nlipsitz@holycross.edu>, Sahar Bazzaz <sbazzaz@holycross.edu>, Sarah Luria <sluria@holycross.edu>, Sarah Petty <spetty@holycross.edu>, Scott Malia <smalia@holycross.edu>, Sharon M. Frechette <sfrechet@holycross.edu>, Shirish Korde <skorde@holycross.edu>, Stephanie Crist <scrist@holycross.edu>, Stephanie J. Reents <sreents@holycross.edu>, Teresa Fenichel <tfeniche@holycross.edu>, Tsitsi Masvawure <tmasvawu@holycross.edu>, Virginia Raguin <vraguin@holycross.edu>, Virginia Ryan <vryan@holycross.edu>

Dear Montserrat Faculty,

I am writing you this morning with a heavy and angry heart at the recent revelations of Chris Dustin's sexual misconduct case involving a student. I am especially concerned for you and our students in Montserrat who must feel, rightly so, deeply upset that Dustin was part of the program in the fall (he taught in the Natural World cluster ). I am also upset by this same reality, and I feel like all of us in Montserrat have been put in a difficult position by the process. This year's incoming class has been hit by one terrible event after another - from James Christie's assaults story to the report of assault for motivated bias to this - and I am sure many of them are feeling confused, angry, undervalued, and maybe even unsafe. This is totally unacceptable.

I want you all to know that I first heard of Dustin's demotion in the same email we all received in the fall. Still unaware of why he was demoted, I contacted the Dean's Office to inquire if he was still allowed to teach in Montserrat. I was told that the sanctions in place still allowed him to teach. Like you, I learned from the *Worcester Magazine* article last week that Dustin's case involved sexual misconduct with a student (thus my outrage). Since then, I have been in touch with Stephanie Reents, director of the Natural World cluster, and several faculty in that cluster to try to support them, including sharing the resources attached here that I gathered from Neal Lipsitz and Amit Taneja. I share these resources with you now as well and hope they offer some strategies for helping students in the coming days and weeks as conversations about this issue arise.

According to the letters from the AGC and the President yesterday, there will be opportunities moving forward for us to address collectively the policy and practice issues surrounding Title IX so that we do not find ourselves in this position again.

Finally, I want you to know that I am here if you need me. After nearly five years as Montserrat Director, I feel a deeply personal responsibility for the program and all of us --especially students -- in it and I am really shaken by what has happened.

Please let me know how I can be of help.

Stephanie

Stephanie E. Yuhl
Director, Montserrat Program
Professor, Department of History
College of the Holy Cross
1 College Street
Worcester, MA 01610
508-793-3003

Associate Faculty, Harvard Graduate School of Design
Author of *A Golden Haze of Memory: The Making of Historic Charleston*
at _https://www.amazon.com/Golden-Haze-Memory-Historic-Charleston/dp/0807855995_

*Pronouns: She, Her, Hers*

Show quoted text