UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER DUSTIN,<br><br>        Plaintiff,<br>v.<br><br>TRUSTEES OF THE COLLEGE OF THE HOLY CROSS, the COLLEGE OF THE HOLY CROSS and REV. PHILIP L. BOROUGHS, S.J., President of the College of the Holy Cross<br><br>        Defendants. | Case No. 4:21-cv-11108-MRG |

# PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Facts Established by the Pleadings*

1. Professor Dustin served as Professor in the Department of Philosophy at Holy Cross for over three decades, from his original appointment in 1991 until terminated in September of 2020. He achieved tenure status on March 10, 1997. AC[1] at ¶ 18

2. The Trustees of the College of the Holy Cross is a duly constituted Massachusetts body corporate pursuant to the provisions of Chapter 99 of the Acts of 1865. The corporation established and has since maintained a private, four-year, liberal arts college located in Worcester, Massachusetts known as the College of the Holy Cross (both the Trustees and the College are hereinafter referred to as "Holy Cross" or "the College"). AC at ¶ 15

---

[1] References to the Amended Complaint shall be denoted AC and is limited to Paragraphs admitted by the Defendants in their entirety Answer to the Amended Complaint

3. Professor Dustin received the Holy Cross Distinguished Teaching Award in 2004, an O'Leary Faculty Recognition Award in 2005, and achieved the capstone honor of appointment as the Dean of the Faculty of the College in February of 2017. AC at ¶ 20

4. There has never been an allegation of scholarly misconduct lodged against Professor Dustin at any time material to this action. AC at ¶ 27

5. The following individuals were employed by Holy Cross during times material to this action: Provost Margaret Freije; Title IX Director/Coordinator Tracy Kennedy; Deputy Title IX Coordinator Cheryl Rogers; Denielle Burl, Interim Title IX Coordinator; General Counsel Elizabeth Small; Professor Stephanie E. Yuhl and Professor Miles Cahill. AC at ¶ 31

6. Jane Doe[2] did not file a complaint against Mr. Dustin while she was a student at the College. AC at ¶ 39.

7. Provost Freije was investigated by a third-party law firm hired by the College in regard to her knowledge of, and response to, previous allegations of misconduct on the part of the Plaintiff. AC at 142

8. The students involved in the 2019 allegations against Mr. Dustin each graduated from the College. AC at ¶ 148.

9. Mr. Dustin began a Holy Cross-approved sabbatical leave for the spring semester of 2018-2019 on January 17, 2019. AC at ¶ 150. EX V.

10. Mr. Dustin was dismissed on September 4, 2020. AC at ¶ 200.

---

[2] By agreement of counsel, reference to former students in this case is by psudonym.

*Contractual Framework*

11. Upon achieving tenure, Mr. Dustin received a "Faculty Contract" from Holy Cross in which the College committed that his annual teaching contract would "be renewed on the same or better terms and conditions" each year; doing so while referencing only one other document in relation to tenure status – the Statutes of the Faculty (as amended from time to time)("the Statutes"), which are, by virtue of such reference, are an intrinsic part of the contract between the parties. (TAB 1 at Article Third).

12. The Statutes of the Faculty were approved by the College's Board of Trustees "to provide for the orderly pursuit of the objectives of the College of the Holy Cross as a Catholic institution of higher learning and to provide for effective Faculty participation in the formation of the academic policies of the College." (TAB 2 at p. 1 ¶ 1).

13. The Statutes define "the Faculty," (with the definitions effective as of the completion of a comprehensive review concluded by the College on August 4, 2009): "The faculty of the College consists of three groups: the teaching faculty, the administrative faculty and the directors of academic office who meet certain criteria defined below." (Id. at Chapter I, Section A, ¶ 1.)

14. The Statutes define the roles and obligations in the first three chapters, including duties and length of term when serving on Faculty and College Committees. (Id. at Chapter III)

15. The Statutes include a provision that "All members of the Committee on Faculty Affairs shall be trained to serve as appellate panelists under the College's discrimination and harassment policies, including, in particular, the Sexual Misconduct Policy. (EX B at Chapter III, Section A(3)(a) ¶ 2.)

16. The Statutes include a standard and a process for dismissal of a tenured faculty member,

found in Article VII.  There, it provides for dismissal of a tenured faculty member for: (1) serious neglect of academic duties, (2) serious violation of the College's policies on scholarly misconduct or harassment,  or (3) such public misconduct as disqualifies him or her from continued association with the College. (EX B at Article VII[A]).

17. In that same paragraph, the Statutes incorporate by reference the "College's discrimination and harassment policies, including the Sexual Misconduct Policy ("the Policy"). Id.

18. The Policy, like the Statutes, is therefore an intrinsic component of the contract between the parties.  Id.

19. The Statutes are divided into Chapters which carefully define and circumscribe the roles of faculty at the college.  Chapter I – The Structure of the Faculty – begins with a section captioned "Definition of the Faculty" that prescribes the various categories among faculty members.   The next four sections – grouped under "Structure of the Faculty" - provide for a process of election to the various Councils that serve to lead the faculty, along with other details that govern that service, such as length of term. (TAB 2 at pp. 3-5).

20. Chapter III contains a list of Faculty and College Committees, and includes provisions that "apply to all committees in the Chapter", while allowing for exceptions for particular committees. ( TAB 2 at Chapter III at pp. 1-2).

*The Sexual Misconduct Policy*

21. The College's Sexual Misconduct Policy is two pronged: It "defines prohibited conduct and the process by which the College will address such conduct in different

4

circumstances." It addresses each in specific sections: (i) "Definitions of Prohibited Conduct" and, (ii) "Process for Resolving Complaints of Sexual Misconduct." (TAB 3 at at p. 2, Section III.)

22. Article VI includes, in its first section, a provision covering "Privacy and Confidentiality: Treatment of Reported Information." There, it provides that the "College will act with discretion with regard to the privacy of individuals …when it receives a report of conduct that could trigger the Sexual Misconduct Policy." (TAB 3 at p. 12).

23. The commitment to privacy is repeated again in the "Additional Matters" section, where a separately-numbered paragraph, "Respect for Privacy" affirms the College's commitment to privacy. ( Id. at p. 34, Par. 9(c))

24. The "Definitions of Prohibited Conduct" are found in Article VII(A), where the conduct prohibited under the policy is defined and explained. Each definition includes a comprehensive explanation of how the conduct is defined under the Policy and what actions the policy prohibits/protects against. (TAB 3 at pp. 16-20).

25. The prohibited conduct defined under the Policy was: (i) Sex Discrimination, (ii) Sexual Harassment – either Quid Pro Quo Harassment or Inappropriate Environment Based on Sex, (iii) Other Inappropriate Sexual Behavior, (iv) Sexual Violence, (v) Other Inappropriate Sexual Contact, (vi) Sexual Exploitation, (vii) Stalking, (viii) Relationship Violence, (ix) Consent and Coercion, (x) Retaliation. (Id.).

26. The "Process" section is found at Article VII(B) where the College provides for everything from "Interim Measures" (VII[B][1]) to "Appeals" (VII[B][7]). (TAB 3 at pp. 20-33)

27. Section 1 addresses "Initial Steps; Interim Measures." The policy explains that the Title

IX Coordinator or designee begins the process by assessing "the need to take any immediate action to address the safety and health needs of the Complaining Party and the College community, and the next steps for investigating the reported conduct and the need for any interim measures." (Id. at p. 20, B[1] and p. 21, B[1][b]).

28. Section 1(a) next states that the Title IX Coordinator will "contact the Complaining Party …to meet to discuss the nature and circumstances of the reported conduct, review relevant documentation that is available and address the need for interim measures." (Id. at 1 (a)).

29. There are two options available to the Title IX coordinator after assessing the reported conduct under this process, found in Sections 1(e) and 1(f).  (Id.)

30. Section 1(e) provides that after review, if "the Title IX Coordinator determines the reported conduct could trigger the Sexual Misconduct Policy" then options for moving forward with an investigation are explained.  (Id. at 1(e)).

31. Section 1(f) covers the response options if "the reported conduct would not, in any way, trigger the Sexual Misconduct Policy" she will so advise the complaining party, and may report the conduct to "the appropriate administrator for handling…"  (Id. at 1(f)).

32. Section 3 covers the Investigation Phase.  (Id. at 22).

33. Section 3 (d) provides that an investigator will be designated "to conduct a prompt, fair and impartial investigation of the reported conduct and prepare a report of investigative findings." (Id. at 23).

34. Section 3(e) explains the "Nature of the Investigation."  The Policy provides that the complaining and responding parties will be interviewed separately, as will "any witnesses whom the Investigator(s) believe will provide necessary and relevant information." It also

provides for review of documentation or other items relevant to the reported conduct." (Id.).

35. Section 3(f) provides that information provided by the Complainant and the Respondent must be "provided to the Investigator during the Investigation Phase and without delay upon becoming aware of it." (Id. )

36. Section 3(g) provides that the Investigator "will not gather or consider information related to either Party's sexual history outside of the conduct in question except as relevant to the alleged policy violation…" (Id. ).

37. Section 4 defines "Content of the Investigative Report" and the process to be followed when the report is reviewed by the Determination Panel. (Id. at 24)

38. The Policy provides that "the Investigator will prepare an Investigative Report, which should include a summary of the factual information presented during the Investigative Phase and a separate section where the Investigator(s) point out relevant consistencies or inconsistencies …[the report] will not include a determination by the Investigator(s) as to whether a Party has violated the [Policy] … (Id. at Section 4[a]).

39. Once completed, the Policy provides for review of the report by the Parties. Each may prepare "written comments" which are then forwarded by the Title IX Coordinator to the Investigator(s) who "may determine that either additional investigation is required or no further investigation is needed. (Id. at pp. 24-25, Section 4[b])

40. The next step in convening a Determination Panel. Once the panel is convened, the Title IX Coordinator "will then submit the Investigative Report to the Determination Panel members…" (Id. at p. 25, Section 4[c]).

41. "The Determination Panel will make a determination as to whether or not the Responding

7

Party is responsible for violating the Sexual Misconduct Policy by having engaged in some or all of the reported conduct." (Id. at Section 4[d]).

42. Once the Panel completes its work and makes its determination, the Determination Panel's findings are provided to the Provost/Dean of the College, who "will determine an appropriate sanction(s). (Id. at p. 27, ¶ (a)(ii)).

*Jane Moe and Jane Doe Investigations*

43. The Jane Moe Panel issued an Outcome Determination, finding Mr. Dustin not responsible for the two violations presented for consideration: Sexual Harassment (Quid Pro Quo) and Sexual Harassment (Intimidating Hostile Environment). (TAB 12 at p. 1).

44. The panel specifically found "insufficient evidence …that the conduct described was believed to rise to the level of sexual misconduct at the time it occurred." (Id.)

45. Mr. Dustin was notified of additional allegations described in the March 1, 2019 email involved reports by two identified witnesses about activities they had observed prior to 2000; and "allegations shared by multiple persons with Margaret Freije," about a sexual relationship with a student, Jane Doe "during the student's enrollment in 1996." (TAB 14 at pp. 1-3)

46. The first witness, identified as "John Joe Witness" reportedly brough forth concerns about incidents "that allegedly took place on campus during 1994-1998." In the brief summary provided, John Joe, a male, recounted "offensive or obscene comments about a sexual dream about a female student…" with little more about the incident provided. His second allegation involved unwelcome gift giving to female students. (Id. at p. 1 at ¶ 3)

47. The notification does not make clear how John Joe is involved, and whether he is a

8

witness or a victim.  Id.

48. The second witness, identified as "John Boe Witness" reportedly brought forth concerns about incidents "that allegedly occurred while he was a student at the College from 1996-2000." (Id. at ¶¶ 5 et seq.)

49. The brief summary of the John Boe allegations "is that he witnessed you engage in inappropriate behavior of a sexual nature that was unwelcome …which occurred during a Schola engagement to sing mass for the Alumni Club in Washington D.C. during the 1996-97 academic year.  (Id. at p. 2, ¶ 1)

50. In an interview with a college investigator, Boe described one direct interaction with Dustin during which Boe recalls  "[Dustin] once took me aside and said I should do whatever Jim Christie ask me to do …because he can open doors for me."  Boe said he was not alone with Dustin at the time, leaving one to infer this was a conversation among multiple people; nothing further is said by Boe about the comment.  (TAB 15, p. 00534)

51. The notification does not make clear how John Joe is involved, and whether he is a witness or a victim.  Id.

52. In  August of 2017 Tracy Kennedy was the Interim Title IX Coordinator for the College.

53. On August 25, 2017, Ms. Kennedy, an attorney, prepared a memorandum to file for the Title IX office in which she outlined allegations of a relationship between Jane Doe and Dustin, and included her determination that (i) Jane Doe declined to participate in "the process" [a proposed Holy Cross investigation], (ii) Jane Doe indicated her interactions with Prof. Dustin were welcome and consensual, (iii) the "alumna graduated more than twenty years ago" and (iv) such relationships were not prohibited at that time.  "Therefore, it does not appear this would be an appropriate direction for this

investigation." (TAB 8)

54. When the Determination Panel issued its findings on January 20, 2020, it found Mr. Dustin not responsible for two chages of Harassment, but found him responsible for what it defined to be a "romantic relationship."  There is no finding as to duration of the relationship, and it is not characterized as sexual. (TAB 7)

55. In relation to his work at the College from the spring of 2017 until February 28, 2020, Chris Dustin received nothing but plaudits from the Dean of the College, Margaret Freije. (TABS 4, 5)

56.  Her February 28, 2017 appointment letter delivered to Dustin when he was named Dean of the Faculty recounted his distinguished service to the College over the course of his career.  (TAB 4)

57. Thereafter, for the next three academic years until the time of his termination, Mr. Dustin received appointment letters that concluded with the following final sentence:  "The Deans and I thank you for your work as a teacher, a mentor and a scholar and for the many ways you contribute to the work we do at the College."   (TAB 5)

58. Ms. Doe graduated from Holy Cross and went on to obtain a Masters from Brown University.  (TAB 9 at p. 13)

59. Ms. Doe served as a lecturer at her alma mater during the 2004 academic year and has served the last 14 years as a curator at a major Art Museum.

60. The College investigated claims made by former students of Dustin, Ms. Roe and Ms. Poe – and upon a finding of responsibility on some of the charges, leveled sanctions that included Mr. Dustin's return to the classroom with limitations.  (TAB 11)

61. Ms. Voe, an alumna of the Class of 2000, came forward on August 26, 2019 "not writing

to report a claim per se" but to explain that she found an invitation from Mr. Dustin to go bird watching on campus "very odd." She "didn't get a grade [she] felt that she deserved in [Dustin's] class, but never approached him because I felt awkward and decided that it wasn't a big deal." She went on to explain that "he never touched me nor did he make any sexually explicit comments to me." She characterized his actions as "weird and off…" concluding "I'm OK – so no worries about me." She closed with "I'm not looking for any sort of assistance from the College." (TAB 13)

## CERTIFICATION OF COMPLIANCE WITH RULE 7.1(a)(2)

Plaintiff's counsel hereby certifies that the parties have conferred in good faith in an effort to resolve or narrow the issues presented in this motion.

CHRISTOPHER DUSTIN,
By his attorney

*James S. Timmins*

James S. Timmins BBO # 547512
55 Willard Street
Quincy MA 02169
(617)376-0700
jtimmins@cronintimmins.com

DATED: May 22, 2023

## CERTIFICATE OF SERVICE

I, James S. Timmins, hereby certify that I have this day served this document via electronic filing and email on counsel of record for the defendants, whose current electronic addresses are known to me personally.

*James S. Timmins*
James S. Timmins BBO # 547512